1  MONICA Y. KIM (SBN 180139)
   LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
2  10250 Constellation Boulevard, Suite 1700
   Los Angeles, California 90067
3  Telephone: (310) 229-1234
   Facsimile:  (310) 229-1244
4  Email: myk@lnbyb.com
5
   Attorneys for Timothy J. Yoo, Chapter 11 Trustee
6
7              **UNITED STATES BANKRUPTCY COURT**
8              **CENTRAL DISTRICT OF CALIFORNIA**
9                 **LOS ANGELES DIVISION**
10

| In re | Case No. 2:18-11469-BB |
|---|---|
| RH BBQ, INC., | Chapter 11 |
|        Debtor. | **TRUSTEE'S MOTION FOR ENTRY OF AN ORDER: (A) APPROVING SALE OF BUSINESS FREE AND CLEAR OF ALL LIENS OR INTERESTS; (B) APPROVING OVERBID PROCEDURES; (C) APPROVING THE ASSUMPTION AND ASSIGNMENT OF REAL PROPERTY LEASE; AND (D) GRANTING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF TIMOTHY J. YOO IN SUPPORT THEREOF** |
| | **[Declarations Of Ryan Oh and David Choi and Request for Judicial Notice Filed Herewith]** |
| | DATE:  October 3, 2018<br>TIME:  10:00 a.m.<br>PLACE:  Courtroom "1539"<br>       255 E. Temple Street<br>       Los Angeles, California |

1

**PLEASE TAKE NOTICE** that a hearing will be held on October 3, 2018 at 10:00 a.m. before the Honorable Sheri Bluebond, United States Bankruptcy Judge, in her Courtroom "1539," located at 255 E. Temple St., Los Angeles, CA, to consider the motion filed by Timothy J. Yoo, the duly appointed Chapter 11 Trustee ("Trustee") for the bankruptcy estate ("Estate") of RH BBQ, Inc., the debtor herein ("Debtor"), hereby files his motion ("Motion") for entry of an order of the Court:

(A)    pursuant to 11 U.S.C. §§ 363(b) and (m), authorizing the Trustee to sell, free and clear of all liens and interests, all of the Estate's rights in and to the business being operated as "Red Castle 3," located at 18311 E. Colima Rd. Suite A, Rowland Heights, CA ("Business"), as more specifically described in that certain *Business Purchase Agreement and Joint Escrow Instructions* dated August 9, 2018 and all addendums, amendments and related agreements thereto (collectively, "BPA") between the Trustee and Kool Corner, Inc. ("Buyer"), true and correct copies of which are attached as **Exhibit "1"** to the Declaration of Timothy J. Yoo annexed hereto ("Yoo Declaration"), to the Buyer, or a successful overbidder, in accordance with the terms and conditions set forth in the BPA;

(B)    approving the overbid procedures set forth in this Motion ("Overbid Procedures");

(C)    pursuant to 11 U.S.C. § 365, (i) authorizing the Trustee to assume and assign to the Buyer, or a successful overbidder, the real property lease ("Lease") between the Debtor and JTNA Enterprises LLC ("Landlord") for the premises upon which the Business is located, a true and correct copy of which Lease is attached as **Exhibit "2"** to the Yoo Declaration, and (ii) establishing the cure amount payable under the Lease ("Cure Amount");

(D)    finding the Buyer (or the successful overbidder) as a good faith purchaser entitled to the protections of 11 U.S.C. § 363(m); and

(E)    waiving the 14-day stay periods set forth in Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") to enable the sale of the Property to close as quickly as possible.

1    The offer from the Buyer to purchase the Estate's right, title and interest in and to the

2    Lease and the Business, including the Estate's liquor license, all inventory, machinery,

3    equipment, fixtures, furniture and other personal property situated at the Business (collectively,

4    the "Property"), all in "as is, where is" condition, with no representation or warranty, but free

5    and clear of all liens and interests, is an all-cash offer for the sum of $580,000 ("Purchase

6    Price"). The Buyer has made a $20,000 deposit towards the Purchase Price, and the balance of

7    the Purchase Price will be due at closing. There are no contingencies to the sale other than the

8    entry of an order approving this Motion authorizing the sale of the Property free and clear of all

9    liens and claims and the assumption and assignment of the Lease, and approval of the transfer of

10    the Business liquor license from the Debtor to the Buyer (or winning overbidder) by the Alcohol

11    and Beverage Control ("ABC").  Closing is to occur immediately upon approval of the transfer

12    of the liquor license from the Debtor to the Buyer (or winning overbidder) by the ABC.  The

13    deposit is non-refundable and forfeited to the Estate if the Buyer (or winning overbidder) is

14    deemed to be the winning bidder for the Property and fails to timely consummate the sale of the

15    Property for any reason other than the dis-approval of the transfer of the liquor license from the

16    Debtor to the Buyer (or winning overbidder) by the ABC despite good faith, best efforts by the

17    Buyer (or winning overbidder) to obtain the transfer of the liquor license.

18    Pursuant to this Motion, the Trustee seeks authority to sell the Property to the Buyer,

19    subject to overbid, and in accordance with the terms and conditions set forth in the BPA.  The

20    sale of the Property to the Buyer (or winning overbidder) will be free and clear of all liens or

21    interests, with such liens or interests to attach to the proceeds of the sale to the same extent,

22    scope and priority as the pre-petition liens or interests. The Trustee also seeks Court approval of

23    the Overbid Procedures described in the Motion in connection with the proposed sale of the

24    Property, which the Trustee believes will maximize the price ultimately obtained for the Property

25    and still protect the Estate from parties who may wish to bid on the Property but who are

26    ultimately unable to consummate a purchase of the Property.  Since the Estate's interest in and to

27    the Lease is a critical component of the proposed sale of the Property, pursuant to this Motion,

28    the Trustee also seeks the entry of a Court order approving the assumption and assignment of the

Lease to the Buyer or a successful overbidder (and, to that end, establishing the Cure Amount required to be paid by the Trustee to assume the Lease at zero). The Trustee requests a finding that the Buyer (or the successful overbidder) is a good faith purchaser entitled to the protections of 11 U.S.C. § 363(m), and that the 14-day stay periods provided by Bankruptcy Rules 6004(h) and 6006(d) be waived to facilitate the closing of the sale of the Property as soon as possible after the entry of an order granting this Motion. Finally, the Trustee requests authority, but not the obligation, to pay the allowed and undisputed portion of the secured claim asserted by Hana Small Business Lending, Inc. ("Hana") which asserts a first-priority security interest and lien upon the Property from the proceeds of the sale of the Property. Other than the foregoing, no other disbursements of the sale proceeds will be made absent further order of this Court.

The Motion is based upon 11 U.S.C. §§ 363 and 365, Bankruptcy Rules 2002, 6004 and 6006, Local Bankruptcy Rules 2002 and 6004-1, the accompanying Memorandum of Points and Authorities, Yoo Declaration, the Declarations of Ryan Oh and David Choi, the entire record of the Debtor's bankruptcy case, the statements, arguments and representations of counsel to be made at the hearing on the Motion, and any other evidence properly presented to the Court at, or prior to, the hearing on the Motion.

**PLEASE TAKE FURTHER NOTICE** that pursuant to Local Bankruptcy Rule 9013-1(o), any opposition or objection to the relief requested in the Motion must be submitted in writing, served on counsel for the Trustee, and filed with the Bankruptcy Court not later than fourteen (14) days prior to the scheduled hearing date.

**WHEREFORE**, the Trustee respectfully requests that the Court enter an Order:

1.    finding that the notice given by the Trustee in connection with the sale of the Property and the hearing on the Motion is adequate, sufficient, proper and complies with all applicable provisions of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure;

2.    granting the Motion in its entirety;

3.    approving the Overbid Procedures;

4

4.      authorizing the Trustee to sell the Property to the Buyer (or to a successful overbidder), free and clear of all liens and interests and pursuant to the terms and conditions set forth in the BPA;

5.      approving the assumption and assignment of the Lease to the Buyer (or a successful overbidder), and establishing that the Cure Amount which must be paid in connection therewith is zero;

6.      authorizing the Trustee to execute and deliver, on behalf of the Estate, any and all documents that may be reasonably necessary to consummate the sale of the Property and the assignment of the Lease to the Buyer;

7.      finding that the Buyer (or the successful overbidder) is a good-faith buyer entitled to all of the protections afforded under 11 U.S.C. § 363(m); and

8.      waiving the 14-day stay periods set forth in Bankruptcy Rules 6004(h) and 6006(d); and

9.      authorizing, but not obligating, the Trustee to pay the undisputed secured claim of Hana; and

10.      granting such other and further relief as may be necessary or appropriate under the circumstances.

Dated: September 12, 2018          TIMOTHY J. YOO, CHAPTER 11 TRUSTEE

By: _/s/ Monica Y. Kim_
        MONICA Y. KIM
        LEVENE, NEALE, BENDER, YOO
          & BRILL L.L.P.
        Attorneys for Timothy J. Yoo,
        Chapter 11 Trustee

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## STATEMENT OF FACTS

**A.    Background.**

1.    RH BBQ, Inc., debtor herein ("Debtor"), commenced this case by filing a voluntary petition under chapter 11 of the Bankruptcy Code on February 9, 2018 ("Petition Date").  Following a hearing on April 6, 2018, the Court ordered the appointment of a chapter 11 trustee.

2.    The Debtor operates a Korean barbeque restaurant doing business as "Red Castle 3" ("Business") located at 18311 E. Colima Road, Suite A, Rowland Heights, California 91748. The Business is being operated at the premises pursuant to a Standard Retail/Multi-Tenant Lease - Net ("Lease") between the Debtor and JTNA Enterprises LLC ("Landlord").

3.    The Debtor is wholly owned by Young Keun Park ("Park") who also filed a Chapter 7 bankruptcy case concurrently with the Debtor. Like the Debtor's case, Park's case was converted to chapter 11 following a hearing on April 6, 2018, and Elissa Miller has been appointed to serve as the chapter 11 trustee of Park's case.

4.    In addition to the Debtor's "Red Castle 3" restaurant, Park owns: (i) Colima BBQ, Inc. ("Colima") which operates a Korean barbeque restaurant doing business as "Red Castle 1" located at 18751 E. Colima Road., Rowland Heights, California, and (ii) Onebada, Inc. ("Onebada") which operates a Korean barbeque restaurant doing business as "Bulgogi House" located at 6901 Walker Street, La Palma, California.  Both Colima and Onebada filed voluntary petitions under chapter 7 and chapter 11, respectively, of the Bankruptcy Code on January 6, 2018 and February 9, 2018.

5.    On or about April 11, 2018, the Office of the United States Trustee appointed Timothy J. Yoo ("Trustee"), to serve as the chapter 11 trustee for the cases of the Debtor, Colima, and Onebada.  After investigating and operating all of these businesses, the Trustee has determined that going concern sales of these restaurants would be the best means of monetizing the highest value of these estates' assets for the benefit of their creditors. In that regard, the

Trustee hired Coldwell Banker Commercial Wilshire Properties ("Coldwell Banker") to assist the estate in marketing and listing the Business for sale.

**B.      Marketing And Proposed Sale To Buyer.**

6.      The Business has been operating for approximately 5 years, and consists of approximately 4600 square feet of space with 57 BBQ tables and hoods. The communities of Rowland Heights and surrounding areas have a high number and concentration of Asian residents and businesses. By early June, 2018, the Trustee and his professionals were able to produce reasonably adequate financial data and due diligence materials to place the Business into the marketplace for sale.  Based on the historical financial performance of the Business and with the advice of Coldwell Banker, the Trustee listed the Business for sale at the selling price of $700,000.

7.      For several months, and as evidenced by the Declaration of Ryan Oh filed herewith, Coldwell Banker undertook extensive efforts to market and sell the Business for the highest price possible, including the following:

- •      Creating a complete marketing package featuring property/business description, location analysis, interior and exterior photos.

- •      Promoting and marketing the Business through the network of known and qualified business owners (the principal of Coldwell Banker, Ryan Oh, has been a business broker, consultant and leasing professional specializing in restaurants since 1989 and he has met and has had business transactions and dealings with a significant number of restaurant owners in Los Angeles and Orange County).

- •      Approaching national restaurant chains and businesses specializing in Asian/fusion cuisine (*e.g.,* Korean BBQ, Japanese BBQ, shabu-shabu) and promoting and marketing the Business for possible company-store and/or franchised units.

- •      Promoting and marketing the Business through a network of real estate/business brokers.

- Promoting and marketing the Business through the online real estate/business engines (BizBen, Costar (member only), Loopnet) as well as Korean media outlets which are popular within the Korean community (The Korea Times, Radio Korea).

- Showing the Business to all prospective buyers, accept and review all offers, and assist the Trustee in negotiating the highest possible price.

8. In addition, Coldwell Banker sent listing and financial information to more than 15 owners of large Asian/Korean restaurants in Los Angeles/Orange County areas, and engaged in meaningful discussions and/or showings with approximately 10-15 interested parties. These discussions and showings are ongoing.

9. The estate ultimately received one offer to purchase the Business for $580,000. In particular, On August 9, 2018, the Trustee received an all-cash offer of $580,000 ("Purchase Price") from Kool Korner, Inc. ("Buyer") to purchase all of the estate's rights in and to the Lease and the Business, including the estate's liquor license, all inventory, machinery, equipment, fixtures, furniture and other personal property situated at the Business (collectively, the "Property"), all in "as is, where is" condition, with no representation or warranty, but free and clear of all liens and interests.  The terms and conditions of the sale are set forth in the *Business Purchase Agreement and Joint Escrow Instructions,* dated August 9, 2018, and all addendums, amendments and related agreements thereto (collectively, "BPA"), true and correct copies of which are attached as **Exhibit 1** to the Declaration of Timothy J. Yoo ("Yoo Declaration") annexed hereto. A true and correct copy of the Lease is attached as **Exhibit 2** to the Yoo Declaration.

10. The Buyer has made a $20,000 deposit towards the Purchase Price, and the balance of the Purchase Price will be due at closing. There are no contingencies to the sale other than the entry of an order approving this Motion authorizing the sale of the Property free and clear of all liens and claims and the assumption and assignment of the Lease, and approval of the transfer of the Business liquor license from the Debtor to the Buyer (or winning overbidder) by the Alcohol and Beverage Control ("ABC").  Closing is to occur immediately upon approval of the transfer of the liquor license from the Debtor to the Buyer (or winning overbidder) by the

8

ABC. The deposit is non-refundable and forfeited to the estate if the Buyer (or winning overbidder) is deemed to be the winning bidder for the Property and fails to timely consummate the sale of the Property for any reason other than the dis-approval of the transfer of the liquor license from the Debtor to the Buyer (or winning overbidder) by the ABC despite good faith, best efforts by the Buyer (or winning overbidder) to obtain the transfer of the liquor license.

11.     The offer from the Buyer is the highest offer received by the estate after several months of marketing and after attempting to negotiate with the Buyer for a higher Purchase Price. As described below, the Trustee believes that the proposed sale of the Business to the Buyer (or winning overbidder) under the terms of the BPA could result in substantial net sale proceeds for the benefit of creditors.

12.     Subject to Court approval, the Trustee proposes to sell the estate's right, title and interest in and to the Property, as more particularly described in the BPA, all in "as is, where is" condition, with no representation or warranty, for cash in the sum of $580,000. The sale of the Property to the Buyer (or winning overbidder) will be free and clear of all liens and interests, with such liens or interests to attach to the proceeds of the sale to the same extent, scope and priority as the pre-petition liens or interests unless, as approved by the Court, the claim of any secured creditor asserting a lien is satisfied from the proceeds of the sale.

13.     The individual in control and management of the Buyer is David Choi. David Choi has provided evidence to the Trustee that he has the funds to deliver the balance of the Purchase Price to the estate upon closing. Concurrently herewith, the Trustee has also filed a Declaration of David Choi which evidences adequate assurance of future performance under the Lease by the Buyer.

14.     The Trustee proposes that the sale of the Property be subject to overbid, in accordance with the overbid procedures described below ("Overbid Procedures"), at an auction of the Property (the "Auction") to be conducted by the Trustee at the time of the hearing on this Motion ("Sale Hearing").  Therefore, pursuant to this Motion, the Trustee seeks Court approval of the Overbid Procedures, which the Trustee believes will maximize the price ultimately

obtained for the Property and still protect the estate from parties who may wish to bid on the Property but who are ultimately unable to consummate a purchase of the Property.

15.    Further, since the estate's interest in and to the Lease is a critical component of the proposed sale of the Property, pursuant to this Motion, the Trustee also seeks the entry of a Court order approving the assumption and assignment of the Lease to the Buyer or a successful overbidder, and, to that end, determining that the amount required to be paid by the Trustee to assume the Lease is the Cure Amount of $0. Since his appointment, the Trustee has remained current on all obligations under the Lease, and intends to remain current on all obligations under the Lease through the closing of the sale.  The Debtor's books and records reflect that the Debtor was current as to all obligations under the Lease prior to the Trustee's appointment. No proof of claim has been filed by the Landlord in this case. Therefore, the Cure Amount should be determined to be $0.

16.    Also, pursuant to this Motion, the Trustee requests that the Court make a finding that the Buyer (or the successful overbidder) is a good faith purchaser entitled to all of the protections afforded under 11 U.S.C. § 363(m), and that the 14-day stay periods provided by Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") be waived to facilitate the closing of the sale of the Property as soon as possible after the entry of an order granting this Motion.

**C.    <u>The Proposed Overbid Procedures</u>.**

17.    While the Trustee is prepared to consummate a sale of the Property to the Buyer, the Trustee is also interested in obtaining the maximum price for the Property.  Accordingly, the Trustee required that any sale of the Property be subject to better and higher bids.  However, in order to have an orderly auction process and to ensure that only qualified bids are received and considered, the Trustee is requiring that certain Overbid Procedures be implemented in connection with the sale of the Property.

18.    Based on the foregoing considerations, the Trustee seeks Court approval of the Overbid Procedures described below in connection with the proposed sale of the Property.

a.    ***<u>Overbid Requirements</u>.***  Any party interested in submitting an overbid for

the Property ("Overbid") must, not later than 12:00 p.m. (Pacific time) on September 28, 2018 ("Overbid Deadline"), deliver such Overbid in writing to counsel for the Trustee (Monica Y. Kim, Esq., Levene, Neale, Bender, Yoo & Brill L.L.P., 10250 Constellation Blvd., Suite 1700, Los Angeles, California 90067, Email: MYK@LNBYB.com, Facsimile: (310) 229-1244), in accordance with the requirements set forth below:

       i.      The purchase price for the Property in any Overbid must be in the sum of at least $585,000.00. Any Overbid must otherwise be on the same terms and conditions set forth in the BPA.

       ii.     Each party submitting an Overbid must, by the Overbid Deadline: (i) deliver a deposit in the sum of $20,000.00, in the form of a cashier's check to the Trustee, so that such deposit is actually received by the Overbid Deadline, (ii) deliver to counsel for the Trustee proof of committed funds available to the bidder sufficient to enable such bidder to consummate the sale of the Property, which proof shall be in the form of a letter of credit, loan commitment or other form acceptable to the Trustee in the Trustee's sole discretion, and (iii) information to demonstrate adequate assurance of future performance of the Lease by such bidder ("Adequate Assurance Information"), which information may include (but is not limited to) balance sheets and income statements for the last two years, federal income tax returns for the last two years, information regarding the bidder's experience in retail store operations, and identity of the management of the bidder and their qualifications. In the event that (i) the bidder fails to timely make the deposit, (ii) the bidder fails to timely provide proof of committed funds, (iii) the bidder fails to provide Adequate Assurance Information, or (iv) the Trustee determines, in his sole discretion, that the proof of funds provided to Trustee by a bidder is unacceptable, the Trustee may, at his sole discretion, disqualify such bidder from participating in Auction. In the event that the Trustee exercises his discretion and disqualifies a bidder from participating in the Auction, the Deposit made by such bidder (if any) shall be returned to the bidder.

b.      ***Bidding At Auction.***  If at least one qualified bidder who has submitted an Overbid appears at the Auction, the Trustee shall designate what he determines, in his reasonable judgment, to be the best and highest Overbid received for the Property to be the leading bid at the Auction.  Thereafter, the Trustee shall solicit better and higher bids for the Property, in bidding increments of at least $5,000.00, from the qualified bidders participating in the Auction (including the Buyer, if he chooses to participate) until the best and highest bid for the Property has been determined by the Trustee.  The qualified bidder who submits the second best/highest bid for the Property at the Auction shall be designated as the backup bidder, if such bidder consents to act as the backup bidder.

c.      ***Backup Bidder:***   In the event that Buyer or the successful overbidder cannot timely complete the purchase of the Property, the Trustee shall be authorized to proceed with the sale of the Property to the backup bidder without further notice, hearing or order of the Court.

d.      ***Closing of Sale and Forfeiture of Deposits:***  If the winning bidder fails to consummate the sale of the Property immediately upon approval of the transfer of the liquor license by the ABC, the winning bidder will be deemed to have forfeited his/her/its deposit unless the Court or the Trustee agrees to provide the winning bidder with an extension of time to close the sale. If the winning bidder fails to timely close and forfeits his/her/its deposit, the backup bidder (if any) will be notified and will then have the opportunity to seek the transfer of the estate's liquor license. If the backup bidder fails to consummate the sale of the Property immediately upon approval of the transfer of the liquor license by the ABC, the backup bidder will be deemed to have forfeited his/her/its deposit unless the Court or the Trustee agrees to provide such backup bidder with an extension of time to close the sale.  The deposit of the backup bidder will be retained by the Trustee following the conclusion of the Auction and will be returned to the backup bidder on the earlier to occur of (i) the closing by the winning bidder of his/her/its purchase of the Property or (ii) the failure of the backup bidder to close for any reason other than the dis-approval of the transfer of the liquor license from the Debtor to the

Buyer (or winning overbidder) by the ABC despite good faith, best efforts by the Buyer (or winning overbidder) to obtain the transfer of the liquor license.

**D.    Liens Asserted Against Property And Distributions From Sale Proceeds.**

19.    The Court established June 29, 2018 as the bar date for creditors to file proofs of claim in this case ("Bar Date"). A review of the Court's Claim Register reveals that there are four (4) creditors which assert security interests and liens upon the Property and timely filed proofs of claim. Each of these creditors, their respective proofs of claim, and their purported security interests and liens are described briefly below.

20.    Also as discussed below, by this Motion, the Trustee is seeking authority, but not the obligation, to pay the undisputed portion of the secured claim of Hana Small Business Lending, Inc., which has a first-priority security interest and lien upon the Property, upon the closing of the sale of the Property. The Trustee does not believe that it is appropriate or prudent for any other purported secured claims (including any disputed portion of Hana's secured claim) to be paid from the proceeds of the sale of the Property at closing absent further order of the Court, and all liens and interests of these creditors will attach to the proceeds of the sale to the same extent, scope and priority as the pre-petition liens or interests.  The dates of the recording of these creditors' UCC-1 financing statements are highlighted in bold below.

21.    Hana Small Business Lending, Inc. ("Hana").  Hana extended a secured loan to the Debtor in the principal amount of $240,000 on or about September 5, 2012 pursuant to a Business Loan Agreement, Note, Commercial Security Agreement and related agreements.[1] Hana recorded a UCC-1 financing statement that covers substantially all of the Debtor's assets with the California Secretary of State's Office on **September 7, 2012**.[2]  Hana also timely filed a proof of claim (Claim No. 4-1) on April 27, 2018 asserting a secured claim of $147,265.40 as of

---

[1] Hana also extended a small business loan to Colima, however, the loans are neither joint and several liabilities nor cross-guarantied or cross-collateralized. The loans appear to be independent and separate loans to the two debtors and borrowers.

[2] Hana also filed an amendment to its initial financing statement on December 24, 2012 adding the Debtor's liquor license and the proceeds therefrom as collateral, and a continuation statement was filed on July 27, 2017.

April 27, 2018, consisting of (i) principal of $131,686.81, (ii) interest of $3,005.35, (iii) late charges of $423.24, and (iv) attorney fees and costs of $12,150.[3]  These amounts will be verified by the Trustee, however, based on the Trustee's investigation, the Debtor does appear to have received this loan when it opened the Business. By this Motion, and only to the extent the Trustee agrees with the claim amount(s), the Trustee seeks authority, but not the obligation, to pay all undisputed portions of this case without further order of the Court with the parties reserving all of their rights and claims with respect to all disputed portions of the claim.

22.    Bank of Hope, successor to BBCN Bank ("Bank of Hope"). On or about September 27, 2013, Bank of Hope provided a construction loan to Onesan, LLC ("Onesan") and Onebada, as co-borrowers, in the original principal sum of $3,521,000. This loan enabled Onesan, as landlord, to purchase and/or build-out the premises upon which Onebada operates its "Bulgogi House" restaurant. The loan was secured by a first-priority mortgage upon the premises, and a first-priority security interest and lien upon the personal property of Onebada. However, the loan was also guarantied by Colima and the Debtor, and their respective guarantees were secured by substantially all assets of these debtors.  In that regard, Bank of Hope recorded a UCC-1 financing statement that covers substantially all of the Debtor's assets with the California Secretary of State's Office on **September 30, 2013**.  Bank of Hope also timely filed a proof of claim (Claim No. 11-1) on June 26, 2018 asserting a secured claim of approximately $3.5 million.[4]

23.    Park is the sole member of Onesan. The real estate owned by Onesan (which is now controlled by Elissa Miller as the Chapter 11 trustee of the Park bankruptcy estate) and the "Bulgogi House" restaurant operated by Onebada are currently listed for sale for $4.6 million (real estate), and $900,000 (restaurant), respectively. The proceeds therefrom are, therefore, extremely likely to be sufficient to satisfy the obligations of Onesan and Onebada, which are the

---

[3] A copy of Hana's proof of claim is attached as Exhibit A to the Request for Judicial Notice ("RJN") filed concurrently herewith.

[4] A copy of Bank of Hope's proof of claim is attached as Exhibit B to the RJN filed concurrently herewith.

primary and co-obligors of the loan to Bank of Hope. The Trustee is also informed that Onesan is current on the payment of its mortgage obligations to Bank of Hope. Given these facts, that Bank of Hope is adequately protected by the value of the real estate and the restaurant, that Onesan and Onebada are not in default of their loan obligations to Bank of Hope, and that the Debtor is a guarantor of the loan obligations, the Trustee submits that there is no basis for Bank of Hope to receive any of the proceeds from the sale of the Debtor's Property at closing absent further order of this Court. However, Bank of Hope's liens, if any, will attach to the proceeds of the sale to the same extent, scope and priority as the pre-petition liens or interests.

24.    <u>Quentin Meats ("Quentin").</u> Quentin was a supplier of meats to the Debtor. Quentin recorded a UCC-1 financing statement that covers substantially all of the Debtor's assets with the California Secretary of State's Office on **March 24, 2017**. Quentin also timely filed a proof of claim (Claim No. 14-1) on June 27, 2018 asserting a secured claim of approximately $325,232.49 for "goods sold/supplied" and later an amended proof of claim (Claim No. 14-2) on August 22, 2018 asserting a secured claim of approximately $429,170.92 for "goods sold/supplied."[5] The proofs of claim also states that Quentin is entitled to 10% interest because the credit application requires the Debtor to pay interest of 10% per annum and all reasonable expenses, including attorneys' fees, of Quentin.

25.    The Trustee intends to file an objection as to the amount and secured status of Quentin's proof of claim 14-2. *As to the amount*, the Trustee will need to independently verify receipt of the goods and the alleged nonpayment of the goods. The proof of claim also attaches a Holding Escrow Instructions document which purports to show that Quentin advanced $250,000 to pay for property taxes owed by Onesan and an entity known as Rapid Advance, but for which the escrow officer recorded UCC-1 financing statements against the Debtor, Colima, and Onebada. It is unclear if the amount of the claim is based solely on the unpaid bills or also includes the $250,000 that was apparently advanced to pay for obligations unrelated to the Debtor. *As to the lien*, there is no evidence in the proof of claim that the Debtor granted to

---

[5] A copy of Quentin's amended Proof of Claim 14-2 is attached as <u>Exhibit C</u> to the RJN filed concurrently herewith.

Quentin a security interest and lien upon its assets to secure any indebtedness resulting from the sale of goods to Quentin.  Under California's Commercial Code, Article 9 provisions, absent any express "granting" of a security interest or lien upon the Debtor's assets, Quentin's alleged lien is defective, and the Trustee's objection to Quentin's proof of claim will fully address this point.

26.    In addition to the Trustee's objection to Quentin's secured claim, any lien asserted by Quentin against this estate's assets is junior in priority to the lien asserted by Bank of Hope which is not receiving any proceeds from the sale of the Property. Therefore, any payment to Quentin on its disputed secured claim is unwarranted at this time. However, Quentin's liens, if any, will attach to the proceeds of the sale to the same extent, scope and priority as the pre-petition liens or interests.

27.    <u>Timberland Bank ("Timberland").</u>  Timberland filed a proof of claim (Claim 5-2) on May 9, 2018 asserting a total claim of $175,551.93, of which $25,000 is claimed to be "secured."[6] Attached to this proof of claim is a supplement which states that the claim is secured because Timberland recorded a UCC-1 financing statement that covers substantially all of the Debtor's assets with the California Secretary of State's Office on **December 28, 2017** which was within the 90 days prior to the Petition Date. Also attached to the proof of claim is: (i) a Merchant Agreement executed by the parties on April 18, 2017 (by Debtor) and April 19, 2017 (by Timberland) pursuant to which Timberland purportedly gave the Debtor a loan for $135,000, and (ii) a Merchant Agreement Guaranty Guarantor executed by the Debtor pursuant to which the Debtor purportedly guarantied the repayment of the loans of Colima to Timberland pursuant to a separate Merchant Agreement between Colima and Timberland dated June 19, 2017.

28.    The Trustee is investigating Timberland's proof of claim to verify, among other things, whether the proceeds of the loan was actually received and used by the Debtor. The books and records of the Debtor, Colima and Onebada, as well as other documents and information, show that Park may have transferred funds of these businesses to himself or other entities without proper reason or authorization. Moreover, Timberland's proof of claim indicates

---

[6] A copy of Timberland's proof of claim is attached as <u>Exhibit D</u> to the RJN filed concurrently herewith.

that it recorded its UCC-1 financing statement more than 8 months after the loan agreement was signed between the parties. Thus, any lien or claim asserted by Timberland may be avoidable and recoverable as a preference or fraudulent transfer.

29.     In any event, any lien asserted by Timberland against this estate's assets is junior in priority to the liens asserted by Bank of Hope and Quentin which are not receiving any proceeds from the sale of the Property. Therefore, any payment to Timberland on its disputed secured claim is unwarranted at this time. However, Timberland's liens, if any, will attach to the proceeds of the sale to the same extent, scope and priority as the pre-petition liens or interests.

30.     Moreover, it is the Trustee's belief that Bank of Hope, Quentin Meats, nor Timberland Bank do not have perfected or enforceable liens upon the estate's leasehold rights and liquor license; therefore, in connection with the continued investigation and objection to the allowance and/or payment of the secured claims asserted by these creditors, the estate reserves its rights fully to argue that the scope of their purported liens do not extend to the proceeds of these assets.

31.     In summary, other than the authority, but not the obligation, to pay the undisputed portion of the secured claim of Hana upon the closing of the sale of the Property, the Trustee is not seeking to disburse the proceeds from the sale of the Property absent further order of the Court.  All liens and interests of these creditors (including as to the disputed portion of Hana's claim) will attach to the proceeds of the sale to the same extent, scope and priority as the pre-petition liens or interests.

## II.

## GOOD CAUSE EXISTS TO APPROVE THE PROPOSED
## OVERBID PROCEDURES

Bankruptcy Rules 2002 and 6004 govern the scope of the notice to be provided in the event a trustee elects to sell property of the estate under 11 U.S.C. § 363; however, with respect to the procedures to be adopted in conducting a sale outside the ordinary course, Bankruptcy Rule 6004 provides only that such sale may be by private sale or public auction, and requires

only that the trustee provide an itemized list of the property sold together with the prices received upon consummation of the sale. Fed. R. Bankr. Proc. 6004(f).

Neither the Bankruptcy Code nor the Bankruptcy Rules contain specific provisions with respect to the procedures to be employed by a trustee in conducting a public or private sale. Nonetheless, as one Court has stated, "[i]t is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate." *In re Atlanta Packaging Products, Inc.*, 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988).   Additionally, courts have long recognized the need for competitive bidding at hearings on private sales; "[c]ompetitive bidding yields higher offers and thus benefits the estate.   Therefore, the objective is 'to maximize bidding, not restrict it.'" *Id.*

The Trustee believes that the proposed Overbid Procedures will maximize the price ultimately obtained for the Property while still protecting the estate from parties who may wish to bid on the Property but who are ultimately unable to consummate a purchase of the Property. The Overbid Procedures serve numerous legitimate purposes.   Among other things, the Overbid Procedures will (i) foster competitive bidding among any serious potential purchasers; (ii) eliminate from consideration purchasers who would waste the estate's time because they would not have the financial ability to consummate a purchase of the Property; and (iii) ensure that the highest possible price is obtained for the Property. Accordingly, the Trustee submits that approval of the proposed Overbid Procedures is in the best interests of the estate and creditors.

 Local Bankruptcy Rule 6004-1 provides that a hearing on a motion to establish procedures for the sale of assets may be scheduled on not less than seven (7) days' notice.   The notice must describe the proposed procedures, describe the purchase agreement, describe the prior marketing effort and provide that opposition may be filed on or before one (1) day prior to the hearing.   LBR 6004-1(b)(2).   A notice of this Motion ("Notice"), which complies with Local Bankruptcy Rule 6004-1(b)(2), is being served on the Debtor, all of the Debtor's creditors, all parties requesting special notice, and the Office of the United States Trustee, via first-class mail. Notwithstanding the provisions of Local Bankruptcy Rule 6004-1, which allow a hearing on a

bidding procedures motion to be scheduled on notice of only seven (7) days, the Trustee is filing and serving the Notice and the Motion with at least twenty-one (21) days' notice before the Sale Hearing.

**III.**

**THE TRUSTEE SHOULD BE PERMITTED TO ASSUME AND ASSIGN THE**

**DEBTOR'S REAL PROPERTY LEASE**

11 U.S.C. § 365(b)(1) sets forth the requirements for assuming an unexpired lease of the debtor.  Specifically, Section 365(b)(1) requires that, if there has been a default in an unexpired lease of the debtor, the trustee must, at the time of assumption of such lease: (A) cure, or provide adequate assurance that the trustee will promptly cure, such default, (B) compensate, or provide adequate assurance that the trustee will promptly compensate, the non-debtor party to such lease, for any actual pecuniary loss to such party resulting from such default, and (C) provide adequate assurance of future performance under the lease.

11 U.S.C. § 365(f)(2) permits a trustee to assign an unexpired lease of the debtor, provided that the trustee first assumes such unexpired lease, in accordance with Bankruptcy Code Section 365(b)(1), and provides adequate assurance of future performance by the assignee of such lease.

As discussed in detail below, the Trustee believes that all of the requirements under 11 U.S.C. §§ 365(b)(1) and 365(f)(2) for the assumption and assignment of the Lease have been or will be satisfied in this case.

1.    Prompt Payment of the Cure Amount.

Since his appointment, the Trustee has remained current on all obligations under the Lease, and intends to remain current on all obligations under the Lease through the closing of the sale.  The Debtor's books and records reflect that the Debtor was current as to all obligations under the Lease prior to the Trustee's appointment. No proof of claim has been filed by the Landlord in this case.

As discussed above, the Trustee believes that the Cure Amount – *i.e.*, the total amount required to be paid to the Landlord to cure the Debtor's defaults under the Lease – is $0.

2.    <u>Compensation For Actual Pecuniary Loss</u>.

The Trustee submits that the Landlord has suffered no "actual pecuniary loss" from any alleged default under the Lease, including monetary defaults since there is no Cure Amount due to the Landlord.

3.    <u>Adequate Assurance Of Future Performance Under The Lease</u>.

The Bankruptcy Code does not define the term "adequate assurance of future performance." "[T]he term was intended to be given a practical, pragmatic construction in light of the facts of each case. *In re Sapolin Paints, Inc.*, 5 B.R. 412, 420-21 (Bankr. E.D.N.Y. 1980). As designed by Congress, it does not mean absolute insurance that the debtor will thrive and make a profit. *In re Alipat, Inc.*, 36 B.R. 274, 278 (Bankr. E.D. Mo. 1984). Regarding a lease covenant to pay rent, the test is simply whether it appears that the rent will be paid and other obligations thereunder met. *See In re Evelyn Byrnes, Inc.*, 32 B.R. 825, 829 (Bankr. S.D.N.Y. 1983; *In re U.L. Radio Corp.*, 19 B.R. 537 (Bankr. S.D.N.Y. 1982). A guaranty is not required." *In re Natco Industries, Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985); *see also, In re Sunrise Restaurants, Inc.* 135 B.R. 149 (Bankr. M.D. Fla 1991) (mere existence of some "lingering doubts" of future performance not sufficient to prohibit assumption of lease where denying assumption motion "would certainly do nothing but visit drastic economic consequences and doom on the entire estate, the secured parties as well as the unsecured [creditors] . . . .").

The policy underlying adequate assurance of future performance is to preserve the "benefit of the bargain" reached between the parties at the time the contract or lease was executed. Section 365(b)(1) "affords no relief to a landlord simply because it might have the opportunity to rent the premises to others at a higher base or percentage rent and would otherwise seek to escape the bargain it made." *See, In re Natco Industries, Inc.*, 54 B.R. at 440. All that is required under Section 365(b)(1)(C) is assurance that the non-debtor party receives the same assurances it had when the contract was executed. *Id.* ("Section 365 gives no indication that a landlord . . . is to improve its position upon the bankruptcy of a tenant.").

Concurrently herewith, the Trustee has filed the Declaration of David Choi, the principal

of the Buyer, which evidences adequate assurance of future performance by the Buyer under the Lease. The Trustee submits that the Landlord will be in a better (or at least equal) position with the Buyer in place as the tenant under the Lease than the Landlord was at the time it entered into the original Lease agreement with the Debtor.  In contrast to the Debtor, which is now in bankruptcy, and the Debtor's owner who is also in bankruptcy and no longer in control or possession of the Business, the Buyer is a business controlled and managed by a successful business person who is well funded and represents a far better credit risk than the Debtor.

In the event a successful overbidder is the prevailing purchaser of the Property, the Trustee will submit evidence to demonstrate adequate assurance of the overbidder's future performance under the Lease.

Based on the foregoing, the Trustee submits that he has complied, or will be able to comply, with the elements of 11 U.S.C. §§ 365(b)(1) and 365(f)(2) to assume the Lease and assign the Lease to the Buyer (or a successful overbidder).

**IV.**

## THE PROPOSED SALE IS IN THE BEST INTERESTS OF THE ESTATE

**A.**    **The Trustee Has Complied With All Applicable Notice Requirements.**

Section 363(b)(1) provides that the Trustee, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Section 102(1) defines "after notice and a hearing" as after such notice as is appropriate in the particular circumstances, and such opportunity for hearing as is appropriate in the particular circumstances.  11 U.S.C. § 102(1)(A).

Bankruptcy Rule 6004(a) provides, in pertinent part, that notice of a proposed sale not in the ordinary course of business must be given pursuant to Bankruptcy Rules 2002(a)(2), (c)(1), (i) and (k), and, if applicable, in accordance with section 363(b)(2) of the Bankruptcy Code. Fed. R. Bankr. P. 6004(a).  Bankruptcy Rule 2002(a)(2) requires at least 21 days' notice by mail of a proposed sale of property of the estate other than in the ordinary course of business, unless the Court for cause shown shortens the time or directs another method of giving notice.  Fed. R. Bankr. P. 2002(a)(2).  Bankruptcy Rule 2002(c)(1) requires that the notice of a proposed sale

include the date, time and place of any public sale, the terms and conditions of any private sale, and the time fixed for filing objections.  It also provides that the notice of sale or property is sufficient if it generally describes the property.  Fed. R. Bankr. P. 2002(c)(1).  Bankruptcy Rule 2002(k) requires that the notice be given to the United States Trustee.  Fed. R. Bankr. P. 2002(k).

In addition, Local Bankruptcy Rule 6004-1 requires that the Notice contain the information specified in Local Bankruptcy Rule 6004-1(c)(3) and that an additional copy of the Notice be submitted to the Clerk of the Bankruptcy Court together with a Form 6004-2 at the time of filing for purposes of publication.  L.B.R. 6004-1(c)(3) and (f).

The Trustee has complied with all of the above provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules.  The Trustee has complied with Bankruptcy Rules 6004(a) and 2002(a)(2), (c)(1), (i) and (k), as well as Local Bankruptcy Rule 6004-1(c)(3), because the Notice of the Motion that has been filed contemporaneously herewith includes all of the required information, including, without limitation, the date, time and place of the Auction and Sale Hearing and the deadline for objecting to this Motion, and has been served on the Office of the United States Trustee, the Debtor, all of the Debtor's known creditors, and all parties requesting special notice.  The Trustee has also complied with the requirements of Local Bankruptcy Rule 6004-1(f) because the Trustee has filed the Notice and Form 6004-2 with the Clerk of the Bankruptcy Court for purposes of publication.

**B.**     **The Sale Of The Property Should Be Approved Because Good Business Reasons Exist, The Purchase Price For The Property Is Fair And Reasonable, And The Proposed Sale Is In The Best Interests Of The Estate And Creditors.**

As a general matter, a Court considering a motion to approve a sale under Bankruptcy Code Section 363(b) should determine from the evidence presented before it that a "good business reason" exists to grant such a motion.  *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983).  In addition, the Court must further find it is in the best interest of the estate.  To make this determination, a Court should consider whether:

(1)     the sale is fair and reasonable, *i.e.*, the price to be paid is

adequate;

(2)     the property has been given adequate marketing;

(3)     the sale is in good faith, *i.e.*, there is an absence of any

lucrative deals with insiders, and

(4)     adequate notice has been provided to creditors.

*In re Wilde Horse Enterprises, Inc.,* 136 B.R. 830, 841-2 (Bankr. C.D. Cal. 1991); *In re The Landing*, 156 B.R. 246, 249 (Bankr. E.D. Mo. 1993); *In re Mama's Original Foods, Inc.,* 234 B.R. 500, 502-505 (C.D. Cal. 1999).   The Trustee submits that the proposed sale of the Property, pursuant to the terms of the BPA, satisfies each of these requirements.

1.     Sound Business Purpose.

The Ninth Circuit Bankruptcy Appellate Panel in *Walter v. Sunwest Bank (In re Walter)*, 83 B.R. 14, 19 (9th Cir. B.A.P. 1988) has adopted a flexible case-by-case test to determine whether the business purpose for a proposed sale justifies disposition of property of the estate under Section 363(b).   The facts pertaining to the sale at issue here amply substantiate the Trustee's business decision that the contemplated sale of the Property, pursuant to the terms of the BPA, serves the best interests of the estate and merits the approval of this Court.

If the Trustee is successful in objecting to the secured claims of Quentin and Timberland, and the Bank of Hope's claim is satisfied by the loan's primary, co-obligors, Onesan and Onebada, the proposed sale of the Property to the Buyer could result in net sale proceeds in excess of $400,000, which will result in a recovery for the Debtor's creditors. On the other hand, if the Trustee is not able to consummate a sale of the Property to the Buyer (or a successful overbidder) as proposed herein, the Trustee will be faced with the choice of having to either (i) immediately close the Business, reject the Lease to avoid incurring additional administrative expenses, and liquidate the remaining assets of the estate which his comprised primarily of minimal inventory, furniture and equipment, and a liquor license, or (ii) continue to operate the Business with the assistance of his internal and external team of managers, and propose a plan of reorganization, the recovery under which is likely to be nominal and speculative and take place over a very long period of time.   Under both of these scenarios, the Trustee believes that

creditors will receive far less value and recovery than what they could obtain through a going concern sale of the Property and the Trustee's pursuit of objections to the secured claims which will unencumber the proceeds of the sale.  Moreover, given the administrative costs incurred by the Trustee to date to operate the Business and negotiate and seek Court approval of the proposed sale of the Property (among other required administrative tasks), without a successful sale of the Property, it is almost assured that the estate will be administratively insolvent.

Based on the foregoing, the Trustee submits that the proposed sale of the Property is in the best interests of the estate and therefore represents a sound exercise of the Trustee's business judgment.

2.    Fair and Reasonable Price.

In order for a sale to be approved under Bankruptcy Code Section 363(b), the purchase price must be fair and reasonable.  *See generally, In re Canyon Partnership*, 55 B.R. 520 (Bankr. S.D. Cal. 1985).  The trustee is given substantial discretion in this regard.  *Id.*  In addition, Courts have broad discretion with respect to matters under section 363(b).  *See Big Shanty Land Corp. v. Comer Properties, Inc.*, 61 B.R. 272, 278 (Bankr. N.D. Ga. 1985).  In any sale of estate assets, the ultimate purpose is to obtain the highest price for the property sold.  *Wilde Horse Enterprises, Inc.*, 136 B.R. at 841 (*citing In re Chung King, Inc.*, 753 F.2d 547 (7th Cir. 1985)), *In re Alpha Industries, Inc.*, 84 B.R. 703, 705 (Bankr. Mont. 1988).

Although the Purchase Price is lower than the listing price, the Trustee believes that the Purchase Price is fair and reasonable under the current circumstances and the highest offer received by the Trustee after several months of extensive marketing efforts by Coldwell Banker and after attempting to negotiate with the Buyer for a higher Purchase Price. Moreover, the Overbid Procedures and Auction process proposed to be implemented by the Trustee is specifically designed to ensure that the highest price possible is obtained for Property. Although the Trustee will not know the results of the Auction (if one is conducted) until the Auction has been completed, the Trustee submits that the highest and best bid obtained for the Property (whether it is the current bid offered by the Buyer or an overbid submitted by a successful

overbidder, including potentially the Debtors) will constitute fair and reasonable value for the Property.

3.    Adequate Marketing.

Coldwell Banker and its principal, Ryan Oh, were hired because of their extensive experience and success leasing retail space and selling businesses, especially businesses that cater to the Korean-American clientele. Mr. Oh has almost 30 years of experience as a business broker, consultant and leasing professional specializing in restaurants and has extensive network and experience in the business space and locations occupied by the Debtor.  As detailed above, Mr. Oh undertook and launched massive efforts to market and advertise the Business through a variety of platforms. Moreover, in an effort to maximize the value obtained for the Property, the Trustee is inviting overbids for the Property, in accordance with the proposed Overbid Procedures.  Therefore, the Trustee respectfully submits that the Property has been, or will be, adequately marketed.

4.    Good Faith.

When a Bankruptcy Court authorizes a sale of assets pursuant to Bankruptcy Code Section 363(b)(1), it is required to make a finding with respect to the "good faith" of the purchaser.  *In re Abbotts Dairies*, 788 F.2d at 149.  Such a procedure ensures that Section 363(b)(1) will not be employed to circumvent creditor protections.  *Id.* at 150.  With respect to the Trustee's conduct in conjunction with the sale of the Property, the good faith requirement focuses principally on whether there is any evidence of "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Abbotts Dairies*, 788 F.2d at 147; *Wilde Horse Enterprises*, 136 B.R. at 842.

The Trustee and the Buyer have negotiated the terms of the proposed sale of the Property, as set forth in the BPA, at arms' length and in good faith.  The Buyer has no affiliation with the Debtor or the Trustee and is not an "insider" of either of the Debtor as that term is defined in 11 U.S.C. § 101(31).  The Trustee submits that there has been no fraud or collusion in connection with the proposed sale of the Property.  No offer to purchase the Property received by the Trustee has been ignored, and the Trustee has taken reasonable steps to try to obtain the

highest price possible for the Property.  Based on the foregoing, the Trustee submits that the good faith requirement has been satisfied.

     5.   <u>Accurate and Reasonable Notice.</u>

The purpose of the notice is to provide an opportunity for objections and hearing before the Court if there are objections.  *In re Karpe*, 84 B.R. 926, 930 (Bankr. M.D.Pa. 1988).  A notice is sufficient if it includes the terms and conditions of the sale and if it states the time for filing objections.  *Id.*

As set forth in detail in Section IV.A of this Motion, the Trustee has complied with all of the applicable notice provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules.  Thus, the Trustee submits that the notice of the Motion (and proposed sale of the Property) should be deemed adequate, accurate and reasonable by the Court.

V.

## SALE OF THE PROPERTY CAN BE FREE AND CLEAR OF ANY AND ALL LIENS

Section 363(f) of the Bankruptcy Code provides, in relevant part, as follows:

The trustee may sell property under subsection (b) . . . of this section free and clear of any interest in such property of an entity other than the estate, only if—

> (1) applicable non-bankruptcy law permits the sale of such property free and clear of such interest; ...
> (2) such entity consents;
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
> (4) Such interest is in bona fide dispute; or
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

Section 363(f) of the Bankruptcy Code was drafted in the disjunctive.  Thus, the Trustee need only meet the provisions of one of the five subsections of section 363(f) in order for a sale of property to be free and clear of all liens, claims and interests. The Trustee submits that one or more of the tests of Bankruptcy Code section 363(f) are clearly satisfied with respect to his proposed sale of the Property to the Buyer free and clear of all liens, claims and interests.

     1.   **The Trustee's Proposed Sale is Permissible Pursuant to 11 U.S.C. Section**

**363(f)(4).**

Section 363(f)(4) of the Bankruptcy Code authorizes a sale to be free and clear of an interest if such interest is in bona-fide dispute. Here, the liens of Quentin and Timberland may be invalid, or undersecured by the value of the Property. Thus, they are in serious bona-fide dispute, as described in the Motion. The Trustee will attempt to resolve these disputes before the hearing on the Motion; however, if he cannot, he anticipates filing objections to the secured claims asserted by these parties.

> **2.** **The Debtors' Proposed Sale is Permissible Pursuant to 11 U.S.C. Section 363(f)(5).**

Section 363(f)(5) of the bankruptcy code permits a sale of property free and clear of liens and interests if "such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." 11 U.S.C. § 363(f)(5). Pursuant to 11 U.S.C. §363(f)(5), a trustee may sell property free and clear of any interest if the holder of that interest "could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." 11 U.S.C. § 363(f)(5); *P.K.R. Convalescent Centers, Inc. v. Commonwealth of Virginia, Dep't of Medical Assistance Serv. (In re P.K.R. Convalescent Centers, Inc.),* 189 B.R. 90 (Bankr. E.D. Va. 1995) (allowing sale of nursing home assets under section 363(f)(5) over objection of the Department of Medical Assistance Service where its interest was reducible to a claim and subject to a hypothetical money satisfaction).

Section 363(f)(5) has generally been interpreted to mean that if, under applicable law, the holder of the lien or interest could be compelled to accept payment in exchange for its interest, the trustee (or debtor-in-possession) may take advantage of that right by replacing the holder's lien or interest with a payment or other adequate protection. Collier on Bankruptcy, ¶ 363.06 [6] (15th ed. rev. 2003) ("Collier"). Applicable nonbankruptcy law may recognize a monetary satisfaction when the lien holder is to be paid in full out of the proceeds of the sale or otherwise. Id. Thus, for example, a sale free of a first mortgage might be approved when the proceeds are sufficient to pay in full the first mortgage and the second mortgagee has consented to the sale.

However, section 363(f)(5) does not require full payment to the lien or interest holder if

the trustee can demonstrate the existence of another legal or equitable proceeding by which the holder may be compelled to accept less than full satisfaction of the secured debt. In re Grand Slam U.S.A., Inc., 178 B.R. 460, 461-62 (E.D. Mich. 1995) (holding that the "money satisfaction" language in section 363(f)(5) does not require full payment to the lien holder); In re Healthco Int'l Inc., 174 B.R. 174, 176-78 (Bankr. D. Mass. 1994) (construing "money satisfaction of such interest" to mean a payment constituting less than full payment of the underlying debt because any lien can always be discharged by full payment of the underlying debt pursuant to section 363(f)(3)); Scherer v. Federal National Mortgage Association (In re Terrace Chalet Apartments, Ltd.), 159 B.R. 821, 829 (Bankr. N.D. Ill. 1993).

Courts have held that chapter 11 cramdown is a typical "legal proceeding" by which an entity may be compelled to accept less than full money satisfaction and which will permit the sale of creditor's collateral free and clear of interest under section 363(f)(5). In re Gulf States Steel, Inc. of Alabama, 285 B.R. 497, 508 (Bankr. N.D. Ala. 2002)(holding that the liens or interests identified in the sale motion could be compelled to accept a money satisfaction in a cram down plan of reorganization in a chapter 11 case); Scherer v. Federal National Mortgage Association (In re Terrace Chalet Apartments, LTD.), 159 B.R. at 829 (finding that section 1129(b)(2) cram down is such a provision); In re Perroncello, 170 B.R. 189 (Bankr. D. Mass. 1994); Collier ¶ 363.06[6][a]. Thus, the trustee can sell property free and clear of a creditor's lien it if demonstrates it can cram down the creditor's interest pursuant to § 1129(b)(2).

Likewise, the holder of a tax lien that would be subordinated under section 724 can be compelled to accept less than full payment. In re Grand Slam U.S.A., Inc., 178 B.R. at 461-62 (holding that § 724(b)(2) is applicable for purposes of § 363(f)(5) because it creates a mechanism by which lien creditors are compelled to receive less than full payment of their interest); In re Healthco Int'l Inc., 174 B.R. 174, 176-78 (Bankr. D. Mass. 1994)(concluding that a trustee may sell property pursuant to section 363(f)(5) free of the county's tax lien lien); Collier, ¶ 363.06[6][a].

In addition to the legal arguments set forth above, the ability of a debtor to "cram-down" a secured creditor under 11 U.S.C. Sec. 1129(b)(1) and (2) also constitutes a "legal proceeding"

28

pursuant to which a secured creditor could be compelled to accept a money satisfaction. *See, In re Grand Slam, U.S.A. Inc.,* 178 B.R. 460, 462 (E.D. Mich. 1995); 11 U.S.C. Sec.1129(b)(2)(A).

Section 1129(b)(2)(A) allows cram-down of a secured creditor, provided that it receives "the indubitable equivalent" of its claim. A debtor can cram down a secured creditor if it demonstrates (1) the debtor is not unfairly discriminating against the secured creditor, 11 U.S.C. § 1129(b)(1); (2) it is acting in good faith, 11 U.S.C. § 1129(a)(3)-(b)(1); and (3) the secured creditor is receiving the actual value of its claim. 11 U.S.C. § 1129(b)(2)(A)(i)(II), 11 U.S.C. § 1129(b)(2)(A)(iii), *see also In re Sandy Ridge Dev. Corp.,* 881 F.2d 1346, 1350 (5th Cir.1989) (holding that "indubitable equivalent" of a secured creditor's interest is the actual value of the claim).

In *In re Hunt Energy Co., Inc.,* 48 B.R. 472, 485 (Bankr. N.D. Ohio, 1985), the court found that a lien which attaches to the proceeds of a sale would necessarily be reduced by subsequent valuation at a hearing under section 506(a) to meet the "indubitable equivalence" requirements of section 1129(b)(2)(A). Once section 1129(b)(2)(A) is satisfied, the lienholder would be compelled through the cram-down process to accept such money satisfaction as dictated by the cram-down provisions. *Id.*

All of the above requirements for cram down are met in these cases. The sale of the Property to the Buyer (or to a successful overbidder) was negotiated and is being conducted in good faith. All of the creditors asserting liens against the Property are being treated fairly and in accordance with their respective lien priorities, so there is no unfair discrimination present in the proposed sale. Finally, any such secured creditors will receive the actual value of their secured claim as measured by section 506(a).

Based upon all of the foregoing, all creditors of the estate, including all secured creditors of the estate, could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of their interest. The Trustee's proposed sale of the Property to the Buyer (or to a successful overbidder) should therefore be free and clear of all liens, claims and interests pursuant to section 363(f)(5) of the Bankruptcy Code.

**VI.**

**REQUEST FOR WAIVER OF 14-DAY STAY PERIODS SET FORTH IN**

**BANKRUPTCY RULES 6004(h) AND 6006(d)**

Bankruptcy Rule 6004(h) provides, among other things, that an order authorizing the use, sale or lease of property . . . is stayed until the expiration of fourteen days after entry of the Court order, unless the Court orders otherwise.  Bankruptcy Rule 6006(d) has a similar provision with respect to an order approving of the assumption and assignment of unexpired leases and executory contracts.

The estate continues to incur administrative expenses for post-petition rent due and payable under the Lease.  To prevent the increase of such administrative expenses and maximize the potential recovery to creditors of the estate, the Trustee and the Buyer (or a successful overbidder) must be permitted to consummate the sale of the Property as soon as possible after entry of an order granting this Motion.  To facilitate the most expeditious sale closing possible, the Trustee requests that the order granting this Motion be effective immediately upon entry by providing that the fourteen-day stay periods provided by Bankruptcy Rule 6004(h) and 6006(d) are waived.

**VII.**

**CONCLUSION**

**WHEREFORE**, the Trustee respectfully requests that the Court enter an Order:

1.      finding that the notice given by the Trustee in connection with the sale of the Property and the hearing on the Motion is adequate, sufficient, proper and complies with all applicable provisions of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure;

2.      granting the Motion in its entirety;

3.      approving the Overbid Procedures;

4.      authorizing the Trustee to sell the Property to the Buyer (or to a successful overbidder), pursuant to the terms and conditions set forth in the BPA;

5.      approving the assumption and assignment of the Lease to the Buyer (or a successful overbidder), and establishing that the Cure Amount which must be paid in

connection therewith is zero;

      6.     authorizing the Trustee to execute and deliver, on behalf of the estate, any and all documents that may be reasonably necessary to consummate the sale of the Property and the assignment of the Lease to the Buyer;

      7.     finding that the Buyer (or the successful overbidder) is a good faith purchaser entitled to all of the protections of 11 U.S.C. § 363(m);

      8.     waiving the 14-day stay periods set forth in Bankruptcy Rules 6004(h) and 6006(d);

      9.     authorizing, but not obligating, the Trustee to pay the undisputed secured claim of Hana; and

      10.     granting such other and further relief as may be necessary or appropriate under the circumstances.

Dated: September 12, 2018          TIMOTHY J. YOO, CHAPTER 11 TRUSTEE

                   By:   */s/ Monica Y. Kim*
                      MONICA Y. KIM
                      LEVENE, NEALE, BENDER, YOO
                        & BRILL L.L.P.
                      Attorneys for Timothy J. Yoo,
                      Chapter 11 Trustee

## DECLARATION OF TIMOTHY J. YOO

I, Timothy J. Yoo, hereby declare as follows:

1.      I am the duly appointed Chapter 11 Trustee of the bankruptcy estate of RH BBQ, Inc., the debtor herein ("Debtor").   I have personal knowledge of the facts set forth below and, if called to testify, I would and could competently testify thereto.

2.      I submit this declaration in support of that certain *Chapter 7 Trustee's Motion For Entry Of An Order: (A) Approving Sale Of Buisness Free And Clear Of All Liens And Interests; (B) Approving Overbid Procedures; (C) Approving The Assumption And Assignment Of Real Property Lease; And (D) Granting Related Relief* ("Motion"), to which this declaration is attached.  All capitalized terms not specifically defined herein shall have the meanings ascribed to them in the Motion.

3.      The Debtor commenced this case by filing a voluntary petition under chapter 11 of the Bankruptcy Code on February 9, 2018 ("Petition Date").  Following a hearing on April 6, 2018, the Court ordered the appointment of a chapter 11 trustee.

4.      The Debtor operates a Korean barbeque restaurant doing business as "Red Castle 3" ("Business") located at 18311 E. Colima Road, Suite A, Rowland Heights, California 91748. The Business is being operated at the premises pursuant to a Standard Retail/Multi-Tenant Lease - Net ("Lease") between the Debtor and JTNA Enterprises LLC ("Landlord").

5.      The Debtor is wholly owned by Young Keun Park ("Park") who also filed a Chapter 7 bankruptcy case concurrently with the Debtor. Like the Debtor's case, Park's case was converted to chapter 11 following a hearing on April 6, 2018, and Elissa Miller has been appointed to serve as the chapter 11 trustee of Park's case.

6.       In addition to the Debtor's "Red Castle 3" restaurant, Park owns: (i) Colima BBQ, Inc. ("Colima") which operates a Korean barbeque restaurant doing business as "Red Castle 1" located at 18751 E. Colima Road., Rowland Heights, California, and (ii) Onebada, Inc. ("Onebada") which operates a Korean barbeque restaurant doing business as "Bulgogi House" located at 6901 Walker Street, La Palma, California.  Both Colima and Onebada filed voluntary

petitions under chapter 7 and chapter 11, respectively, of the Bankruptcy Code on January 6, 2018 and February 9, 2018.

7.      On or about April 11, 2018, the Office of the United States Trustee appointed me to serve as the chapter 11 trustee for the cases of the Debtor, Colima, and Onebada.  After investigating and operating all of these businesses, I have determined that going concern sales of these restaurants would be the best means of monetizing the highest value of these estates' assets for the benefit of their creditors. In that regard, I hired Coldwell Banker Commercial Wilshire Properties ("<u>Coldwell Banker</u>") to assist the estate in marketing and listing the Business for sale.

8.      The Business has been operating for approximately 5 years, and consists of approximately 4600 square feet of space with 57 BBQ tables and hoods. The communities of Rowland Heights and surrounding areas have a high number and concentration of Asian residents and businesses. By early June, 2018, my professionals and I were able to produce reasonably adequate financial data and due diligence materials to place the Business into the marketplace for sale.  Based on the historical financial performance of the Business and with the advice of Coldwell Banker, I listed the Business for sale at the selling price of $700,000.

9.      For several months, and as evidenced by the Declaration of Ryan Oh filed herewith, Coldwell Banker undertook extensive efforts to market and sell the Business for the highest price possible.

10.      The estate ultimately received one offer to purchase the Business for $580,000. In particular, On August 9, 2018, I received an all-cash offer of $580,000 ("<u>Purchase Price</u>") from Kool Korner, Inc. ("<u>Buyer</u>") to purchase all of the estate's rights in and to the Lease and the Business, including the estate's liquor license, all inventory, machinery, equipment, fixtures, furniture and other personal property situated at the Business (collectively, the "<u>Property</u>"), all in "as is, where is" condition, with no representation or warranty, but free and clear of all liens and interests.  The terms and conditions of the sale are set forth in the *Business Purchase Agreement and Joint Escrow Instructions,* dated August 9, 2018, and all addendums, amendments and related agreements thereto (collectively, "<u>BPA</u>"), true and correct copies of which are attached hereto as **<u>Exhibit 1</u>**.  A true and correct copy of the Lease is attached hereto as **<u>Exhibit 2</u>**.

11.    The Buyer has made a $20,000 deposit towards the Purchase Price, and the balance of the Purchase Price will be due at closing. There are no contingencies to the sale other than the entry of an order approving the Motion authorizing the sale of the Property free and clear of all liens and claims and the assumption and assignment of the Lease, and approval of the transfer of the Business liquor license from the Debtor to the Buyer (or winning overbidder) by the Alcohol and Beverage Control ("ABC").  Closing is to occur immediately upon approval of the transfer of the liquor license from the Debtor to the Buyer (or winning overbidder) by the ABC. The deposit is non-refundable and forfeited to the estate if the Buyer (or winning overbidder) is deemed to be the winning bidder for the Property and fails to timely consummate the sale of the Property for any reason other than the dis-approval of the transfer of the liquor license from the Debtor to the Buyer (or winning overbidder) by the ABC despite good faith, best efforts by the Buyer (or winning overbidder) to obtain the transfer of the liquor license.

12.    The offer from the Buyer is the highest offer received by the estate after several months of marketing and after attempting to negotiate with the Buyer for a higher Purchase Price. As described in the Motion, I believe that the proposed sale of the Business to the Buyer (or winning overbidder) under the terms of the BPA could result in substantial net sale proceeds for the benefit of creditors.

13.    Subject to Court approval, I propose to sell the estate's right, title and interest in and to the Property, as more particularly described in the BPA, all in "as is, where is" condition, with no representation or warranty, for cash in the sum of $580,000. The sale of the Property to the Buyer (or winning overbidder) will be free and clear of all liens and interests, with such liens or interests to attach to the proceeds of the sale to the same extent, scope and priority as the pre-petition liens or interests unless, as approved by the Court, the claim of any secured creditor asserting a lien is satisfied from the proceeds of the sale.

14.    I am informed that the individual in control and management of the Buyer is David Choi. David Choi has provided evidence to me that he has the funds to deliver the balance of the Purchase Price to the estate upon closing. Concurrently herewith, a Declaration of David

Choi has been submitted to the Court which evidences adequate assurance of future performance under the Lease by the Buyer.

15.    I propose that the sale of the Property be subject to overbid, in accordance with the overbid procedures described in the Motion ("Overbid Procedures"), at an auction of the Property (the "Auction") to be conducted by me at the time of the hearing on this Motion ("Sale Hearing").  Therefore, pursuant to the Motion, I seek Court approval of the Overbid Procedures, which I believe will maximize the price ultimately obtained for the Property and still protect the estate from parties who may wish to bid on the Property but who are ultimately unable to consummate a purchase of the Property.

16.    Further, since the estate's interest in and to the Lease is a critical component of the proposed sale of the Property, pursuant to this Motion, I also seek the entry of a Court order approving the assumption and assignment of the Lease to the Buyer or a successful overbidder, and, to that end, determining that the amount required to be paid by the estate to assume the Lease is the Cure Amount of $0. Since his appointment, the estate has remained current on all obligations under the Lease, and intends to remain current on all obligations under the Lease through the closing of the sale.  The Debtor's books and records reflect that the Debtor was current as to all obligations under the Lease prior to my appointment. No proof of claim has been filed by the Landlord in this case. Therefore, the Cure Amount should be determined to be $0.

17.    Also, pursuant to the Motion, I request that the Court make a finding that the Buyer (or the successful overbidder) is a good faith purchaser entitled to all of the protections afforded under 11 U.S.C. § 363(m), and that the 14-day stay periods provided by Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") be waived to facilitate the closing of the sale of the Property as soon as possible after the entry of an order granting this Motion.

18.    The Court established June 29, 2018 as the bar date for creditors to file proofs of claim in this case ("Bar Date"). A review of the Court's Claim Register reveals that there are four (4) creditors which assert security interests and liens upon the Property and timely filed

proofs of claim. Each of these creditors, their respective proofs of claim, and their purported security interests and liens are described in the Motion.

19.    As discussed in the Motion, by the Motion, I am seeking authority, but not the obligation, to pay the undisputed portion of the secured claim of Hana Small Business Lending, Inc., which has a first-priority security interest and lien upon the Property, upon the closing of the sale of the Property. I do not believe that it is appropriate or prudent for any other purported secured claims (including any disputed portion of Hana's secured claim) to be paid from the proceeds of the sale of the Property at closing absent further order of the Court, and all liens and interests of these creditors will attach to the proceeds of the sale to the same extent, scope and priority as the pre-petition liens or interests.

20.    If I am successful in objecting to the secured claims of Quentin and Timberland, and the Bank of Hope's claim is satisfied by the loan's primary, co-obligors, Onesan and Onebada, the proposed sale of the Property to the Buyer could result in net sale proceeds in excess of $400,000, which will result in a recovery for the Debtor's creditors. On the other hand, if I am not able to consummate a sale of the Property to the Buyer (or a successful overbidder) as proposed herein, the estate will be faced with the choice of having to either (i) immediately close the Business, reject the Lease to avoid incurring additional administrative expenses, and liquidate the remaining assets of the estate which his comprised primarily of minimal inventory, furniture and equipment, and a liquor license, or (ii) continue to operate the Business with the assistance of his internal and external team of managers, and propose a plan of reorganization, the recovery under which is likely to be nominal and speculative and take place over a very long period of time.    Under both of these scenarios, I believe that creditors will receive far less value and recovery than what they could obtain through a going concern sale of the Property and my pursuit of objections to the secured claims which will unencumber the proceeds of the sale. Moreover, given the administrative costs incurred by the estate to date to operate the Business and negotiate and seek Court approval of the proposed sale of the Property (among other required administrative tasks), without a successful sale of the Property, it is almost assured that the estate will be administratively insolvent.

21.     The Buyer and I have negotiated the terms of the proposed sale of the Property, as set forth in the BPA, at arms' length and in good faith.  The Buyer has no affiliation with the Debtor or with me and is not an "insider" of either of the Debtor as that term is defined in 11 U.S.C. § 101(31).  I submit that there has been no fraud or collusion in connection with the proposed sale of the Property. No offer to purchase the Property received by the estate has been ignored, and I have taken reasonable steps to try to obtain the highest price possible for the Property.  Based on the foregoing, I submit that the good faith requirement has been satisfied.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 11th day of September, 2018, at Los Angeles, California.


Timothy J. Yoo

1
2
3

## EXHIBIT "1"

[Business Purchase Agreement]

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**BUSINESS PURCHASE AGREEMENT AND
JOINT ESCROW INSTRUCTIONS**
(C.A.R. Form BPA, Revised 11/14)

ASSOCIATION
OF REALTORS®

**Date Prepared:** 08/09/2018

1. **OFFER:**
   A. **THIS IS AN OFFER FROM** KOOL CORNER, INC ("Buyer"),
      ☐ Individual(s), ☐ a Partnership, ☑ a Corporation, ☐ an LLC, ☐ an LLP, ☐ Other
   B. **THE BUSINESS** to be acquired is R H BBQ #311 E. Colima Rd, situated in
      Rowland Height (City), Los Angeles (County), California, 90748 (Zip Code)
   C. **THE PURCHASE PRICE** offered is Five hundred eighty thousand
      Dollars $ 580,000
   D. **INVENTORY** valued at approximately $ _____, including work in progress, is included in the purchase price.
   E. **CLOSE OF ESCROW** shall occur on☐ _____ (date) (or ☐ _____ **Days** After Acceptance).
   F. Buyer and Seller are referred to herein as the "Parties." Brokers are not Parties to this Agreement.

2. **AGENCY:**
   A. **POTENTIALLY COMPETING BUYERS AND SELLERS:** The Parties each acknowledge receipt of a ☒ "Possible Representation of More than One Buyer or Seller - Disclosure and Consent" (C.A.R. Form PRBS).
   B. **CONFIRMATION:** The following agency relationships are hereby confirmed for this transaction:
      Listing Agent _____ (Print Firm Name) is the agent of (check one):
      ☐ the Seller exclusively; or ☐ both the Buyer and Seller.
      Selling Agent Wilshire Realty & Investment (Print Firm Name) (if not the same as the Listing Agent) is the agent of (check one): ☐ the Buyer exclusively; or ☐ the Seller exclusively; or ☐ both the Buyer and Seller.

3. **PAYMENT OF PURCHASE PRICE:** Buyer represents that funds will be good when deposited with Escrow Holder.
   A. **INITIAL DEPOSIT:** Deposit shall be in the amount of . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ 20,000
      **(1) Buyer Direct Deposit:** Buyer shall deliver deposit directly to Escrow Holder by electronic funds transfer, ☐ cashier's check, ☐ personal check, ☐ other _____ within 3 business days after Acceptance (or _____);
      OR **(2)** ☐ Buyer Deposit with Agent: Buyer has given the deposit by personal check (or _____ ) to the agent submitting the offer (or to _____ ), made payable to _____ . The deposit shall be held uncashed until Acceptance and then deposited with Escrow Holder within 3 business days after Acceptance (or _____ ).
      Deposit checks given to agent shall be an original signed check and not a copy.
      (Note: Initial and increased deposits checks received by agent shall be recorded in Broker's trust fund log.)
   B. **INCREASED DEPOSIT:** Buyer shall deposit with Escrow Holder an increased deposit in the amount of. . . . .$ _____
      within _____ **Days** After Acceptance, (or _____ ).
      If the Parties agree to liquidated damages in this Agreement, they also agree to incorporate the increased deposit into the liquidated damages amount in a separate liquidated damages clause (C.A.R. Form RID) at the time the increased deposit is delivered to Escrow Holder.
   C. ☑ **ALL CASH OFFER:** No loan is needed to purchase the Business. This offer is NOT contingent on Buyer obtaining a loan. Written verification of sufficient funds to close this transaction IS ATTACHED to this offer or ☐ Buyer shall, within **3 (or _____ ) Days** After Acceptance, Deliver to Seller such verification.
   D. **LOAN(S):**
      **(1) FIRST LOAN:** in the amount of . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .$ _____
      This loan will be conventional financing or☐ Seller financing (C.A.R. Form SFA), ☐ Small Business Administration, secured by Buyer's own real property, or if real property is included in the sale, then by that real property, ☐ Other _____ . This loan shall be at a fixed rate not to exceed _____ % or, ☐ an adjustable rate loan with initial rate not to exceed _____ %. Regardless of the type of loan, Buyer shall pay points not to exceed _____ % of the loan amount.
      **(2)** ☐ **SECOND LOAN** in the amount of . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ _____
      This loan will be conventional financing or☐ Seller financing (C.A.R. Form SFA), ☐ Small Business Administration, secured by Buyer's own real property, or if real property is included in the sale, then by that real property, ☐ Other _____ . This loan shall be at a fixed rate not to exceed _____ % or, ☐ an adjustable rate loan with initial rate not to exceed _____ %. Regardless of the type of loan, Buyer shall pay points not to exceed _____ % of the loan amount.
   E. **LOAN SECURED BY BUSINESS ASSETS IN THE AMOUNT OF** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $ _____
      Evidenced by a note in favor of Seller secured by the assets of the Business, together with a security agreement in the usual and customary form covering all assets of the Business, and a UCC-1 filing to be filed with the Secretary of State, which shall include proceeds of collateral, in ☐ first or ☐ second position. The loan shall be at a fixed rate not exceed _____ % or, ☐ an adjustable rate with an inital rate not to exceed _____ %. Buyer shall have the right, at Buyer's expense, to conduct a valuation of the assets within the time specified in paragraphs 8 and 25. If the assets' value is less than the amount of the loan provided for in this paragraph 3E, then the difference between the amount of the loan specified in this paragraph 3E, less the value of the assets, shall become an unsecured loan.

Buyer's Initials ( VC )( _____ )
Seller's Initials ( _____ )( _____ )

© 1989-2014, California Association of REALTORS®, Inc.
BPA REVISED 11/14 (PAGE 1 OF 9)

**BUSINESS PURCHASE AGREEMENT (BPA PAGE 1 OF 9)**

Business Address: _/#311 E. Col_____CA_ Date: _____

**F. ADDITIONAL FINANCING TERMS:** ................................................................. $ _____

_____
_____
_____
_____
_____
_____
_____

**G. BALANCE OF DOWN PAYMENT OR PURCHASE PRICE** in the amount of ...................... $ _560.000_
to be deposited with Escrow Holder pursuant to Escrow Holder Instructions.

**CAUTION:** Obligations secured by mixed collateral (i.e., both personal and real property) are subject to complex rules and court decisions under the California Civil Code, Commercial Code and the Code of Civil Procedure. Buyer and Seller are strongly cautioned to consult legal counsel in connection with the securing and enforcement of any such obligations.

**H. PURCHASE PRICE (TOTAL):** ..................................................................... $ _____

**I. VERIFICATION OF DOWN PAYMENT AND CLOSING COSTS:** Buyer (or Buyer's lender or loan broker pursuant to paragraph 3K(1)) shall, within **3 (or _____ ) Days** After Acceptance, Deliver to Seller written verification of Buyer's down payment and closing costs. (☐ Verification attached.)

**J. APPRAISAL CONTINGENCY AND REMOVAL:** This Agreement is **(or ☐ is NOT)** contingent upon a written appraisal of the Business by a licensed or certified appraiser at no less than the purchase price. Buyer shall, as specified in paragraph 25B(3), in writing, remove the appraisal contingency or cancel this Agreement within **17 (or ___ ) Days** After Acceptance.

**K. LOAN TERMS:**
**(1) LOAN APPLICATIONS:** Within **3 (or ___ ) Days** After Acceptance, Buyer shall Deliver to Seller a letter from Buyer's lender or loan broker stating that, based on a review of Buyer's written application and credit report, Buyer is prequalified or preapproved for any NEW loan specified in paragraph 3D. If any loan specified in paragraph 3D is an adjustable rate loan, the prequalification or preapproval letter shall be based on the qualifying rate, not the initial loan rate. (☐ Letter attached.)
**(2) LOAN CONTINGENCY:** Buyer shall act diligently and in good faith to obtain the designated loan(s). Buyer's qualification for the loan(s) specified above **is a contingency** of this Agreement unless otherwise agreed in writing. If there is no appraisal contingency or the appraisal contingency has been waived or removed, then failure of the Business to appraise at the purchase price does not entitle Buyer to exercise the cancellation right pursuant to the loan contingency if Buyer is otherwise qualified for the specified loan. Buyer's contractual obligations regarding deposit, balance of down payment and closing costs **are not contingencies** of this Agreement.
**(3) LOAN CONTINGENCY REMOVAL:** Within **21 (or ___ ) Days** After Acceptance, Buyer shall, as specified in paragraph 25, in writing, remove the loan contingency or cancel this Agreement. If there is an appraisal contingency, removal of the loan contingency shall not be deemed removal of the appraisal contingency.
**(4) ☐ NO LOAN CONTINGENCY:** Obtaining any loan specified above is NOT a contingency of this Agreement. If Buyer does not obtain the loan and as a result does not purchase the Business, Seller may be entitled to Buyer's deposit or other legal remedies.
**(5) LENDER LIMITS ON BUYER CREDITS:** Any credit to Buyer, from any source, for closing or other costs that is agreed to by the Parties ("Contractual Credit") shall be disclosed to Buyer's lender. If the total credit allowed by Buyer's lender ("Lender Allowable Credit") is less than the Contractual Credit, then (i) the Contractual Credit shall be reduced to the Lender Allowable Credit, and (ii) in the absence of a separate written agreement between the Parties, there shall be no automatic adjustment to the purchase price to make up for the difference between the Contractual Credit and the Lender Allowable Credit.

**L. BUYER STATED FINANCING:** Seller is relying on Buyer's representation of the type of financing specified (including but not limited to, as applicable, all cash, amount of down payment, or contingent or non-contingent loan). Seller has agreed to a specific closing date, purchase price and to sell to Buyer in reliance on Buyer's covenant concerning financing. Buyer shall pursue the financing specified in this Agreement. Seller has no obligation to cooperate with Buyer's efforts to obtain any financing other than that specified in the Agreement and the availability of any such alternate financing does not excuse Buyer from the obligation to purchase the Business and close escrow as specified in this Agreement

**4. ESCROW AND TITLE:**
**A. ESCROW HOLDER:** ☒ Buyer ☒ Seller shall pay escrow fees _50 % Each_____. Escrow Holder shall be _____. The Parties shall, within **5 (or ___ ) Days** After receipt, sign and return Escrow Holder's general provisions.
**B. (1) FORM OF OWNERSHIP:** The Business shall be owned in the form designated in Buyer's escrow instructions. THE MANNER OF TAKING TITLE AND THE FORM OF OWNERSHIP OF THE BUSINESS MAY HAVE SIGNIFICANT LEGAL AND TAX CONSEQUENCES. CONSULT AN APPROPRIATE PROFESSIONAL.
**(2) TITLE:** Seller shall furnish to Buyer bills of sale and other instruments of transfer or assignment necessary to carry out this Agreement

**5. CLOSING AND POSSESSION:**
**A.** Possession shall be delivered to Buyer at 6PM or ☐ _____ ☐ AM/☐ PM, on the date of Close Of Escrow; ☐ on _____ ; or ☐ no later than _____ calendar days after Close Of Escrow. If Seller also owns the real property upon which the Business operates and transfer of title to the real property and possession of the Business do not occur at the same time, Owner and Buyer are advised to: **(i)** enter into a written agreement regarding possession; and **(ii)** consult with their insurance and legal advisors or other appropriate professional(s).

Buyer's Initials ( _VL_ ) ( _____ )                    Seller's Initials ( _____ ) ( _____ )

Business Address: _14 311 E. Colima R_ _____ Date: _____

B. At Close Of Escrow, Seller assigns to Buyer any assignable warranty rights for items included in the sale and shall provide any available Copies of such warranties. Brokers cannot and will not determine the assignability of any warranties.

C. At Close Of Escrow, unless otherwise agreed in writing, Seller shall provide keys and/or means to operate all locks, mailboxes, security systems and alarms.

**6. ASSETS TRANSFERRED:** With the exception of cash or cash equivalents on deposit in any financial institution, and assets excluded below, Buyer is purchasing all assets of the Business, including but not limited to: inventory for sale, machinery, furniture, fixtures and other equipment, leasehold improvements, transferable government licenses and permits, customer lists, fictitious business names, trade names and trademarks, logos, copyrights and patents, signs and advertising materials, telephone and fax numbers, web sites, URL names, e-mail addresses, accounts receivable, vendor lists and catalogs, goodwill, agreements not to compete, franchise agreements, distribution rights, employee lists and information, computer and customer software, and customer deposits. All items transferred that are leased are subject to the terms of existing lease(s).

☐ Other _____

Excluded asset _____

**7. LIABILITIES TRANSFERRED:** Buyer is NOT purchasing any liabilities of the Business, EXCEPT those items checked below:
A. ☐ Accounts payable, per attached list.
B. ☐ Service, maintenance and advertising agreements, per attached list.
C. ☐ Other _____

**8.** ☒ **INVENTORY:**
A. Buyer's acceptance of inventory is a contingency of this Agreement. Buyer shall have the right, at Buyer's expense, within the time specified in paragraph 25, to conduct a physical inventory and, in writing, remove the unacceptable inventory or cancel this Agreement.
B. Buyer has the right to confirm the inventory within 5 (or ☒ / ) Days Prior to Close Of Escrow. The purchase price shall be adjusted to reflect the remaining inventory. The adjustment is to be added to or subtracted from the ☐ cash down payment; or ☐ seller financing.

**9. SELLER DISCLOSURE; BUYER INVESTIGATION:**
Seller shall, within the time specified in paragraph 25, provide to Buyer, or to Buyer's counsel, accountant or other designated representative, the lists of items or documents, or Copies thereof, for the items checked below. For each item, as applicable, Seller shall include a statement of whether the item is owned or leased and whether Seller has any legal, proprietary interest, or intellectual property rights in or, restrictions on, the item. Buyer, within the time specified in paragraph 25, shall then investigate the items provided to Buyer and take the action specified in paragraph 25.

☐ Inventory, including work in progress
☒ Machinery
☒ Furniture, fixtures and other equipment
☐ Other personal property
☒ Leasehold improvements
☒ Government licenses and permits
☐ Customer lists
☒ Fictitious business name statements
☒ Trade names and trademarks
☒ Logo
☐ Copyrights and patents
☐ Schedule of accounts receivable
☐ Business appraisal
☐ Other assets:
☐ Schedule of accounts payable
☐ Other liabilities:
☐ Employee estoppel certificates
☐ Sales tax returns for the years. . . . . . . . . . . . . . . . . . . . . _____ to _____
☐ Federal and state income tax returns for the years . . . . _____ to _____
☐ Financial statements for the years. . . . . . . . . . . . . . . . . _____ to _____
☐ Employment withholding returns for the years . . . . . . . . . _____ to _____

☒ Signs and advertising materials
☒ Telephone and fax numbers
☐ Websites, URL names and e-mail addresses
☒ Vendor lists and catalogs
☒ Goodwill
☒ Agreements not to compete
☐ Franchise agreements
☒ Distribution rights
☒ Employee lists and information
☐ Computer and customer software
☐ Customer deposits
☒ Lease

☐ Service, maintenance and advertising agreements

☐ Proposed allocation of purchase price among assets

SELLER REPRESENTS THAT: (i) THE BOOKS AND RECORDS THAT OWNER PROVIDES ARE THOSE MAINTAINED IN THE ORDINARY AND NORMAL COURSE OF BUSINESS; AND (ii) FEDERAL AND STATE TAX RETURNS THAT SELLER PROVIDES ARE COPIES OF THOSE FILED WITH THE APPLICABLE GOVERNMENTAL AGENCIES.

**10. CONSULTING AND TRAINING:** Seller shall consult with Buyer to show Buyer methods used in operating the Business. Seller shall provide consulting services for a period of _14_ Days After Close Of Escrow at no cost to Buyer, which services shall not exceed a total of _____ hours. Seller shall not be responsible for training Buyer in the basics of operating a business of the type being sold pursuant to this Agreement, but only to alert Buyer to the nuances, as determined by Seller, of operating this type of business. **NOTE TO BUYER: IF YOU ARE NOT ALREADY TRAINED IN THIS TYPE OF BUSINESS, YOU ARE STRONGLY ADVISED TO SEEK TRAINING.**

**11.** ☐ **AGREEMENT NOT TO COMPETE:** As a material part of the consideration of the sale, Seller agrees not to operate or engage in, directly or indirectly, whether as a principal, agent, manager, employee, owner, member, partner, stockholder, director or officer of a corporation, trustee, consultant, or any other capacity whatsoever, any business the same as, or substantially similar to, or in competition with the Business within a radius of _____ miles from the current location of the Business (or ☐ _____ _____ ) for a period of _____ year(s) from the date of final transfer of the Business, so long as Buyer, or Buyer's successor-in-interest, is operating the Business in said area.

Buyer's Initials ( _____ ) ( _____ )                                    Seller's Initials ( _____ ) ( _____ )

BPA REVISED 11/14 (PAGE 3 OF 9)

**BUSINESS PURCHASE AGREEMENT (BPA PAGE 3 OF 9)**

Business Address: _____  Date: _____

**12. LEASE (Check applicable items):** The sale is contingent upon Buyer obtaining, within 21 (or ☐ _____ ) Days After Acceptance, the assignment, new lease, option to extend, sublease or other lease as indicated below. Buyer shall submit an application for such lease to Seller's landlord or Seller, as applicable, within 15 (or ☐ _____ ) Days After Acceptance.

    **A.** ☒ An assignment of Seller's existing lease.
    **B.** ☐ A new lease with Seller's landlord, on terms acceptable to Buyer, to become effective concurrently with the Close Of Escrow.
    **C.** ☐ An option to extend Seller's present lease for an additional____ year(s), on terms acceptable to Buyer and Seller's landlord.
    **D.** ☐ A sublease with Seller, on terms acceptable to Buyer, to become effective concurrently with the Close Of Escrow.
        **Buyer and Seller are advised that such sublease may require notice to or approval of Seller's landlord.**
    **E.** ☐ OTHER: _____

**13.** ☐ **PURCHASE OF REAL PROPERTY:** The sale is contingent upon Buyer's ability to purchase, concurrently with the Close Of Escrow, the real property in which the Business operates. **A separate Real Property Purchase Agreement is required (C.A.R. Form CPA).**

**14. LICENSES:**
    **A.** LIQUOR: If transfer of a liquor license is included in this sale, Seller shall comply with the Alcoholic Beverage Control Act concerning such transfer. Escrow shall not close, and no funds shall be transferred to Seller, until Escrow Holder is advised by the State of California Department of Alcoholic Beverage Control that the license transfer has been approved. The costs of such transfer shall be paid _____
    **B.** OTHER: This sale is contingent upon Buyer's obtaining, prior to the Close Of Escrow, the license(s) indicated below. Buyer shall apply for such license(s) within 15 (or ☐ _____ ) Days After Acceptance:
        **1.** ☐ City license: _____
        **2.** ☐ State license: _____
        **3.** ☐ Other: _____

**15. FRANCHISE:** If the Business is a franchise, in addition to being subject to Buyer's acceptance of the terms of franchise as provided in paragraph 9, the sale is also contingent upon Franchisor's acceptance of Buyer.

**16. SALES AND USE TAX:** Buyer shall pay any sales or use tax payable as a result of the sale under any Law and shall furnish Seller with Resale Certificates for any items bought for resale.

**17. PRORATIONS:** Personal property taxes, business taxes, rents, interest, insurance acceptable to Buyer, and prepaid deposits shall be prorated as of Close Of Escrow (or ☐ _____ ).

**18. TAX CLEARANCES:** Seller shall deliver to Escrow Holder proof that city (if applicable), state and federal income tax withholdings are current. Amounts withheld but not yet payable will be transferred in escrow or credited to Buyer. Seller shall also deliver to Escrow Holder any clearance documents available from the State Board of Equalization or Employment Development Department regarding S.D.I. unemployment insurance and FICA withholdings. No funds shall be released from escrow before such delivery.

**19. NOTICES OF VIOLATIONS:** Seller represents that, to the best of Seller's knowledge, no notices of violations of federal, state or local statute(s), law(s) or regulation(s) exist, or are filed or issued, that affect the operation of the Business, including any such notices regarding the real property in which the Business is situated ("Notices"), EXCEPT: _____

If prior to Close Of Escrow, Seller receives or becomes aware of any Notices filed against or affecting the Business, Seller shall immediately notify Buyer.

**20. BULK TRANSFER:** Seller shall comply with the Bulk Sales provision of Division 6 of the Uniform Commercial Code, Bulk Transfer Section, as the law applies within the Seller's state.

**21. LIENS; ENCUMBRANCES; RESTRICTIONS:** Seller warrants that, to the best of Seller's knowledge, there are no undisclosed liens, encumbrances or restrictions upon the Business.

**22. OPERATION OF BUSINESS DURING ESCROW:** During the escrow period, Seller shall: **(i)** operate the Business diligently and in substantially the same manner as prior to this offer; **(ii)** maintain the goodwill of the Business; **(iii)** keep all equipment and personal property in normal working order; and _____

**23. SELLER REPRESENTATIONS:** Seller's representations and warranties set forth herein, or in any written statements delivered to Buyer, shall be true and correct at Close Of Escrow, and shall survive the transfer of ownership of the Business.

**24. OTHER TERMS AND CONDITIONS,** including attached supplements:

    ① This contract is subject to buyer obtaining lease from landlord.

    ② This contract is subject to buyer obtaining ABC License.

Buyer's Initials ( *DC* ) ( _____ )                 Seller's Initials ( _____ ) ( _____ )

**BPA REVISED 11/14 (PAGE 4 OF 9)**



Business Address: _____    Date: _____

**25. TIME PERIODS; REMOVAL OF CONTINGENCIES; CANCELLATION RIGHTS:** The following time periods may only be extended, altered, modified or changed by mutual written agreement. Any removal of contingencies or cancellation under this paragraph by either Buyer or Seller must be exercised in good faith and in writing (C.A.R. Form CR or CC).

**A. SELLER HAS: 7 (or ☐ ___ ) Days** After Acceptance to Deliver to Buyer all reports, disclosures and information for which Seller is responsible under paragraph 9. Buyer may give Seller a Notice to Seller to Perform (C.A.R. Form NSP) if Seller has not Delivered the items within the time specified.

**B. BUYER SHALL,** within the times set forth below, take the specified action and, in writing, either remove the applicable contingency or cancel this Agreement:

   **(1) BUYER HAS: 17 (or ☐ ___ ) Days** After Acceptance to complete all buyer investigations, unless otherwise agreed in 25B(2), approve all disclosures, reports, and review of reports and other applicable information, for which Buyer is responsible or which Buyer receives from Seller; and approve all other matters affecting the Business.

   **(2) ☐ (If checked) BUYER HAS: 30 (or ☐ ___ ) Days** After Acceptance to complete geologic, soil and environmental inspections.

   **(3)** Within the time specified in 25B(1) (or as otherwise specified in this Agreement), Buyer shall Deliver to Seller either **(i)** a removal of the applicable contingency (C.A.R. Form CR), or **(ii)** a cancellation (C.A.R. Form CC) of this Agreement based upon a contingency or Seller's failure to Deliver the specified items. However, if any report, disclosure or information for which Seller is responsible is not Delivered within the time specified in 25A, then Buyer has **5 (or ☐ ___ ) Days** After Delivery of any such items, or the time specified in 25B(1), whichever is later, to Deliver to Seller a removal of the applicable contingency or cancellation of this Agreement.

   **(4) Continuation of Contingency:** Even after the end of the time specified in 25B(1) and before Seller cancels this Agreement, if at all, pursuant to 25C, Buyer retains the right to either **(i)** in writing remove remaining contingencies, or **(ii)** cancel this Agreement based upon a remaining contingency or Seller's failure to Deliver the specified items. Once Buyer's written removal of all contingencies is Delivered to Seller, Seller may not cancel this Agreement pursuant to 25C(1).

**C. SELLER RIGHT TO CANCEL:**

   **(1) Seller right to Cancel; Buyer Contingencies:** If, by the time specified in this Agreement, Buyer does not Deliver to Seller a removal of the applicable contingency or cancellation of this Agreement then Seller, after first Delivering to Buyer a Notice to Buyer to Perform (C.A.R. Form NBP) may cancel this Agreement. In such event, Seller shall authorize return of Buyer's deposit.

   **(2) Seller right to Cancel; Buyer Contract Obligations:** Seller, after first Delivering to Buyer a NBP may cancel this Agreement for any of the following reasons: **(i)** if Buyer fails to deposit funds as required by 3A or 3B; **(ii)** if the funds deposited pursuant to 3A or 3B are not good when deposited; **(iii)** if Buyer fails to Deliver a letter as required by 3K; **(iv)** if Buyer fails to Deliver verification as required by 3C or 3I; or **(v)** if Seller reasonably disapproves of the verification provided by 3C or 3I. In such event, Seller shall authorize return of Buyer's deposit.

   **(3) Notice To Buyer To Perform:** The NBP shall: **(i)** be in writing; **(ii)** be signed by Seller; and **(iii)** give Buyer at least **2 (or ☐ ___ ) Days** After Delivery (or until the time specified in the applicable paragraph, whichever occurs last) to take the applicable action. A NBP may not be Delivered any earlier than **2 Days** Prior to the expiration of the applicable time for Buyer to remove a contingency or cancel this Agreement or meet an obligation specified in 25C(2).

**D. NOTICE TO BUYER OR SELLER TO PERFORM:** The NBP or NSP shall: **(i)** be in writing; **(ii)** be signed by the applicable Buyer or Seller; and **(iii)** give the other Party at least **2 (or ___ ) Days** After Delivery (or until the time specified in the applicable paragraph, whichever occurs last) to take the applicable action. A NBP or NSP may not be Delivered any earlier than **2 Days** Prior to the expiration of the applicable time for the other Party to remove a contingency or cancel this Agreement or meet an obligation specified in paragraph 25.

**E. EFFECT OF BUYER'S REMOVAL OF CONTINGENCIES:** If Buyer removes, in writing, any contingency or cancellation rights, unless otherwise specified in writing, Buyer shall conclusively be deemed to have: **(i)** completed all Buyer Investigations, and review of reports and other applicable information and disclosures pertaining to that contingency or cancellation right; **(ii)** elected to proceed with the transaction; and **(iii)** assumed all liability, responsibility and expense for Repairs or corrections pertaining to that contingency or cancellation right, or for the inability to obtain financing.

**F. CLOSE OF ESCROW:** Before Buyer or Seller may cancel this Agreement for failure of the other Party to close escrow pursuant to this Agreement, Buyer or Seller must first Deliver to the other Party a demand to close escrow (C.A.R. Form DCE). The DCE shall: **(i)** be signed by the applicable Buyer or Seller; and **(ii)** give the other Party at least **3 (or ___ ) Days** After Delivery to close escrow. A DCE may not be Delivered any earlier than **3 Days** Prior to the scheduled close of escrow.

**G. EFFECT OF CANCELLATION ON DEPOSITS:** If Buyer or Seller gives written notice of cancellation pursuant to rights duly exercised under the terms of this Agreement, the Parties agree to Sign mutual instructions to cancel the sale and escrow and release deposits, if any, to the party entitled to the funds, less fees and costs incurred by that party. Fees and costs may be payable to service providers and vendors for services and products provided during escrow. Except as specified below, **release of funds will require mutual Signed release instructions from the Parties, judicial decision or arbitration award.** If either Party fails to execute mutual instructions to cancel escrow, one Party may make a written demand to Escrow Holder for the deposit (C.A.R. Form BDRD or SDRD). Escrow Holder, upon receipt, shall promptly deliver notice of the demand to the other Party. If, within 10 Days After Escrow Holder's notice, the other Party does not object to the demand, Escrow Holder shall disburse the deposit to the Party making the demand. If Escrow Holder complies with the preceding process, each Party shall be deemed to have released Escrow Holder from any and all claims or liability related to the disbursal of the deposit. Escrow Holder, at its discretion, may nonetheless require mutual cancellation instructions. **A Party may be subject to a civil penalty of up to $1,000 for refusal to sign cancellation instructions if no good faith dispute exists as to who is entitled to the deposited funds (Civil Code §1057.3).**

**26. BROKERS:**

**A. COMPENSATION:** Seller or Buyer, or both, as applicable, agrees to pay compensation to Broker as specified in a separate written agreement between Broker and that Seller or Buyer. Compensation is payable upon Close Of Escrow, or if escrow does not close, as otherwise specified in the agreement between Broker and that Seller or Buyer.

**B. SCOPE OF BROKER DUTY:** Buyer and Seller acknowledge and agree that: **(i)** Brokers do not decide what price Buyer should pay or Seller should accept; **(ii)** Brokers do not guarantee the performance or repairs of others who have provided services or products to Buyer or Seller; and **(iii)** they will seek legal, tax, insurance, title and other assistance from appropriate professionals.

Buyer's Initials ( _____ ) ( _____ )                    Seller's Initials ( _____ ) ( _____ )

BPA REVISED 11/14 (PAGE 5 OF 9)

**BUSINESS PURCHASE AGREEMENT (BPA PAGE 5 OF 9)**
Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026  www.zipLogix.com                Untitled

Business Address: _____   Date: _____

**C. BROKERAGE:** Neither Buyer nor Seller has utilized the services of, or for any other reason owes compensation to, a licensed real estate broker (individual or corporate), agent, finder, or other entity, other than as specified in this Agreement, in connection with any act relating to the Business, including, but not limited to, inquiries, introductions, consultations, and negotiations leading to this Agreement. Buyer and Seller each agree to indemnify and hold the other, the Brokers specified herein and their agents, harmless from and against any costs, expenses or liability for compensation claimed inconsistent with the warranty and representation in this Agreement.

**27. REPRESENTATIVE CAPACITY:** If one or more Parties is signing this Agreement in a representative capacity and not for him/herself as an individual then that Party shall so indicate in paragraph 45 or 46 and attach a Representative Capacity Signature Disclosure (C.A.R. Form RCSD). Wherever the signature or initials of the representative identified in the RCSD appear on this Agreement or any related documents, it shall be deemed to be in a representative capacity for the entity described and not in an individual capacity, unless otherwise indicated. The Party acting in a representative capacity (i) represents that the entity for which the party is acting already exists and (ii) shall Deliver to the other Party and Escrow Holder, within 3 Days After Acceptance, evidence of authority to act in that capacity (such as but not limited to: applicable portion of the trust or Certification Of Trust (Probate Code §18100.5), letters testamentary, court order, power of attorney, corporate resolution, or formation documents of the business entity).

**28. JOINT ESCROW INSTRUCTIONS TO ESCROW HOLDER:**

**A.** The following paragraphs, or applicable portions thereof, of this Agreement constitute the joint escrow instructions of **Buyer and Seller to Escrow Holder,** which Escrow Holder is to use along with any related counter offers and addenda, and any additional mutual instructions to close the escrow: paragraphs 1, 3, 4, 8B, 13, 14A, 17, 18, 20, 24, 25G, 27, 28, 36, 43, 44, 45, 46, and paragraph D of the section titled Real Estate Brokers on page 9. If a Copy of the separate compensation agreement(s) provided for in paragraph 26A, or paragraph D of the section titled Real Estate Brokers on page 9 is deposited with Escrow Holder by Broker, Escrow Holder shall accept such agreement(s) and pay out from Buyer's or Seller's funds, or both, as applicable, the Broker's compensation provided for in such agreement(s). The terms and conditions of this Agreement not set forth in the specified paragraphs are additional matters for the information of Escrow Holder, but about which Escrow Holder need not be concerned. Buyer and Seller will receive Escrow Holder's general provisions, if any, directly from Escrow Holder and will execute such provisions within the time specified in paragraph 4. To the extent the general provisions are inconsistent or conflict with this Agreement, the general provisions will control as to the duties and obligations of Escrow Holder only. Buyer and Seller will execute additional instructions, documents and forms provided by Escrow Holder that are reasonably necessary to close the escrow.

**B.** A Copy of this Agreement including any counter offer(s) and addenda shall be delivered to Escrow Holder within **3 Days After** Acceptance (or _____ ). Buyer and Seller authorize Escrow Holder to accept and rely on Copies and Signatures as defined in this Agreement as originals, to open escrow and for other purposes of escrow. The validity of this Agreement as between Buyer and Seller is not affected by whether or when Escrow Holder Signs this Agreement. Escrow Holder shall provide Seller's Statement of Information to Title company when received from Seller.

**C.** Brokers are a party to the escrow for the sole purpose of compensation pursuant to paragraph 26A and paragraph D of the section titled Real Estate Brokers on page 9. Buyer and Seller irrevocably assign to Brokers compensation specified in paragraph 26A, and irrevocably instruct Escrow Holder to disburse those funds to Brokers at Close Of Escrow or pursuant to any other mutually executed cancellation agreement. Compensation instructions can be amended or revoked only with the written consent of Brokers. Buyer and Seller shall release and hold harmless Escrow Holder from any liability resulting from Escrow Holder's payment to Broker(s) of compensation pursuant to this Agreement.

**D.** Upon receipt, Escrow Holder shall provide Seller and Seller's Broker verification of Buyer's deposit of funds pursuant to paragraph 3A and 3B. Once Escrow Holder becomes aware of any of the following, Escrow Holder shall immediately notify all Brokers: **(i)** if Buyer's initial or any additional deposit or down payment is not made pursuant to this Agreement, or is not good at time of deposit with Escrow Holder; or **(ii)** if Buyer and Seller instruct Escrow Holder to cancel escrow.

**E.** A Copy of any amendment that affects any paragraph of this Agreement for which Escrow Holder is responsible shall be delivered to Escrow Holder within **3 Days** after mutual execution of the amendment.

**29. REMEDIES FOR BUYER'S BREACH OF CONTRACT:**

**A. Any clause added by the Parties specifying a remedy (such as release or forfeiture of deposit or making a deposit non-refundable) for failure of Buyer to complete the purchase in violation of this Agreement shall be deemed invalid unless the clause independently satisfies the statutory liquidated damages requirements set forth in the Civil Code.**

**B. LIQUIDATED DAMAGES: If Buyer fails to complete this purchase because of Buyer's default, Seller shall retain, as liquidated damages, the deposit actually paid. Buyer and Seller agree that this amount is a reasonable sum given that it is impractical or extremely difficult to establish the amount of damages that would actually be suffered by Seller in the event Buyer were to breach this Agreement.**

Buyer's Initials  ___PC___ / _____          Seller's Initials _____ / _____

**30. DISPUTE RESOLUTION:**

**A. MEDIATION:** The Parties agree to mediate any dispute or claim arising between them out of this Agreement, or any resulting transaction, before resorting to arbitration or court action through the C.A.R. Real Estate Mediation Center for Consumers **(www.consumermediation.org)** or through any other mediation provider or service mutually agreed to by the Parties. The Parties **also agree to mediate any disputes or claims with Broker(s), who, in writing, agree to such mediation prior to, or within a reasonable time after, the dispute or claim is presented to the Broker.** Mediation fees, if any, shall be divided equally among the Parties involved. If, for any dispute or claim to which this paragraph applies, any Party (i) commences an action without first attempting to resolve the matter through mediation, or (ii) before commencement of an action, refuses to mediate after a request has been made, then that Party shall not be entitled to recover attorney fees, even if they would otherwise be available to that Party in any such action. THIS MEDIATION PROVISION APPLIES WHETHER OR NOT THE ARBITRATION PROVISION IS INITIALED. Exclusions from this mediation agreement are specified in paragraph 30C.

Buyer's Initials ( __PC__ ) ( _____ )          Seller's Initials ( _____ ) ( _____ )
BPA REVISED 11/14 (PAGE 6 OF 9)

**BUSINESS PURCHASE AGREEMENT (BPA PAGE 6 OF 9)**

EQUAL HOUSING
OPPORTUNITY

Business Address: _____   Date: _____

**B. ARBITRATION OF DISPUTES:**

The Parties agree that any dispute or claim in law or equity arising between them out of this Agreement or any resulting transaction, which is not settled through mediation, shall be decided by neutral, binding arbitration. The Parties also agree to arbitrate any disputes or claims with Broker(s), who, in writing, agree to such arbitration prior to, or within a reasonable time after, the dispute or claim is presented to the Broker. The arbitrator shall be a retired judge or justice, or an attorney with at least 5 years of residential real estate Law experience, unless the parties mutually agree to a different arbitrator. The Parties shall have the right to discovery in accordance with Code of Civil Procedure §1283.05. In all other respects, the arbitration shall be conducted in accordance with Title 9 of Part 3 of the Code of Civil Procedure. Judgment upon the award of the arbitrator(s) may be entered into any court having jurisdiction. Enforcement of this agreement to arbitrate shall be governed by the Federal Arbitration Act. Exclusions from this arbitration agreement are specified in paragraph 30C.

"NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY."

"WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION TO NEUTRAL ARBITRATION."

Buyer's Initials _____/_____          Seller's Initials _____/_____

**C. ADDITIONAL MEDIATION AND ARBITRATION TERMS:**

(1) **EXCLUSIONS:** The following matters are excluded from mediation and arbitration: (i) a judicial or non-judicial foreclosure or other action or proceeding to enforce a deed of trust, mortgage or installment land sale contract as defined in Civil Code §2985; (ii) an unlawful detainer action; and (iii) any matter that is within the jurisdiction of a probate, small claims or bankruptcy court.

(2) **PRESERVATION OF ACTIONS:** The following shall not constitute a waiver nor violation of the mediation and arbitration provisions: i) the filing of a court action to preserve a statute of limitations; (ii) the filing of a court action to enable the recording of a notice of pending action, for order of attachment, receivership, injunction, or other provisional remedies; or (iii) the filing of a mechanic's lien.

(3) **BROKERS:** Brokers shall not be obligated nor compelled to mediate or arbitrate unless they agree to do so in writing. Any Broker(s) participating in mediation or arbitration shall not be deemed a party to this Agreement.

**31. ENVIRONMENTAL HAZARD CONSULTATION:** Buyer and Seller acknowledge: (i) Federal, state, and local legislation impose liability upon existing and former owners and users of real property, in applicable situations, for certain legislatively defined, environmentally hazardous substances; (ii) Broker(s) has/have made no representation concerning the applicability of any such Law to this transaction or to Buyer or to Seller, except as otherwise indicated in this Agreement; (iii) Broker(s) has/have made no representation concerning the existence, testing, discovery, location and evaluation of/for, and risks posed by, environmentally hazardous substances, if any, located on or potentially affecting the Business; and (iv) Buyer and Seller are each advised to consult with technical and legal experts concerning the existence, testing, discovery, location and evaluation of/for, and risks posed by, environmentally hazardous substances, if any, located on or potentially affecting the Business.

**32. AMERICANS WITH DISABILITIES ACT:** The Americans With Disabilities Act ("ADA") prohibits discrimination against individuals with disabilities. The ADA affects almost all commercial facilities and public accommodations. Residential properties are not typically covered by the ADA, but may be governed by its provisions if used for certain purposes. The ADA can require, among other things, that buildings be made readily accessible to the disabled. Different requirements apply to new construction, alterations to existing buildings, and removal of barriers in existing buildings. Compliance with the ADA may require significant costs. Monetary and injunctive remedies may be incurred if the Business is not in compliance. A real estate broker does not have the technical expertise to determine whether a building is in compliance with ADA requirements, or to advise a principal on those requirements. Buyer and Seller are advised to contact an attorney, contractor, architect, engineer or other qualified professional of Buyer or Seller's own choosing to determine to what degree, if any, the ADA impacts that principal or this transaction.

**33. SELECTION OF SERVICE PROVIDERS:** Brokers do not guarantee the performance of any vendors, service or product providers ("Providers"), whether referred by Broker or selected by Buyer, Seller or other person. Buyer and Seller may select ANY Providers of their own choosing.

**34. MULTIPLE LISTING SERVICE ("MLS"):** Brokers are authorized to report to the MLS a pending sale and, upon Close Of Escrow, the sales price and other terms of this transaction shall be provided to the MLS to be published and disseminated to persons and entities authorized to use the information on terms approved by the MLS.

**35. ATTORNEY FEES:** In any action, proceeding, or arbitration between Buyer and Seller arising out of this Agreement, the prevailing Buyer or Seller shall be entitled to reasonable attorneys fees and costs from the non-prevailing Buyer or Seller, except as provided in paragraph 30A.

**36. ASSIGNMENT:** Buyer shall not assign all or any part of Buyer's interest in this Agreement without first having obtained the separate written consent of Seller to a specified assignee. Such consent shall not be unreasonably withheld unless otherwise agreed in writing. Any total or partial assignment shall not relieve Buyer of Buyer's obligations pursuant to this Agreement unless otherwise agreed in writing by Seller (C.A.R. Form AOAA).

Buyer's Initials ( _____ )( _____ )          Seller's Initials ( _____ )( _____ )

**BPA REVISED 11/14 (PAGE 7 OF 9)**

Business Address: _____   Date: _____

37. **SUCCESSORS AND ASSIGNS:** This Agreement shall be binding upon, and inure to the benefit of, Buyer and Seller and their respective successors and assigns, except as otherwise provided herein.

38. **COPIES:** Seller and Buyer each represent that Copies of all reports, documents, certificates, approvals, and other documents that are furnished to the other are true, correct and unaltered Copies of the original documents, if the originals are in the possession of the furnishing party.

39. **RISK OF LOSS:** Any risk of loss to the Business shall be borne by Seller until ownership has been transferred to Buyer.

40. **DAMAGE OR DESTRUCTION:** If the Business or real property in which the Business is situated is destroyed or materially damaged prior to Close Of Escrow, then, on demand of Buyer, any deposit made by Buyer shall be returned to Buyer and this Agreement shall terminate.

41. **EQUAL OPPORTUNITY:** The Business is sold in compliance with federal, state and local anti-discrimination Laws.

42. **TERMS AND CONDITIONS OF OFFER:**
This is an offer to purchase the Property on the above terms and conditions. The liquidated damages paragraph or the arbitration of disputes paragraph is incorporated in this Agreement if initialed by all Parties or if incorporated by mutual agreement in a counter offer or addendum. If at least one but not all Parties initial, a counter offer is required until agreement is reached. Seller has the right to continue to offer the Business for sale and to accept any other offer at any time prior to notification of Acceptance. The Parties have read and acknowledge receipt of a Copy of the offer and agree to the confirmation of agency relationships. If this offer is accepted and Buyer subsequently defaults, Buyer may be responsible for payment of Brokers' compensation. This Agreement and any supplement, addendum or modification, including any Copy, may be Signed in two or more counterparts, all of which shall constitute one and the same writing.

43. **TIME OF ESSENCE; ENTIRE CONTRACT; CHANGES:** Time is of the essence. All understandings between the Parties are incorporated in this Agreement. Its terms are intended by the Parties as a final, complete and exclusive expression of their Agreement with respect to its subject matter, and may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. If any provision of this Agreement is held to be ineffective or invalid, the remaining provisions will nevertheless be given full force and effect. Except as otherwise specified, this Agreement shall be interpreted and disputes shall be resolved in accordance wth the Laws of the State of California. **Neither this Agreement nor any provision in it may be extended, amended, modified, altered or changed, except in writing Signed by Buyer and Seller.**

44. **DEFINITIONS:** As used in this Agreement:
   A. **"Acceptance"** means the time the offer or final counter offer is accepted in writing by a Party and is delivered to and personally received by the other Party or that Party's authorized agent in accordance with the terms of this offer or a final counter offer.
   B. **"Agreement"** means this document and any counter offers and any incorporated addenda, collectively forming the binding agreement between the Parties. Addenda are incorporated only when Signed by all parties.
   C. **"C.A.R. Form"** means the most current version of the specific form referenced or another comparable form agreed to by the parties.
   D. **"Close Of Escrow"**, including "COE", means the date the grant deed, or other evidence of transfer of title, is recorded.
   E. **"Copy"** means copy by any means including photocopy, NCR, facsimile and electronic.
   F. **"Days"** means calendar days. However, after Acceptance, the last Day for performance of any act required by this Agreement (including Close Of Escrow) shall not include any Saturday, Sunday, or legal holiday and shall instead be the next Day.
   G. **"Days After"** means the specified number of calendar days after the occurrence of the event specified, not counting the calendar date on which the specified event occurs, and ending at 11:59 PM on the final day.
   H. **"Days Prior"** means the specified number of calendar days before the occurrence of the event specified, not counting the calendar date on which the specified event is scheduled to occur.
   I. **"Deliver", "Delivered" or "Delivery"**, unless otherwise specified in writing, means and shall be effective upon: personal receipt by Buyer or Seller or the individual Real Estate Licensee for that principal as specified in the section titled Real Estate Brokers on page10, regardless of the method used (i.e., messenger, mail, email, fax, other).
   J. **"Electronic Copy" or "Electronic Signature"** means, as applicable, an electronic copy or signature complying with California Law. Buyer and Seller agree that electronic means will not be used by either Party to modify or alter the content or integrity of this Agreement without the knowledge and consent of the other Party.
   K. **"Law"** means any law, code, statute, ordinance, regulation, rule or order, which is adopted by a controlling city, county, state or federal legislative, judicial or executive body or agency.
   M. **"Signed"** means either a handwritten or electronic signature on an original document, Copy or any counterpart.

45. **EXPIRATION OF OFFER:** This offer shall be deemed revoked and the deposit, if any, shall be returned to Buyer unless the offer is Signed by Seller and a Copy of the Signed offer is personally received by Buyer, or by _____, who is authorized to receive it, by 5:00 PM on the third Day after this offer is signed by Buyer (or by [ ] _____ [ ] AM/ [ ] PM, on _____ (date)).

☐ One or more Buyers is signing this Agreement in a representative capacity and not for him/herself as an individual. See attached Representative Capacity Signature Disclosure (C.A.R. Form RCSD) for additional terms.

Date _08/ 09/20_ BUYER _____

(Print name)  DAVID CHOI

Date _____   BUYER _____

(Print name) _____

☐ Additional Signature Addendum attached (C.A.R. Form ASA).

Seller's Initials ( _____ ) ( _____ )

BPA REVISED 11/14 (PAGE 8 OF 9)

**BUSINESS PURCHASE AGREEMENT (BPA PAGE 8 OF 9)**

Business Address: _____    Date: _____

**46. ACCEPTANCE OF OFFER:** Seller warrants that Seller is the owner of the Property, or has the authority to execute this Agreement. Seller accepts the above offer and agrees to sell the Property on the above terms and conditions. Seller has read and acknowledges receipt of a Copy of this Agreement, and authorizes Broker to Deliver a Signed Copy to Buyer.

☐ **(If checked) SELLER'S ACCEPTANCE IS SUBJECT TO ATTACHED COUNTER OFFER (C.A.R. Form SCO or SMCO) DATED:**
_____

☐ One or more Sellers is signing the Agreement in a representative capacity and not for him/herself as an individual. See attached Representative Capacity Signature Disclosure (C.A.R. Form RCSD) for additional terms.

Date _____    SELLER _____

**(Print name)** _____

Date _____    SELLER _____

**(Print name)** _____

☐ Additional Signature Addendum attached (C.A.R. Form ASA).

( _____ / _____ ) **(Do not initial if making a counter offer.) CONFIRMATION OF ACCEPTANCE:** A Copy of Signed Acceptance was
(Initials)    personally received by Buyer or Buyer's authorized agent on (date) _____ at _____
☐ AM/☐ PM. A binding Agreement is created when a Copy of Signed Acceptance is personally received by Buyer or Buyer's authorized agent whether or not confirmed in this document. Completion of this confirmation is not legally required in order to create a binding Agreement; it is solely intended to evidence the date that Confirmation of Acceptance has occurred.

---

**REAL ESTATE BROKERS:**
**A.** Real Estate Brokers are not parties to the Agreement between Buyer and Seller.
**B.** Agency relationships are confirmed as stated in paragraph 2.
**C.** If specified in paragraph 3A(2), Agent who submitted the offer for Buyer acknowledges receipt of deposit.
**D. COOPERATING BROKER COMPENSATION:** Listing Broker agrees to pay Cooperating Broker **(Selling Firm)** and Cooperating Broker agrees to accept, out of Listing Broker's proceeds in escrow, the amount specified in the MLS, provided Cooperating Broker is a Participant of the MLS in which the Business is offered for sale or a reciprocal MLS. If Listing Broker and Cooperating Broker are not both Participants of the MLS, or a reciprocal MLS, in which the Business is offered for sale, then compensation must be specified in a separate written agreement (C.A.R. Form CBC). Declaration of License and Tax (C.A.R. Form DLT) may be used to document that tax reporting will be required or that an exemption exists.

Real Estate Broker (Selling Firm) _Wilshire Realty & Investment_    CalBRE Lic. # _0202 8843_
By _K. Joon Han_    CalBRE Lic. # _01905517_    Date _08-09-2018_
By _____    CalBRE Lic. # _____    Date _____
Address _____    City _____    State _____ Zip _____
Telephone _____ Fax _____    E-mail _____
Real Estate Broker (Listing Firm) _____    CalBRE Lic. # _____
By _____    CalBRE Lic. # _____    Date _____
By _____    CalBRE Lic. # _____    Date _____
Address _____    City _____    State _____ Zip _____
Telephone _____ Fax _____    E-mail _____

---

**ESCROW HOLDER ACKNOWLEDGMENT:**
Escrow Holder acknowledges receipt of a Copy of this Agreement, (if checked,) ☐ a deposit in the amount of $ _____ ),
counter offer numbers _____ ☐ Seller's Statement of Information and _____
_____, and agrees to act as Escrow Holder subject to paragraph 28 of this Agreement, any supplemental escrow instructions and the terms of Escrow Holder's general provisions.

Escrow Holder is advised that the date of Confirmation of Acceptance of the Agreement as between Buyer and Seller is_____

Escrow Holder _____    Escrow # _____
By _____    Date _____
Address _____
Phone/Fax/E-mail _____
Escrow Holder has the following license number # _____
☐ Department of Business Oversight, ☐ Department of Insurance, ☐ Bureau of Real Estate.

---

**PRESENTATION OF OFFER:** ( _____ ) Listing Broker presented this offer to Seller on _____ (date).
Broker or Designee Initials

---

**REJECTION OF OFFER:** ( _____ ) ( _____ ) No counter offer is being made. This offer was rejected by Seller on _____ (date).
Seller's Initials

---

©1989– 2014, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form, or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
a subsidiary of the CALIFORNIA ASSOCIATION OF REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020
**BPA REVISED 11/14 (PAGE 9 OF 9)**

Buyer's Acknowledge that page 10 if part of
this Agreement ( _VL_ ) ( _____ )

Reviewed by
Broker or Designee _____

**BUSINESS PURCHASE AGREEMENT (BPA PAGE 9 OF 9)**



# DEPOSIT CHECK
# LOG – IN

**Wilshire Realty**

| # |
| --- |
| **AGENT NAME** |

---

**DAVID CHOI**
1604 VIA ROMA
MONTEBELLO, CA 90640

16-4123/1220

№ **104**

Date **8/10/18**

PAY TO THE ORDER OF  Wilshire Realty & Investment   $ 20000 00

twenty thousand

**Bank of Hope**
(888) 811-6272
bankofhope.com
Bank SWIFT Code: NARAUS6L

Memo

⑈122041235⑈0104 ⑈6200674756⑈

---

| PROPERTY ADDRESS | BUSINESS NAME |
| --- | --- |
| 1. | |
| 2. | |
| 3. | |

| DATE SUBMITTED TO BROKER | | AGENT'S SIGNATURE | |
| --- | --- | --- | --- |
| DATE RECEIVED FROM AGENT | | BROKER'S SIGNATURE | |

| TRANSFERRED TO | | | ESCROW CO |
| --- | --- | --- | --- |
| | [ ] MESSENGER PICK UP | [ ] PERSONAL DELIVERY BY AGENT | |
| AGENT'S PICK UP SIGNATURE | | DATE : | |

| SEND BACK TO BUYER | [ ] MAIL | [ ] PERSONAL DELIVERY BY AGENT | |
| --- | --- | --- | --- |
| AGENT'S PICK UP SIGNATURE | | DATE : | |



CALIFORNIA
ASSOCIATION
OF REALTORS®

# COOPERATING BROKER COMPENSATION
# AGREEMENT AND ESCROW INSTRUCTION
(C.A.R. Form CBC, Revised 4/09)

**1. IDENTITY OF LISTING BROKER, PROPERTY AND SELLER:**
    **Coldwell Banker Commercial** ("Listing Broker") is a real estate broker who has entered into a written agreement for the marketing and sale or lease of the real property, manufactured home, or business opportunity described as **RH BBQ**, Assessor's Parcel No. _____, situated in **18311 E. Colima Rd, Rowland Height**, County of **Los Angeles**, California ("Property") for ("Seller").

**2. IDENTITY OF COOPERATING (SELLING) BROKER AND BUYER:**
    **Wilshire Realty & Investment** ("Cooperating Broker") is a real estate broker licensed to practice real estate in California (or ☐ if checked _____ ) and represents _____ ("Buyer") who has offered, is contemplating making an offer, or has entered into a contract, to purchase or lease the Property.

**3. LISTING BROKER COMPENSATION TO COOPERATING BROKER:**
    Provided the transaction between the principals closes or Listing Broker receives compensation for the transaction, Listing Broker agrees to pay Cooperating Broker, and Cooperating Broker agrees to accept, compensation as follows:
    **A. PROPERTY LISTED WITH THE    MULTIPLE LISTING SERVICE ("MLS"):**
        **(i)** ☐ **Confirmation of Compensation in MLS:** Cooperating Broker is a participant in the MLS or reciprocal MLS and accepts the offer of compensation published in the MLS as: _____ % of the selling (or leasing) price or $ _____ ☐ and/or _____
        **OR (ii)** ☐ **Modification of Compensation in MLS:** Cooperating Broker is a participant in the MLS or reciprocal MLS and accepts the offer of compensation published in the MLS as modified herein: _____ % of the selling (or leasing) price or $ _____ ☐ and/or _____
        **OR (iii)** ☐ **Cooperating Broker Not a Member of the MLS or Reciprocal MLS:** Cooperating Broker compensation shall be _____ % of the selling (or leasing) price or $ _____ ☐ and/or _____. Listing Broker and Cooperating Broker agree to resolve disputes arising out of this agreement by arbitration conducted by the Association of Realtors® (or if none, the MLS) to which the Listing Broker belongs.
        **OR (iv)** ☐ **Short Sale Confirmation of Compensation in MLS:** Cooperating Broker (i) is a participant in the MLS or a reciprocal MLS; (ii) accepts the offer of compensation published in the MLS; and (iii) if the amount or method of reduction of commission upon Lender approval is specified in the MLS, agrees to such reduction.
    **B. PROPERTY NOT LISTED WITH ANY MULTIPLE LISTING SERVICE ("MLS"):**
        ☒ Cooperating Broker compensation shall be _**5.000**_ % of the selling (or leasing) price or $ _____ ☐ and/or _____.
    **C. COOPERATING BROKER HAS PROCURED A TENANT FOR THE PROPERTY LISTED FOR LEASE, AND THAT TENANT ACQUIRES THE PROPERTY DURING THE TERM OF THE LEASE OR ANY EXTENSION:**
        ☐ Cooperating Broker compensation on the sale shall be _____ % of the selling price or $ _____ ☐ and/or _____.

**4. BROKER INSTRUCTION TO ESCROW HOLDER:**
    Listing Broker and Cooperating Broker instruct Escrow Holder to disburse to Cooperating Broker the amount specified in paragraph 3, out of Listing Broker's proceeds in escrow, and upon Close Of Escrow of the Property. This compensation instruction can be amended or revoked only with the written consent of both Brokers. Escrow Holder shall immediately notify Brokers if either Broker instructs Escrow Holder to change the terms of this instruction.

**5. MANAGEMENT APPROVAL:**
    If Paragraph 3A(ii), 3A(iii), or 3B is checked, this Agreement is not binding until the Broker or office manager for the Listing Broker firm has signed below.

**6. ACKNOWLEDGMENT:**
    By signing below, the undersigned acknowledges that each has read, understands, accepts and has received a Copy of this Agreement.

Listing Broker (Firm) **Coldwell Banker Commercial**    BRE Lic. # _____

| By (Agent) | | | BRE Lic. # | | Date | |
|---|---|---|---|---|---|---|
| Address | | City | | State | | Zip |
| Telephone | Fax | E-mail | | | | |

**If paragraph 3A(ii), 3A(iii), or 3 B is checked:**
Listing Broker/Office Manager: _____ (Name)  (Signature)    Date _____

Cooperating Broker (Firm) **Wilshire Realty & Investment**    BRE Lic. # **02028843**

| By (Agent) | _ki Joon Han_ | BRE Lic. # **01905517** | Date **08/10/2018** |
|---|---|---|---|
| Address **3440 Wilshire Blvd #490** | City **Los Angeles** | State **CA** | Zip **90010** |
| Telephone **(213)263-2514** | Fax **(213)263-2615** | E-mail **prokihan@gmail.com** | |

The copyright laws of the United States (Title 17 U.S. Code) forbid the unauthorized reproduction of this form by any means, including facsimile or computerized formats. Copyright © 2009, CALIFORNIA ASSOCIATION OF REALTORS®, INC. ALL RIGHTS RESERVED.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.) NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ADEQUACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is available for use by the entire real estate industry. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by:
REAL ESTATE BUSINESS SERVICES, INC.
a subsidiary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

Reviewed by _____ Date _____    EQUAL HOUSING OPPORTUNITY

**CBC 4/09 (PAGE 1 OF 1)**
**COOPERATING BROKER COMPENSATION AGREEMENT AND ESCROW INSTRUCTION (CBC PAGE 1 OF 1)**



CALIFORNIA
ASSOCIATION
OF REALTORS®

**ADDENDUM**

(C.A.R. Form ADM, Revised 12/15)

**No. *1***

The following terms and conditions are hereby incorporated in and made a part of the: ☐ Purchase Agreement, ☐ Residential Lease or Month-to-Month Rental Agreement, ☐ Transfer Disclosure Statement (Note: An amendment to the TDS may give the Buyer a right to rescind), ☒ Other *Business Purchase Agreement and Joint Escrow Instructions*

dated **August 9, 2018** , on property known as **RH BBQ at 18311 Colima Rd**
**Rowland Heights, CA 91748**

in which **Kool Corner, Inc.** is referred to as ("Buyer/Tenant")

and is referred to as ("Seller/Landlord").

*1. Buyer and Seller agree to extend the duration of offer dated 8/19/2018 until the bankruptcy court order approving the sale.*
*2. Both parties agree there are no conditions or contingencies to closing other than*
*(1) Entry of bankruptcy court order approving the sale, subject to overbids, and assigning the lease without any modification, and*
*(2) Approval of the transfer of the liquor license to Buyer. The business is being sold in "as-is, where-is" condition, with no representation or warranty. The balance of the purchase price is due at closing which shall occur immediately upon approval of the transfer of the liquor license. Buyer agrees to use best efforts and act in good faith to obtain the transfer of the liquor license. The deposit is non-refundable and forfeited if Buyer fails to timely close.*

The foregoing terms and conditions are hereby agreed to, and the undersigned acknowledge receipt of a copy of this document.

Date  *8/30/18*

Date

Buyer/Tenant _____
*Kool Corner, Inc.*

Seller/Landlord

Buyer/Tenant

Seller/Landlord

© 1986-2015, California Association of REALTORS®, Inc. United States copyright law (Title 17 U.S. Code) forbids the unauthorized distribution, display and reproduction of this form or any portion thereof, by photocopy machine or any other means, including facsimile or computerized formats.
THIS FORM HAS BEEN APPROVED BY THE CALIFORNIA ASSOCIATION OF REALTORS® (C.A.R.). NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ACCURACY OF ANY PROVISION IN ANY SPECIFIC TRANSACTION. A REAL ESTATE BROKER IS THE PERSON QUALIFIED TO ADVISE ON REAL ESTATE TRANSACTIONS. IF YOU DESIRE LEGAL OR TAX ADVICE, CONSULT AN APPROPRIATE PROFESSIONAL.
This form is made available to real estate professionals through an agreement with or purchase from the California Association of REALTORS®. It is not intended to identify the user as a REALTOR®. REALTOR® is a registered collective membership mark which may be used only by members of the NATIONAL ASSOCIATION OF REALTORS® who subscribe to its Code of Ethics.

Published and Distributed by
REAL ESTATE BUSINESS SERVICES, INC.
a subsidiary of the California Association of REALTORS®
525 South Virgil Avenue, Los Angeles, California 90020

**ADM REVISED 12/15 (PAGE 1 OF 1)**

**ADDENDUM (ADM PAGE 1 OF 1)**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>EXHIBIT "2"</u>**

[Lease]

**JTNA Commercial Development and Management Inc.**
**269 S Beverly Dr # 366**
**Beverly Hills, CA 90212**
**310-284-8733/9 (o)**
**310-284-8738 (f)**
**e-mail: jtna@sbcglobal.net**

**December 15, 2017**

**To: Young Keun Park**
**18311A East Colima rd**
**Rowland Heights Ca 91748**

**Re: Options TO Extend / JTNA Enterprises LLC**

**Dear Young Keun Park :**

**Our record indicate your lease at above referenced property will expire on December 31 2017. Please put your signature next to the * to extend the lease for an additional 10 years. Should you have any questions, please don't hesitate to call me. Thank you!**

\* _____
   **Young Keun Park**

**Sincerely,**

**Sue Cheng**
**JTNA Leasing Division**



# AIR COMMERCIAL REAL ESTATE ASSOCIATION

# STANDARD RETAIL/MULTI-TENANT LEASE - NET

1.  **Basic Provisions ("Basic Provisions").**
    1.1    **Parties:** This Lease ("Lease"), dated for reference purposes only <u>12/10/2007</u>
is made by and between <u>JTNA Enterprises LLC</u>
                                                                                                                                                    ("Lessor")

and <u>Joung Nam Oh</u>
                                                                                                                                                    ("Lessee")
(collectively the **"Parties"**, or individually a **"Party"**).
    1.2    **Premises:** That certain portion of the Shopping Center (as defined below), including all improvements therein or to be provided by
Lessor under the terms of this Lease, commonly known by the street address of <u>18311A East Colima Rd</u>
located in the City of <u>Rowland Heights</u>                                              , County of <u>Los Angeles</u>                                         , State of
<u>California</u>                                     , with zip code <u>91748</u>          , as outlined on Exhibit _____ attached hereto ("Premises")
and generally described as (describe briefly the nature of the Premises): _____

In addition to Lessee's rights to use and occupy the Premises as hereinafter specified, Lessee shall have non-exclusive rights to the Common Areas
(as defined in Paragraph 2.7 below) as hereinafter specified, but shall not have any rights to the roof, exterior walls or utility raceways of the building
containing the Premises ("Building") or to any other buildings in the Shopping Center. The Premises and the Building are situated within the Shopping
Center known as <u>Rowland Heights Shopping Center</u>                                                   The Premises, the Building,
the Common Areas and all other buildings and improvements within said Shopping Center, together with the land upon which they are located, are
herein collectively referred to as the **"Shopping Center."** (See also Paragraph 2)
    1.3    **Term:** <u>5</u>                              years and _____ months ("Original Term")
commencing <u>1/1/2008</u>                           ("Commencement Date") and ending <u>12/31/2012</u>
("Expiration Date"). (See also Paragraph 3)
    1.4    **Early Possession:** _____ ("Early Possession Date"). (See also Paragraphs 3.2 and 3.3)
    1.5    **Base Rent:** $<u>9,867.40</u>                        per month ("Base Rent"), payable on the <u>1st</u>
day of each month commencing <u>January 2008</u>                                       . (See also Paragraph 4)
    ☐  If this box is checked, there are provisions in this Lease for the Base Rent to be adjusted.
    1.6    **Percentage Rent Rate:** _____ percent (_____%) of Gross Sales.  Percentage
Rent shall be due and payable in accordance with the provisions of the Percentage Rent Addendum, if any, attached hereto and made a part hereof,
and Paragraph 4 hereof.
    1.7    **Lessee's Share of Common Area Operating Expenses:** <u>estimated $3175.38</u>                            percent (_____%)
("Lessee's Share").
    1.8    **Merchants' Association Annual Dues:** $ _____ per year ("Merchants' Association Dues").
Lessee shall pay Merchants' Association Dues and/or become a member of the Merchants' Association in accordance with the provisions of the
Merchants' Association Addendum, if any, attached hereto.
    1.9    **Base Rent and Other Monies Paid Upon Execution:**
        (a)    Base Rent: $<u>9,867.40</u>        for the period <u>Jan 2008</u>
        (b)    Common Area Operating Expenses: $<u>estimated 3175.38</u> for the period <u>Jan 2008</u>
        (c)    Security Deposit: $ <u>39,128.34</u>              ("Security Deposit"). (See also Paragraph 5)
        (d)    Merchants' Association Dues: $_____        for the period _____
        (e)    Other: $_____ for _____
        (f)    Total Due Upon Execution of this Lease: $<u>52,171.12</u>
    1.10    **Agreed Use:** <u>Korean BBQ Restaurant</u>

total Base Rent) for the brokerage services rendered by the Brokers.

1.14    **Guarantor.** The obligations of the Lessee under this Lease are to be guaranteed by Joung Nam Oh
_____
("Guarantor"). (See also Paragraph 37)

1.15    **Attachments.** Attached hereto are the following, all of which constitute a part of this Lease:
☑ an addendum consisting of Paragraphs 58 _____ through 59 _____
☐ a site plan marked Exhibit _____, depicting the Premises;
☐ a site plan marked Exhibit _____, depicting the Shopping Center;
☐ a current set of Rules and Regulations for the Shopping Center;
☐ a current set of the Sign Criteria for the Shopping Center;
☐ a work letter;
☐ other (specify): _____

_____
_____
_____

2.    **Premises.**

2.1    **Letting.** Lessor hereby leases to Lessee and Lessee hereby leases from Lessor, the Premises, for the term, at the rental, and upon all of the terms, covenants and conditions set forth in this Lease. Unless otherwise provided herein, any statement of size set forth in this Lease, or that may have been used in calculating Rent, is an approximation which the Parties agree is reasonable and any payments based thereon are not subject to revision whether or not the actual size is more or less. NOTE: Lessee is advised to verify the actual size prior to executing this Lease.

2.2    **Condition.** Lessor shall deliver the Premises to Lessee broom clean and free of debris on the Commencement Date or the Early Possession Date, whichever first occurs ("Start Date"), and, so long as the required service contracts described in Paragraph 7.1(b) below are obtained by Lessee and in effect within 30 days following the Start Date, warrants that the existing electrical, plumbing, fire sprinkler, lighting, heating, ventilating and air conditioning systems ("HVAC"), loading doors, if any, and all other such elements in the Premises, other than those constructed by Lessee, shall be in good operating condition on said date and that the structural elements of the roof, bearing walls and foundation of the Premises shall be free of material defects, and that the Premises do not contain hazardous levels of any mold or fungi defined as toxic under applicable state or federal law. If a non-compliance with such warranty exists as of the Start Date, or if one of such systems or elements should malfunction or fail within the appropriate warranty period, Lessor shall, as Lessor's sole obligation with respect to such matter, except as otherwise provided in this Lease, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, malfunction or failure, rectify same at Lessor's expense. The warranty periods shall be as follows: (i) 6 months as to the HVAC systems, and (ii) 30 days as to the remaining systems and other elements of the Premises. If Lessee does not give Lessor the required notice within the appropriate warranty period, correction of any such non-compliance, malfunction or failure shall be the obligation of Lessee at Lessee's sole cost and expense (except for the repairs to the fire sprinkler systems, roof, foundations, and/or bearing walls).

2.3    **Compliance.** Lessor warrants that to the best of its knowledge the improvements on the Premises and the Common Areas comply with the building codes that were in effect at the time that each such improvement, or portion thereof, was constructed, and also with all applicable laws, covenants or restrictions of record, regulations, and ordinances in effect on the Start Date ("Applicable Requirements"). Said warranty does not apply to the use to which Lessee will put the Premises, modifications which may be required by the Americans with Disabilities Act or any similar laws as a result of Lessee's use (see Paragraph 51), or to any Alterations or Utility Installations (as defined in Paragraph 7.3(a)) made or to be made by Lessee. NOTE: Lessee is responsible for determining whether or not the Applicable Requirements, and especially the zoning, are appropriate for Lessee's intended use, and acknowledges that past uses of the Premises may no longer be allowed. If the Premises do not comply with said warranty, Lessor shall, except as otherwise provided, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, rectify the same at Lessor's expense. If Lessee does not give Lessor written notice of a non-compliance with this warranty within 6 months following the Start Date, correction of that non-compliance shall be the obligation of Lessee at Lessee's sole cost and expense. If the Applicable Requirements are hereafter changed so as to require during the term of this Lease the construction of an addition to or an alteration of the Premises and/or Building, the remediation of any Hazardous Substance, or the reinforcement or other physical modification of the Premises and/or Building ("Capital Expenditure"), Lessor and Lessee shall allocate the cost of such work as follows:

(a)    Subject to Paragraph 2.3(c) below, if such Capital Expenditures are required as a result of the specific and unique use of the Premises by Lessee as compared with uses by tenants in general, Lessee shall be fully responsible for the cost thereof, provided, however that if such Capital Expenditure is required during the last 2 years of this Lease and the cost thereof exceeds 6 months' Base Rent, Lessee may instead terminate this Lease unless Lessor notifies Lessee, in writing, within 10 days after receipt of Lessee's termination notice that Lessor has elected to pay the difference between the actual cost thereof and the amount equal to 6 months' Base Rent. If Lessee elects termination, Lessee shall immediately cease the use of the Premises which requires such Capital Expenditure and deliver to Lessor written notice specifying a termination date at least 90 days thereafter. Such termination date shall, however, in no event be earlier than the last day that Lessee could legally utilize the Premises without commencing such Capital Expenditure.

(b)    If such Capital Expenditure is not the result of the specific and unique use of the Premises by Lessee (such as, governmentally mandated seismic modifications), then Lessor and Lessee shall allocate the obligation to pay for the portion of such costs reasonably attributable to the Premises pursuant to the formula set out in Paragraph 7.1(d); provided, however, that if such Capital Expenditure is required during the last 2 years of this Lease or if Lessor reasonably determines that it is not economically feasible to pay its share thereof, Lessor shall have the option to terminate this Lease upon 90 days prior written notice to Lessee unless Lessee notifies Lessor, in writing, within 10 days after receipt of Lessor's termination notice that Lessee will pay for such Capital Expenditure. If Lessor does not elect to terminate, and fails to tender its share of any such Capital Expenditure, Lessee may advance such funds and deduct same, with Interest, from Rent until Lessor's share of such costs have been fully paid. If Lessee is unable to finance Lessor's share, or if the balance of the Rent due and payable for the remainder of this Lease is not sufficient to fully reimburse Lessee on an offset basis, Lessee shall have the right to terminate this Lease upon 30 days written notice to Lessor.

(c)    Notwithstanding the above, the provisions concerning Capital Expenditures are intended to apply only to non-voluntary, unexpected, and new Applicable Requirements. If the Capital Expenditures are instead triggered by Lessee as a result of an actual or proposed change in use, change in intensity of use, or modification to the Premises then, and in that event, Lessee shall either: (i) immediately cease such changed use or intensity of use and/or take such other steps as may be necessary to eliminate the requirement for such Capital Expenditure, or (ii) complete such Capital Expenditure at its own expense. Lessee shall not have any right to terminate this Lease.

2.4    **Acknowledgements.** Lessee acknowledges that: (a) it has been advised by Lessor and/or Brokers to satisfy itself with respect to the condition of the Premises (including but not limited to the electrical, HVAC and fire sprinkler systems, security, environmental aspects, and compliance with Applicable Requirements and the Americans with Disabilities Act) and their suitability for Lessee's intended use, (b) Lessee has made such investigation as it deems necessary with reference to such matters and assumes all responsibility therefor as the same relate to its occupancy of the Premises, and (c) neither Lessor, Lessor's agents, nor Brokers have made any oral or written representations or warranties with respect to said matters other than as set forth in this Lease. In addition, Lessor acknowledges that: (i) Brokers have made no representations, promises or warranties concerning Lessee's ability to honor the Lease or suitability to occupy the Premises, and (ii) it is Lessor's sole responsibility to investigate the financial capability and/or suitability of all proposed tenants.

2.7    **Common Areas - Definition.** The term "Common Areas" is defined as all areas and facilities outside the Premises and within the exterior boundary line of the Shopping Center and interior utility raceways and installations within the Premises that are provided and designated by the Lessor from time to time for the general non-exclusive use of Lessor, Lessee and other tenants of the Shopping Center and their respective employees, suppliers, shippers, customers, contractors and invitees, including parking areas, loading and unloading areas, trash areas, roadways, walkways, driveways and landscaped areas.

2.8    **Common Areas - Lessee's Rights.** Lessor grants to Lessee, for the benefit of Lessee and its employees, suppliers, shippers, contractors, customers and invitees, during the term of this Lease, the non-exclusive right to use, in common with others entitled to such use, the Common Areas as they exist from time to time, subject to any rights, powers, and privileges reserved by Lessor under the terms hereof or under the terms of any rules and regulations or restrictions governing the use of the Shopping Center. Under no circumstances shall the right herein granted to use the Common Areas be deemed to include the right to store any property, temporarily or permanently, in the Common Areas, nor the right to display merchandise or conduct sales in the Common Areas. Any such storage, display or sales shall be permitted only by the prior written consent of Lessor or Lessor's designated agent, as exercised in Lessor's sole discretion, which consent may be revoked at any time. In the event that any unauthorized storage or displays shall occur then Lessor shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove the property and charge the cost to Lessee, which cost shall be immediately payable upon demand by Lessor.

2.9    **Common Areas - Rules and Regulations.** Lessor or such other person(s) as Lessor may appoint shall have the exclusive control and management of the Common Areas and shall have the right, from time to time, to establish, modify, amend and enforce reasonable rules and regulations ("**Rules and Regulations**") for the management, safety, care, and cleanliness of the grounds, the parking and unloading of vehicles and the preservation of good order, as well as for the convenience of other occupants or tenants of the Building and the Shopping Center and their invitees. Lessee agrees to abide by and conform to all such Rules and Regulations, and shall use its best efforts to cause its employees, suppliers, shippers, customers, contractors and invitees to so abide and conform. Lessor shall not be responsible to Lessee for the non-compliance with said Rules and Regulations by other tenants of the Project.

2.10    **Common Areas - Changes.** Lessor shall have the right, in Lessor's sole discretion, from time to time:

(a)    To make changes or additions to the Common Areas, including, without limitation, changes in the location, size, shape and number of driveways, entrances, parking spaces, parking areas, loading and unloading areas, ingress, egress, direction of traffic, elevations, landscaped areas, signage, walkways and utility raceways;

(b)    To use and close temporarily any of the Common Areas for the purpose of maintaining, repairing and altering the Shopping Center, so long as reasonable access to the Premises remains available, and to close temporarily any of the Common Areas to whatever extent is required in the opinion of Lessor's counsel to prevent a dedication of or the accrual of any rights of any persons or of the public to any of the Common Areas;

(c)    To designate other land outside the boundaries of the Shopping Center to be a part of the Common Areas or to be entitled to use the Common Areas on a reciprocal basis;

(d)    To add additional buildings and improvements to the Common Areas; and

(e)    To do and perform such other acts and make such other changes in, to or with respect to the Common Areas and Shopping Center as Lessor may, in the exercise of sound business judgment, deem to be appropriate.

2.11    **Common Areas - Promotional Events; Sidewalk Sales.** Lessor reserves the right, from time to time, in Lessor's sole discretion, to utilize portions of the Common Areas for promotional events, which may include but shall not be limited to entertainment. Lessor further reserves the right, in Lessor's sole discretion, to permit any one or more tenants of the Shopping Center to conduct the display and/or sale of merchandise from the sidewalks immediately adjacent to such tenants' respective premises.

2.12    **Common Areas - Remodeling.** At any time during the Term, Lessor may remodel or expand, in any manner, the existing Shopping Center, which work may include, without limitation, the addition of shops and/or new buildings to the Shopping Center (collectively, "**Remodeled Center**"). If Lessor deems it necessary for construction personnel to enter the Premises in order to construct the Remodeled Center, Lessor shall give Lessee no less than 60 days prior notice and Lessee shall allow such entry. Lessor shall use reasonable efforts to complete any work affecting the Premises in an efficient manner so as not to interfere unreasonably with Lessee's business. Lessee shall not be entitled to any damages for any inconvenience or any disruption to Lessee's business caused by such work; provided, however, the Base Rent paid by Lessee for the period of the inconvenience shall be abated in proportion to the degree that Lessee's use of the Premises is impaired. Lessor shall have the right to use portions of the Premises to accommodate any structures required for the Remodeled Center, provided that if as a result thereof there is a permanent decrease in the floor area of the Premises of 3% or more, there shall be a proportionate downward adjustment of Base Rent and Lessee's Share.

3.    **Term.**

3.1    **Term.** The Commencement Date, Expiration Date and Original Term of this Lease are as specified in Paragraph 1.3.

3.2    **Early Possession.** If an Early Possession Date has been specified in Paragraph 1.4, the Parties intend that Lessee shall have access to the Premises as of the Early Possession Date for purposes of preparing and fixturing the Premises for the conduct of Lessee's business. If Lessee totally or partially occupies the Premises prior to the Commencement Date for any reason (and for purposes hereof, "occupancy" shall include, without limitation, Lessee's entry onto the Premises for purposes of preparing and fixturing the Premises for business), the obligation to pay Base Rent and Percentage Rent shall be abated for the period of such early possession. All other terms of this Lease (including but not limited to Lessee's obligations to carry insurance and to maintain the Premises) shall be in effect during such period, except that Lessee's obligation to pay Lessee's Share of Common Area Operating Expenses, Real Property Taxes and insurance premiums shall only be in effect prior to the Commencement Date if Lessee has opened for business in the Premises prior to the Commencement Date. Any such early possession shall not affect the Expiration Date.

3.3    **Delay In Possession.** Lessor agrees to use its best commercially reasonable efforts to deliver possession of the Premises to Lessee by the Start Date. If, despite said efforts, Lessor is unable to deliver possession as agreed, Lessor shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease or change the Expiration Date. Lessee shall not, however, be obligated to pay Rent or perform its other obligations until Lessor delivers possession of the Premises and any period of rent abatement that Lessee would otherwise have enjoyed shall run from the date of the delivery of possession and continue for a period equal to what Lessee would otherwise have enjoyed, but minus any days of delay caused by the acts or omissions of Lessee. If possession is not delivered within 60 days after the Commencement Date, Lessee may, at its option, by notice in writing within 10 days after the end of such 60 day period, cancel this Lease, in which event the Parties shall be discharged from all obligations hereunder. If such written notice is not received by Lessor within said 10 day period, Lessee's right to cancel shall terminate. Except as otherwise provided, if possession is not tendered to Lessee by the Commencement Date and Lessee does not terminate this Lease, as aforesaid, any period of rent abatement that Lessee would otherwise have enjoyed shall run from the date of delivery of possession and continue for a period equal to what Lessee would otherwise have enjoyed under the terms hereof, but minus any days of delay caused by the acts or omissions of Lessee. If possession of the Premises is not delivered within 4 months after the Commencement Date, this Lease shall terminate unless other agreements are reached between Lessor and Lessee, in writing.

3.4    **Lessee Compliance.** Lessor shall not be required to tender possession of the Premises to Lessee until Lessee complies with its obligation to provide evidence of insurance (Paragraph 8.5). Pending delivery of such evidence, Lessee shall be required to perform all of its obligations under this Lease from and after the Start Date, including the payment of Rent, notwithstanding Lessor's election to withhold possession pending receipt of such evidence of insurance. Further, if Lessee is required to perform any other conditions prior to or concurrent with the Start Date, the Start Date shall occur but Lessor may elect to withhold possession until such conditions are satisfied.

4.    **Rent.**

4.1    **Rent Defined.** All monetary obligations of Lessee to Lessor under the terms of this Lease (except for the Security Deposit) are deemed to be rent ("**Rent**").

metered.

         (ii)        The cost of water, gas, electricity and telephone to service the Common Areas and any utilities not separately

         (iii)       Trash disposal, pest control services, property management (including, but not be limited to, a property management fee to Lessor equal to 5% of Base Rent and Percentage Rent, security services, and the costs of any environmental inspections. 15% *administration fee to all CAM expenses.*

         (iv)       Reserves set aside for equipment, maintenance, repair and replacement of Common Areas.

         (v)       Real Property Taxes (as defined in Paragraph 10).

         (vi)       The cost of the premiums for the insurance maintained by Lessor pursuant to Paragraph 8.

         (vii)      Any deductible portion of an insured loss concerning the Building or the Common Areas.

         (viii)     Auditors', accountants' and attorneys' fees and costs related to the operation of the Shopping Center.

         (ix)       The cost of any capital improvement to the Building or the Shopping Center not covered under the provisions of Paragraph 2.3; provided, however, that Lessor shall allocate the cost of any such capital improvement over a 12 year period and Lessee shall not be required to pay more than Lessee's Share of 1/144th of the cost of such capital improvement in any given month.

         (x)       Any other services to be provided by Lessor that are stated elsewhere in this Lease to be a Common Area Operating Expense.

         (b)       If Lessor determines that the method of proration of any item included within Common Area Operating Expenses is inequitable, Lessor may prorate such item on the basis of usage or other equitable considerations. Any Common Area Operating Expenses and Real Property Taxes that are specifically attributable to the Premises, the Building or to any other premises or building in the Shopping Center or to the operation, repair and maintenance thereof shall be allocated entirely to such premises or building. However, any Common Area Operating Expenses and Real Property Taxes that are not specifically attributable to any premises or building or to the operation, repair and maintenance thereof shall be equitably allocated by Lessor to all buildings in the Shopping Center.

         (c)       The inclusion of the improvements, facilities and services set forth in Subparagraph 4.2(a) shall not be deemed to impose an obligation upon Lessor to either have said improvements or facilities or to provide those services unless the Shopping Center already has the same, Lessor already provides the services, or Lessor has agreed elsewhere in this Lease to provide the same or some of them.

         (d)       Lessee's Share of Common Area Operating Expenses is payable monthly on the same day as the Base Rent is due hereunder. The amount of such payments shall be based on Lessor's estimate of the annual Common Area Operating Expenses. Within 60 days after written request (but not more than once each year) Lessor shall deliver to Lessee a reasonably detailed statement showing Lessee's Share of the actual Common Area Operating Expenses incurred during the preceding year. If Lessee's payments during such year exceed Lessee's Share, Lessor shall credit the amount of such over-payment against Lessee's future payments. If Lessee's payments during such year were less than Lessee's Share, Lessee shall pay to Lessor the amount of the deficiency within 10 days after delivery by Lessor to Lessee of the statement.

         (e)       If there are one or more Major Tenants (as hereinafter defined) within the Shopping Center, then at Lessor's sole option, the amount to be reimbursed by such Major Tenants to Lessor for all or a portion of the Common Area Operating Expenses may be determined by alternative equitable methods (e.g., a Major Tenant may pay directly for its own security), and the actual amount paid by such Major Tenants shall be credited against the Common Area Operating Expenses allocated to other tenants of the Shopping Center; provided, however, that in such event the rentable area of the buildings leased to such Major Tenants shall be excluded from the rentable area of the Shopping Center for purposes of determining Lessee's Share of Common Area Operating Expenses for those specific items, notwithstanding the percentage set forth in Paragraph 1.7. As used herein, the term **"Major Tenant"** shall mean a tenant leasing at least 15,000 square feet of rentable area within the Shopping Center.

         (f)       Common Area Operating Expenses shall not include any expenses paid by any tenant directly to third parties, or as to which Lessor is otherwise reimbursed by any third party, other tenant, or insurance proceeds.

         4.3       **Payment.** Lessee shall cause payment of Rent to be received by Lessor in lawful money of the United States, without offset or deduction (except as specifically permitted in this Lease), on or before the day on which it is due. All monetary amounts shall be rounded to the nearest whole dollar. In the event that any invoice prepared by Lessor is inaccurate such inaccuracy shall not constitute a waiver and Lessee shall be obligated to pay the amount set forth in this Lease. Rent for any period during the term hereof which is for less than one full calendar month shall be prorated based upon the actual number of days of said month. Payment of Rent shall be made to Lessor at its address stated herein or to such other persons or place as Lessor may from time to time designate in writing. Acceptance of a payment which is less than the amount then due shall not be a waiver of Lessor's rights to the balance of such Rent, regardless of Lessor's endorsement of any check so stating. In the event that any check, draft, or other instrument of payment given by Lessee to Lessor is dishonored for any reason, Lessee agrees to pay to Lessor the sum of $25 in addition to any Late Charge and Lessor, at its option, may require all future Rent be paid by cashier's check. Payments will be applied first to accrued late charges and attorney's fees, second to accrued interest, then to Base Rent and Common Area Operating Expenses, and any remaining amount to any other outstanding charges or costs.

**5.**       **Security Deposit.** Lessee shall deposit with Lessor upon execution hereof the Security Deposit as security for Lessee's faithful performance of its obligations under this Lease. If Lessee fails to pay Rent, or otherwise Defaults under this Lease, Lessor may use, apply or retain all or any portion of said Security Deposit for the payment of any amount due Lessor or to reimburse or compensate Lessor for any liability, expense, loss or damage which Lessor may suffer or incur by reason thereof. If Lessor uses or applies all or any portion of the Security Deposit, Lessee shall within 10 days after written request therefor deposit monies with Lessor sufficient to restore said Security Deposit to the full amount required by this Lease. If the Base Rent increases during the term of this Lease, Lessee shall, upon written request from Lessor, deposit additional monies with Lessor so that the total amount of the Security Deposit shall at all times bear the same proportion to the increased Base Rent as the initial Security Deposit bore to the initial Base Rent. Should the Agreed Use be amended to accommodate a material change in the business of Lessee or to accommodate a sublessee or assignee, Lessor shall have the right to increase the Security Deposit to the extent necessary, in Lessor's reasonable judgment, to account for any increased wear and tear that the Premises may suffer as a result thereof. If a change in control of Lessee occurs during this Lease and following such change the financial condition of Lessee is, in Lessor's reasonable judgment, significantly reduced, Lessee shall deposit such additional monies with Lessor as shall be sufficient to cause the Security Deposit to be at a commercially reasonable level based on such change in financial condition. Lessor shall not be required to keep the Security Deposit separate from its general accounts. Within 14 days after the expiration or termination of this Lease, if Lessor elects to apply the Security Deposit only to unpaid Rent, and otherwise within 30 days after the Premises have been vacated pursuant to Paragraph 7.4(c) below, Lessor shall return that portion of the Security Deposit not used or applied by Lessor. No part of the Security Deposit shall be considered to be held in trust, to bear interest or to be prepayment for any monies to be paid by Lessee under this Lease.

**6.**       **Use.**

         6.1       **Use.**

         (a)       **Agreed Use; Agreed Trade Name.** Lessee shall use and occupy the Premises only for the Agreed Use, and for no other purpose, and Lessee shall operate at the Premises only under the Agreed Trade Name and under no other trade name. Lessee shall not use or permit the use of the Premises in a manner that is unlawful, creates damage, waste or a nuisance, or that disturbs occupants of or causes damage to neighboring premises or properties. Other than guide, signal and seeing eye dogs, Lessee shall not keep or allow in the Premises any pets, animals, birds, fish, or reptiles. Lessor shall not unreasonably withhold or delay its consent to any written request for a modification of the Agreed Use, so long as the same will not impair the structural integrity of the improvement on the Premises or the mechanical or electrical systems therein, and/or is not significantly more burdensome to the Premises, and/or is not in conflict with or incompatible with the existing or proposed uses (whether or not exclusive) of other occupants of the Shopping Center. Lessor shall not unreasonably withhold or delay its consent to any written request for a modification of the Agreed Trade Name, so long as the same is not in conflict with or incompatible with the nature and character of the Shopping Center or other existing or proposed uses of other occupants of the Shopping Center. If Lessor elects to withhold consent, Lessor shall within 7 days after

remedies available to Lessor, Lessor may seek to enjoin Lessee's breach of such covenant and Lessee shall be liable for any damages incurred or sustained by Lessor to such other tenants whose exclusive use rights are breached by Lessee. In no event shall Lessor be liable to Lessee for any failure of any other tenants of the Shopping Center to operate their businesses, or for any loss or damage that may be occasioned by or through the acts or omissions of other tenants or third parties.

(d)   **Other Tenancies.**   Lessor, at its sole discretion, reserves the absolute right to establish procedures to control other tenancies in the Shopping Center. Regardless of whether any specific tenants are shown on any site plan attached hereto, Lessee does not rely on that fact, nor does Lessor represent that any specific tenant or number or type of tenants shall or shall not during the Term occupy any portion of the Shopping Center, nor does Lessee rely on any other tenant operating its business in the Shopping Center at any particular time or times. Further, no conduct by any tenant, subtenant or other occupant of, or any customer of, or any supplier to or use of any portion of the Shopping Center shall constitute an eviction, constructive or otherwise, of Lessee from the Premises, and Lessee hereby waives any and all claims that it might otherwise have against Lessor by reason thereof.

6.2   **Hazardous Substances.**

(a)   **Reportable Uses Require Consent.**   The term "Hazardous Substance" as used in this Lease shall mean any product, substance, or waste whose presence, use, manufacture, disposal, transportation, or release, either by itself or in combination with other materials expected to be on the Premises, is either: (i) potentially injurious to the public health, safety or welfare, the environment or the Premises, (ii) regulated or monitored by any governmental authority, or (iii) a basis for potential liability of Lessor to any governmental agency or third party under any applicable statute or common law theory. Hazardous Substances shall include, but not be limited to, hydrocarbons, petroleum, gasoline, and/or crude oil or any products, by-products or fractions thereof. Lessee shall not engage in any activity in or on the Premises which constitutes a Reportable Use of Hazardous Substances without the express prior written consent of Lessor and timely compliance (at Lessee's expense) with all Applicable Requirements. "Reportable Use" shall mean (i) the installation or use of any above or below ground storage tank, (ii) the generation, possession, storage, use, transportation, or disposal of a Hazardous Substance that requires a permit from, or with respect to which a report, notice, registration or business plan is required to be filed with, any governmental authority, and/or (iii) the presence at the Premises of a Hazardous Substance with respect to which any Applicable Requirements requires that a notice be given to persons entering or occupying the Premises or neighboring properties. Notwithstanding the foregoing, Lessee may use any ordinary and customary materials reasonably required to be used in the normal course of the Agreed Use, ordinary office supplies (copier toner, liquid paper, glue, etc.) and common household cleaning materials, so long as such use is in compliance with all Applicable Requirements, is not a Reportable Use, and does not expose the Premises or neighboring property to any meaningful risk of contamination or damage or expose Lessor to any liability therefor. In addition, Lessor may condition its consent to any Reportable Use upon receiving such additional assurances as Lessor reasonably deems necessary to protect itself, the public, the Premises and/or the environment against damage, contamination, injury and/or liability, including, but not limited to, the installation (and removal on or before Lease expiration or termination) of protective modifications (such as concrete encasements) and/or increasing the Security Deposit.

(b)   **Duty to Inform Lessor.**   If Lessee knows, or has reasonable cause to believe, that a Hazardous Substance has come to be located in, on, under or about the Premises, other than as previously consented to by Lessor, Lessee shall immediately give written notice of such fact to Lessor, and provide Lessor with a copy of any report, notice, claim or other documentation which it has concerning the presence of such Hazardous Substance.

(c)   **Lessee Remediation.**   Lessee shall not cause or permit any Hazardous Substance to be spilled or released in, on, under, or about the Premises (including through the plumbing or sanitary sewer system) and shall promptly, at Lessee's expense, comply with all Applicable Requirements and take all investigatory and/or remedial action reasonably recommended, whether or not formally ordered or required, for the cleanup of any contamination of, and for the maintenance, security and/or monitoring of the Premises or neighboring properties, that was caused or materially contributed to by Lessee, or pertaining to or involving any Hazardous Substance brought onto the Premises during the term of this Lease, by or for Lessee, or any third party.

(d)   **Lessee Indemnification.**   Lessee shall indemnify, defend and hold Lessor, its agents, employees, lenders and ground lessor, if any, harmless from and against any and all loss of rents and/or damages, liabilities, judgments, claims, expenses, penalties, and attorneys' and consultants' fees arising out of or involving any Hazardous Substance brought onto the Premises by or for Lessee, or any third party (provided, however, that Lessee shall have no liability under this Lease with respect to underground migration of any Hazardous Substance under the Premises from areas outside of the Shopping Center not caused or contributed to by Lessee). Lessee's obligations shall include, but not be limited to, the effects of any contamination or injury to person, property or the environment created or suffered by Lessee, and the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease. No termination, cancellation or release agreement entered into by Lessor and Lessee shall release Lessee from its obligations under this Lease with respect to Hazardous Substances, unless specifically so agreed by Lessor in writing at the time of such agreement.

(e)   **Lessor Indemnification.**   Lessor and its successors and assigns shall indemnify, defend, reimburse and hold Lessee, its employees and lenders, harmless from and against any and all environmental damages, including the cost of remediation, which are suffered as a direct result of Hazardous Substances on the Premises prior to Lessee taking possession or which are caused by the gross negligence or willful misconduct of Lessor, its agents or employees. Lessor's obligations, as and when required by the Applicable Requirements, shall include, but not be limited to, the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease.

(f)   **Investigations and Remediations.**   Lessor shall retain the responsibility and pay for any investigations or remediation measures required by governmental entities having jurisdiction with respect to the existence of Hazardous Substances on the Premises prior to Lessee taking possession, unless such remediation measure is required as a result of Lessee's use (including "Alterations", as defined in paragraph 7.3(a) below) of the Premises, in which event Lessee shall be responsible for such payment. Lessee shall cooperate fully in any such activities at the request of Lessor, including allowing Lessor and Lessor's agents to have reasonable access to the Premises at reasonable times in order to carry out Lessor's investigative and remedial responsibilities.

(g)   **Lessor Termination Option.**   If a Hazardous Substance Condition (see Paragraph 9.1(e)) occurs during the term of this Lease, unless Lessee is legally responsible therefor (in which case Lessee shall make the investigation and remediation thereof required by the Applicable Requirements and this Lease shall continue in full force and effect, but subject to Lessor's rights under Paragraph 6.2(d) and Paragraph 13), Lessor may, at Lessor's option, either (i) investigate and remediate such Hazardous Substance Condition, if required, as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) if the estimated cost to remediate such condition exceeds 12 times the then monthly Base Rent or $100,000, whichever is greater, give written notice to Lessee, within 30 days after receipt by Lessor of knowledge of the occurrence of such Hazardous Substance Condition, of Lessor's desire to terminate this Lease as of the date 60 days following the date of such notice. In the event Lessor elects to give a termination notice, Lessee may, within 10 days thereafter, give written notice to Lessor of Lessee's commitment to pay the amount by which the cost of the remediation of such Hazardous Substance Condition exceeds an amount equal to 12 times the then monthly Base Rent or $100,000, whichever is greater. Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days following such commitment. In such event, this Lease shall continue in full force and effect, and Lessor shall proceed to make such remediation as soon as reasonably possible after the required funds are available. If Lessee does not give such notice and provide the required funds or assurance thereof within the time provided, this Lease shall terminate as of the date specified in Lessor's notice of termination.

6.3   **Lessee's Compliance with Applicable Requirements.**   Except as otherwise provided in this Lease, Lessee shall, at Lessee's sole expense, fully, diligently and in a timely manner, materially comply with all Applicable Requirements, the requirements of any applicable fire insurance underwriter or rating bureau, and the recommendations of Lessor's engineers and/or consultants which relate in any manner to such Requirements, without regard to whether said Requirements are now in effect or become effective after the Start Date. Lessee shall, within 10 days after receipt of Lessor's written request, provide Lessor with copies of all permits and other documents, and other information evidencing Lessee's compliance with any Applicable Requirements specified by Lessor, and shall immediately upon receipt, notify Lessor in writing (with copies of any documents involved) of any threatened or actual claim, notice, citation, warning, complaint or report pertaining to or involving the failure of Lessee or the Premises to comply with any Applicable Requirements. Likewise, Lessee shall immediately give written notice to Lessor of: (i) any water damage to the

keep the Premises, Utility Installations (intended for Lessee's exclusive use, no matter where located), and Alterations in good order, condition and repair (whether or not the portion of the Premises requiring repairs, or the means of repairing the same, are reasonably or readily accessible to Lessee, and whether or not the need for such repairs occurs as a result of Lessee's use, any prior use, the elements or the age of such portion of the Premises), including, but not limited to, all equipment or facilities, such as plumbing, HVAC equipment, electrical, lighting facilities, boilers, pressure vessels, fixtures, interior walls, interior surfaces of exterior walls, ceilings, floors, windows, doors, plate glass, and skylights but excluding any items which are the responsibility of Lessor pursuant to Paragraph 7.2. Lessee, in keeping the Premises in good order, condition and repair, shall exercise and perform good maintenance practices, specifically including the procurement and maintenance of the service contracts required by Paragraph 7.1(b) below. Lessee's obligations shall include restorations, replacements or renewals when necessary to keep the Premises and all improvements thereon or a part thereof in good order, condition and state of repair.

(b)    **Service Contracts.** Lessee shall, at Lessee's sole expense, procure and maintain contracts, with copies to Lessor, in customary form and substance for, and with contractors specializing and experienced in the maintenance of the following equipment and improvements, if any, if and when installed on the Premises: (i) HVAC equipment, (ii) boiler and pressure vessels, (iii) clarifiers, and (iv) any other equipment, if reasonably required by Lessor. However, Lessor reserves the right, upon notice to Lessee, to procure and maintain any or all of such service contracts, and Lessee shall reimburse Lessor, upon demand, for the cost thereof.

(c)    **Failure to Perform.** If Lessee fails to perform Lessee's obligations under this Paragraph 7.1, Lessor may enter upon the Premises after 10 days' prior written notice to Lessee (except in the case of an emergency, in which case no notice shall be required), perform such obligations on Lessee's behalf, and put the Premises in good order, condition and repair, and Lessee shall promptly pay to Lessor a sum equal to 115% of the cost thereof.

(d)    **Replacement.** Subject to Lessee's indemnification of Lessor as set forth in Paragraph 8.7 below, and without relieving Lessee of liability resulting from Lessee's failure to exercise and perform good maintenance practices, if an item described in Paragraph 7.1(b) cannot be repaired other than at a cost which is in excess of 50% of the cost of replacing such item, then such item shall be replaced by Lessor, and the cost thereof shall be prorated between the Parties and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease, on the date on which Base Rent is due, an amount equal to the product of multiplying the cost of such replacement by a fraction, the numerator of which is one, and the denominator of which is 144 (i.e. 1/144th of the cost per month). Lessee shall pay interest on the unamortized balance but may prepay its obligation at any time

7.2    **Lessor's Obligations.** Subject to the provisions of Paragraphs 2.2 (Condition), 2.3 (Compliance), 4.2 (Common Area Operating Expenses), 6 (Use), 7.1 (Lessee's Obligations), 9 (Damage or Destruction) and 14 (Condemnation), Lessor, subject to reimbursement pursuant to Paragraph 4.2, shall keep in good order, condition and repair the foundations, exterior walls, structural condition of interior bearing walls, exterior roof, fire sprinkler system, Common Area fire alarm and/or smoke detection systems, fire hydrants, parking lots, walkways, parkways, driveways, landscaping, fences, signs and utility systems serving the Common Areas and all parts thereof, as well as providing the services for which there is a Common Area Operating Expense pursuant to Paragraph 4.2. Lessor shall not be obligated to paint the exterior or interior surfaces of exterior walls nor shall Lessor be obligated to maintain, repair or replace windows, doors or plate glass of the Premises. Lessee expressly waives the benefit of any statute now or hereafter in effect to the extent it is inconsistent with the terms of this Lease.

7.3    **Utility Installations; Trade Fixtures; Alterations.**

(a)    **Definitions.** The term "Utility Installations" refers to all floor and window coverings, air and/or vacuum lines, power panels, electrical distribution, security and fire protection systems, communication cabling, lighting fixtures, HVAC equipment, plumbing, and fencing in or on the Premises. The term "Trade Fixtures" shall mean Lessee's machinery and equipment that can be removed without doing material damage to the Premises. The term "Alterations" shall mean any modification of the improvements, other than Utility Installations or Trade Fixtures, whether by addition or deletion. "Lessee Owned Alterations and/or Utility Installations" are defined as Alterations and/or Utility Installations made by Lessee that are not yet owned by Lessor pursuant to Paragraph 7.4(a).

(b)    **Consent.** Lessee shall not make any Alterations or Utility Installations to the Premises without Lessor's prior written consent. Lessee may, however, make non-structural Utility Installations to the interior of the Premises (excluding the roof) without such consent but upon notice to Lessor, as long as they are not visible from the outside, do not involve puncturing, relocating or removing the roof or any existing walls, will not affect the electrical, plumbing, HVAC, and/or life safety systems, and the cumulative cost thereof during this Lease as extended does not exceed a sum equal to 3 month's Base Rent in the aggregate or a sum equal to one month's Base Rent in any one year. Notwithstanding the foregoing, Lessee shall not make or permit any roof penetrations and/or install anything on the roof without the prior written approval of Lessor. Lessor may, as a precondition to granting such approval, require Lessee to utilize a contractor chosen and/or approved by Lessor. Any Alterations or Utility Installations that Lessee shall desire to make and which require the consent of the Lessor shall be presented to Lessor in written form with detailed plans. Consent shall be deemed conditioned upon Lessee's: (i) acquiring all applicable governmental permits, (ii) furnishing Lessor with copies of both the permits and the plans and specifications prior to commencement of the work, and (iii) compliance with all conditions of said permits and other Applicable Requirements in a prompt and expeditious manner. Any Alterations or Utility Installations shall be performed in a workmanlike manner with good and sufficient materials. Lessee shall promptly upon completion furnish Lessor with as-built plans and specifications. For work which costs an amount in excess of one month's Base Rent, Lessor may condition its consent upon Lessee providing a lien and completion bond in an amount equal to 150% of the estimated cost of such Alteration or Utility Installation and/or upon Lessee's posting an additional Security Deposit with Lessor.

(c)    **Liens; Bonds.** Lessee shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Lessee at or for use on the Premises, which claims are or may be secured by any mechanic's or materialman's lien against the Premises or any interest therein. Lessee shall give Lessor not less than 10 days notice prior to the commencement of any work in, on or about the Premises, and Lessor shall have the right to post notices of non-responsibility. If Lessee shall contest the validity of any such lien, claim or demand, then Lessee shall, at its sole expense defend and protect itself, Lessor and the Premises against the same and shall pay and satisfy any such adverse judgment that may be rendered thereon before the enforcement thereof. If Lessor shall require, Lessee shall furnish a surety bond in an amount equal to 150% of the amount of such contested lien, claim or demand, indemnifying Lessor against liability for the same. If Lessor elects to participate in any such action, Lessee shall pay Lessor's attorneys' fees and costs.

7.4    **Ownership; Removal; Surrender; and Restoration.**

(a)    **Ownership.** Subject to Lessor's right to require removal or elect ownership as hereinafter provided, all Alterations and Utility Installations made by Lessee shall be the property of Lessee, but considered a part of the Premises. Lessor may, at any time, elect in writing to be the owner of all or any specified part of the Lessee Owned Alterations and Utility Installations. Unless otherwise instructed per Paragraph 7.4(b) hereof, all Lessee Owned Alterations and Utility Installations shall, at the expiration or termination of this Lease, become the property of Lessor and be surrendered by Lessee with the Premises.

(b)    **Removal.** By delivery to Lessee of written notice from Lessor not earlier than 90 and not later than 30 days prior to the end of the term of this Lease, Lessor may require that any or all Lessee Owned Alterations or Utility Installations be removed by the expiration or termination of this Lease. Lessor may require the removal at any time of all or any part of any Lessee Owned Alterations or Utility Installations made without the required consent.

(c)    **Surrender; Restoration.** Lessee shall surrender the Premises by the Expiration Date or any earlier termination date, with all of the improvements, parts and surfaces thereof broom clean and free of debris, and in good operating order, condition and state of repair, ordinary wear and tear excepted. "Ordinary wear and tear" shall not include any damage or deterioration that would have been prevented by good maintenance practice. Notwithstanding the foregoing, if this Lease is for 12 months or less, then Lessee shall surrender the Premises in the same condition as delivered to Lessee on the Start Date with NO allowance for ordinary wear and tear. Lessee shall repair any damage occasioned by the installation, maintenance or removal of Trade Fixtures, Lessee Owned Alterations and/or Utility Installations, furnishings, and equipment as well as the removal of any storage tank installed by or for Lessee. Lessee shall also completely remove from the Premises any and all Hazardous Substances brought onto the Premises by or for Lessee, or any third party (except Hazardous Substances which were deposited via underground migration from

providing single limit coverage in an amount not less than $1,000,000 per occurrence with an annual aggregate of not less than $2,000,000. Lessee shall add Lessor as an additional insured by means of an endorsement at least as broad as the Insurance Service Organization's "Additional Insured-Managers or Lessors of Premises" Endorsement and coverage shall also be extended to include damage caused by heat, smoke or fumes from a hostile fire. The policy shall not contain any intra-insured exclusions as between insured persons or organizations, but shall include coverage for liability assumed under this Lease as an "Insured contract" for the performance of Lessee's indemnity obligations under this Lease. The limits of said insurance shall not, however, limit the liability of Lessee nor relieve Lessee of any obligation hereunder. Lessee shall provide an endorsement on its liability policy(ies) which provides that its insurance  shall be primary to and not contributory with any similar insurance carried by Lessor, whose insurance shall be considered excess insurance only.

(b)      **Carried by Lessor.** Lessor shall maintain liability insurance as described in Paragraph 8.2(a), in addition to, and not in lieu of, the insurance required to be maintained by Lessee.  Lessee shall not be named as an additional insured therein.

8.3      **Property Insurance - Building, Improvements and Rental Value.**

(a)      **Building and Improvements.** Lessor shall obtain and keep in force a policy or policies of insurance in the name of Lessor, with loss payable to Lessor, any ground-lessor, and to any Lender insuring loss or damage to the Premises.  The amount of such insurance shall be equal to the full insurable replacement cost of the Premises, as the same shall exist from time to time, or the amount required by any Lender, but in no event more than the commercially reasonable and available insurable value thereof.  Lessee Owned Alterations and Utility Installations, Trade Fixtures, and Lessee's personal property shall be insured by Lessee under Paragraph 8.4.  If the coverage is available and commercially appropriate, such policy or policies shall insure against all risks of direct physical loss or damage (except the perils of flood and/or earthquake unless required by a Lender), including coverage for debris removal and the enforcement of any Applicable Requirements requiring the upgrading, demolition, reconstruction or replacement of any portion of the Premises as the result of a covered loss. Said policy or policies shall also contain an agreed valuation provision in lieu of any coinsurance clause, waiver of subrogation, and inflation guard protection causing an increase in the annual property insurance coverage amount by a factor of not less than the adjusted U.S. Department of Labor Consumer Price Index for All Urban Consumers for the city nearest to where the Premises are located. If such insurance coverage has a deductible clause, the deductible amount shall not exceed $1,000 per occurrence.

(b)      **Rental Value.** Lessor shall also obtain and keep in force a policy or policies in the name of Lessor with loss payable to Lessor and any Lender, insuring the loss of the full Rent for one year with an extended period of indemnity for an additional 180 days ("Rental Value Insurance").  Said insurance shall contain an agreed valuation provision in lieu of any coinsurance clause, and the amount of coverage shall be adjusted annually to reflect the projected Rent otherwise payable by Lessee, for the next 12 month period.

(c)      **Adjacent Premises.** Lessee shall pay for any increase in the premiums for the property insurance of the Building and for the Common Areas or other buildings in the Shopping Center if said increase is caused by Lessee's acts, omissions, use  or occupancy of the Premises.

(d)      **Lessee's Improvements.** Since Lessor is the Insuring Party, Lessor shall not be required to insure Lessee Owned Alterations and Utility Installations unless the item in question has become the property of Lessor under the terms of this Lease.

8.4      **Lessee's Property; Business Interruption Insurance.**

(a)      **Property Damage.** Lessee shall obtain and maintain insurance coverage on all of Lessee's personal property, Trade Fixtures, and Lessee Owned Alterations and Utility Installations.  Such insurance shall be full replacement cost coverage with a deductible of not to exceed $1,000 per occurrence.  The proceeds from any such insurance shall be used by Lessee for the replacement of personal property, Trade Fixtures and Lessee Owned Alterations and Utility Installations. Lessee shall provide Lessor with written evidence that such insurance is in force.

(b)      **Business Interruption.** Lessee shall obtain and maintain loss of income and extra expense insurance in amounts as will reimburse Lessee for direct or indirect loss of earnings attributable to all perils commonly insured against by prudent lessees in the business of Lessee or attributable to prevention of access to the Premises as a result of such perils.

(c)      **No Representation of Adequate Coverage.** Lessor makes no representation that the limits or forms of coverage of insurance specified herein are adequate to cover Lessee's property, business operations or obligations under this Lease.

8.5      **Insurance Policies.** Insurance required herein shall be by companies duly licensed or admitted to transact business in the state where the Premises are located, and maintaining during the policy term a "General Policyholders Rating" of at least A-, VI, as set forth in the most current issue of "Best's Insurance Guide", or such other rating as may be required by a Lender.  Lessee shall not do or permit to be done anything which invalidates the required insurance policies.  Lessee shall, prior to the Start Date, deliver to Lessor certified copies of policies of such insurance or certificates evidencing the existence and amounts of the required insurance.  No such policy shall be cancelable or subject to modification except after 30 days prior written notice to Lessor.  Lessee shall, at least 10 days prior to the expiration of such policies, furnish Lessor with evidence of renewals or "insurance binders" evidencing renewal thereof, or Lessor may order such insurance and charge the cost thereof to Lessee, which amount shall be payable by Lessee to Lessor upon demand.  Such policies shall be for a term of at least one year, or the length of the remaining term of this Lease, whichever is less.  If either Party shall fail to procure and maintain the insurance required to be carried by it, the other Party may, but shall not be required to, procure and maintain the same.

8.6      **Waiver of Subrogation.** Without affecting any other rights or remedies, Lessee and Lessor each hereby release and relieve the other, and waive their entire right to recover damages against the other, for loss of or damage to its property arising out of or incident to the perils required to be insured against herein.  The effect of such releases and waivers is not limited by the amount of insurance carried or required, or by any deductibles applicable hereto.  The Parties agree to have their respective property damage insurance carriers waive any right to subrogation that such companies may have against Lessor or Lessee, as the case may be, so long as the insurance is not invalidated thereby.

8.7      **Indemnity.** Except for Lessor's gross negligence or willful misconduct, Lessee shall indemnify, protect, defend and hold harmless the Premises, Lessor and its agents, Lessor's master or ground lessor, partners and Lenders, from and against any and all claims, loss of rents and/or damages, liens, judgments, penalties, attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with, the use and/or occupancy of the Premises by Lessee.  If any action or proceeding is brought against Lessor by reason of any of the foregoing matters, Lessee shall upon notice defend the same at Lessee's expense by counsel reasonably satisfactory to Lessor and Lessor shall cooperate with Lessee in such defense.  Lessee need not have first paid any such claim in order to be defended or indemnified.

8.8      **Exemption of Lessor and its Agents from Liability.** Notwithstanding the negligence or breach of this Lease by Lessor or its agents, neither Lessor nor its agents shall be liable under any circumstances for: (i) injury or damage to the person or goods, wares, merchandise or other property of Lessee, Lessee's employees, contractors, invitees, customers, or any other person in or about the Premises, whether such damage or injury is caused by or results from fire, steam, electricity, gas, water or rain, indoor air quality, the presence of mold or from the breakage, leakage, obstruction or other defects of pipes, fire sprinklers, wires, appliances, plumbing, HVAC or lighting fixtures, or from any other cause, whether the said injury or damage results from conditions arising upon the Premises or upon other portions of the building of which the Premises are a part, or from other sources or places, (ii) any damages arising from any act or neglect of any other tenant of Lessor or from the failure of Lessor or its agents to enforce the provisions of any other lease in the Shopping Center, or (iii) injury to Lessee's business or for any loss of income or profit therefrom.  Instead, it is intended that Lessee's sole recourse in the event of such damages or injury be to file a claim on the insurance policy(ies) that Lessee is required to maintain pursuant to the provisions of paragraph 8.

8.9      **Failure to Provide Insurance.** Lessee acknowledges that any failure on its part to obtain or maintain the insurance required herein will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain.  Accordingly, for any month or portion thereof that Lessee does not maintain the required insurance and/or does not provide Lessor with the required binders or certificates evidencing the existence of the required insurance, the Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater.  The parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to maintain the required insurance.  Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to the failure to maintain such insurance, prevent the exercise of any of the other rights and remedies granted hereunder, nor relieve Lessee of its obligation to

Alterations and Utility Installations and Trade Fixtures, which was caused by an event required to be covered by the insurance described in Paragraph 8.3(a), irrespective of any deductible amounts or coverage limits involved.

(d)    **"Replacement Cost"** shall mean the cost to repair or rebuild the improvements owned by Lessor at the time of the occurrence to their condition existing immediately prior thereto, including demolition, debris removal and upgrading required by the operation of Applicable Requirements, and without deduction for depreciation.

(e)    **"Hazardous Substance Condition"** shall mean the occurrence or discovery of a condition involving the presence of, or a contamination by, a Hazardous Substance as defined in Paragraph 6.2(a), in, on, or under the Premises or Common Areas.which requires repair, remediation, or restoration.

9.2    **Partial Damage - Insured Loss.** If a Premises Partial Damage that is an Insured Loss occurs, then Lessor shall, at Lessor's expense, repair such damage (but not Lessee's Trade Fixtures or Lessee Owned Alterations and Utility Installations) as soon as reasonably possible and this Lease shall continue in full force and effect; provided, however, that Lessee shall, at Lessor's election, make the repair of any damage or destruction the total Replacement Cost of which is $10,000 or less, and, in such event, Lessor shall make any applicable insurance proceeds available to Lessee on a reasonable basis for that purpose. Notwithstanding the foregoing, if the required insurance was not in force or the insurance proceeds are not sufficient to effect such repair, the Insuring Party shall promptly contribute the shortage in proceeds as and when required to complete said repairs. In the event, however, such shortage was due to the fact that, by reason of the unique nature of the improvements, full Replacement Cost insurance coverage was not commercially reasonable and available, Lessor shall have no obligation to pay for the shortage in insurance proceeds or to fully restore the unique aspects of the Premises unless Lessee provides Lessor with the funds to cover same, or adequate assurance thereof, within 10 days following receipt of written notice of such shortage and request therefor. If Lessor receives said funds or adequate assurance thereof within said 10 day period, the party responsible for making the repairs shall complete them as soon as reasonably possible and this Lease shall remain in full force and effect. If such funds or assurance are not received, Lessor may nevertheless elect by written notice to Lessee within 10 days thereafter to: (i) make such restoration and repair as is commercially reasonable with Lessor paying any shortage in proceeds, in which case this Lease shall remain in full force and effect, or (ii) have this Lease terminate 30 days thereafter. Lessee shall not be entitled to reimbursement of any funds contributed by Lessee to repair any such damage or destruction. Premises Partial Damage due to flood or earthquake shall be subject to Paragraph 9.3, notwithstanding that there may be some insurance coverage, but the net proceeds of any such insurance shall be made available for the repairs if made by either Party.

9.3    **Partial Damage - Uninsured Loss.** If a Premises Partial Damage that is not an Insured Loss occurs, unless caused by a negligent or willful act of Lessee (in which event Lessee shall make the repairs at Lessee's expense), Lessor may either: (i) repair such damage as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) terminate this Lease by giving written notice to Lessee within 30 days after receipt by Lessor of knowledge of the occurrence of such damage. Such termination shall be effective 60 days following the date of such notice. In the event Lessor elects to terminate this Lease, Lessee shall have the right within 10 days after receipt of the termination notice to give written notice to Lessor of Lessee's commitment to pay for the repair of such damage without reimbursement from Lessor. Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days after making such commitment. In such event this Lease shall continue in full force and effect, and Lessor shall proceed to make such repairs as soon as reasonably possible after the required funds are available. If Lessee does not make the required commitment, this Lease shall terminate as of the date specified in the termination notice.

9.4    **Total Destruction.** Notwithstanding any other provision hereof, if a Premises Total Destruction occurs, this Lease shall terminate 60 days following such Destruction. If the damage or destruction was caused by the gross negligence or willful misconduct of Lessee, Lessor shall have the right to recover Lessor's damages from Lessee, except as provided in Paragraph 8.6.

9.5    **Damage Near End of Term.** If at any time during the last 6 months of this Lease there is damage for which the cost to repair exceeds one month's Base Rent, whether or not an Insured Loss, Lessor may terminate this Lease effective 60 days following the date of occurrence of such damage by giving a written termination notice to Lessee within 30 days after the date of occurrence of such damage. Notwithstanding the foregoing, if Lessee at that time has an exercisable option to extend this Lease or to purchase the Premises, then Lessee may preserve this Lease by, (a) exercising such option and (b) providing Lessor with any shortage in insurance proceeds (or adequate assurance thereof) needed to make the repairs on or before the earlier of (i) the date which is 10 days after Lessee's receipt of Lessor's written notice purporting to terminate this Lease, or (ii) the day prior to the date upon which such option expires. If Lessee duly exercises such option during such period and provides Lessor with funds (or adequate assurance thereof) to cover any shortage in insurance proceeds, Lessor shall, at Lessor's commercially reasonable expense, repair such damage as soon as reasonably possible and this Lease shall continue in full force and effect. If Lessee fails to exercise such option and provide such funds or assurance during such period, then this Lease shall terminate on the date specified in the termination notice and Lessee's option shall be extinguished.

9.6    **Damage to Shopping Center.** In the event of any damage or destruction to other portions of the Building or to any other buildings in the Shopping Center, whether insured or uninsured (and whether or not there is also damage or destruction to the Premises), which cannot reasonably be repaired in 6 months or less from the date of the damage or destruction, Lessor may either (i) repair such damage or destruction as soon as reasonably possible without expense to Lessee, in which event this Lease shall continue in full force and effect, or (ii) terminate this Lease by giving written notice to Lessee within 30 days after receipt by Lessor of knowledge of the occurrence of such damage or destruction. Such termination shall be effective 60 days following the date of such notice.

9.7    **Abatement of Rent; Lessee's Remedies.**

(a)    **Abatement.** In the event of Premises Partial Damage or Premises Total Destruction or a Hazardous Substance Condition for which Lessee is not responsible under this Lease, the Base Rent payable by Lessee for the period required for the repair, remediation or restoration of such damage shall be abated in proportion to the degree to which Lessee's use of the Premises is impaired, but not to exceed the proceeds received from the Rental Value Insurance. All other obligations of Lessee hereunder shall be performed by Lessee, and Lessor shall have no liability for any such damage, destruction, remediation, repair or restoration except as provided herein.

(b)    **Remedies.** If Lessor shall be obligated to repair or restore the Premises and does not commence, in a substantial and meaningful way, such repair or restoration within 90 days after such obligation shall accrue, Lessee may, at any time prior to the commencement of such repair or restoration, give written notice to Lessor and to any Lenders of which Lessee has actual notice, of Lessee's election to terminate this Lease on a date not less than 60 days following the giving of such notice. If Lessee gives such notice and such repair or restoration is not commenced within 30 days thereafter, this Lease shall terminate as of the date specified in said notice. If the repair or restoration is commenced within such 30 days, this Lease shall continue in full force and effect. "Commence" shall mean either the unconditional authorization of the preparation of the required plans, or the beginning of the actual work on the Premises, whichever first occurs.

9.8    **Termination; Advance Payments.** Upon termination of this Lease pursuant to Paragraph 6.2(g) or Paragraph 9, an equitable adjustment shall be made concerning advance Base Rent and any other advance payments made by Lessee to Lessor. Lessor shall, in addition, return to Lessee so much of Lessee's Security Deposit as has not been, or is not then required to be, used by Lessor.

9.9    **Waive Statutes.** Lessor and Lessee agree that the terms of this Lease shall govern the effect of any damage to or destruction of the Premises with respect to the termination of this Lease and hereby waive the provisions of any present or future statute to the extent inconsistent herewith.

10.    **Real Property Taxes.**

10.1    **Definition.** As used herein, the term **"Real Property Taxes"** shall include any form of assessment; real estate, general, special, ordinary or extraordinary, or rental levy or tax (other than inheritance, personal income or estate taxes); improvement bond; and/or license fee imposed upon or levied against any legal or equitable interest of Lessor in the Shopping Center, Lessor's right to other income therefrom, and/or Lessor's business of leasing, by any authority having the direct or indirect power to tax and where the funds are generated with reference to the Shopping Center address and where the proceeds so generated are to be applied by the city, county or other local taxing authority of a jurisdiction within which the Shopping Center is located. The term "Real Property Taxes" shall also include any tax, fee, levy, assessment or charge, or any increase therein: (i)

proportion of the Real Property Taxes for all of the land and improvements included within the tax parcel assessed, such proportion to be determined by Lessor from the respective valuations assigned in the assessor's work sheets or such other information as may be reasonably available. Lessor's reasonable determination thereof, in good faith, shall be conclusive.

10.5     **Personal Property Taxes.** Lessee shall pay prior to delinquency all taxes assessed against and levied upon Lessee Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all personal property of Lessee contained in the Premises. When possible, Lessee shall cause its Lessee Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all other personal property to be assessed and billed separately from the real property of Lessor. If any of Lessee's said property shall be assessed with Lessor's real property, Lessee shall pay Lessor the taxes attributable to Lessee's property within 10 days after receipt of a written statement setting forth the taxes applicable to Lessee's property.

11.     **Utilities and Services.** Lessee shall pay for all water, gas, heat, light, power, telephone, trash disposal and other utilities and services supplied to the Premises, together with any taxes thereon. To the extent any such utilities and/or services are not separately metered, Lessee shall pay Lessee's Share thereof in accordance with Paragraph 4.2. Notwithstanding the provisions of Paragraph 4.2, if at any time in Lessor's sole judgment, Lessor determines that Lessee is using a disproportionate amount of water, electricity or other commonly metered utilities, or that Lessee is generating such a large volume of trash as to require an increase in the size of the trash receptacle and/or an increase in the number of times per month that it is emptied, then Lessor may increase Lessee's Base Rent by an amount equal to such increased costs. There shall be no abatement of Rent and Lessor shall not be liable in any respect whatsoever for the inadequacy, stoppage, interruption or discontinuance of any utility or service due to riot, strike, labor dispute, breakdown, accident, repair or other cause beyond Lessor's reasonable control or in cooperation with governmental request or directions.

12.     **Assignment and Subletting.**
    12.1     **Lessor's Consent Required.**
        (a)     Lessee shall not voluntarily or by operation of law assign, transfer, mortgage or encumber (collectively, "assign or assignment") or sublet all or any part of Lessee's interest in this Lease or in the Premises without Lessor's prior written consent.
        (b)     Unless Lessee is a corporation and its stock is publicly traded on a national stock exchange, a change in the control of Lessee shall constitute an assignment requiring consent. The transfer, on a cumulative basis, of 25% or more of the voting control of Lessee shall constitute a change in control for this purpose.
        (c)     The involvement of Lessee or its assets in any transaction, or series of transactions (by way of merger, sale, acquisition, financing, transfer, leveraged buy-out or otherwise), whether or not a formal assignment or hypothecation of this Lease or Lessee's assets occurs, which results or will result in a reduction of the Net Worth of Lessee by an amount greater than 25% of such Net Worth as it was represented at the time of the execution of this Lease or at the time of the most recent assignment to which Lessor has consented, or as it exists immediately prior to said transaction or transactions constituting such reduction, whichever was or is greater, shall be considered an assignment of this Lease to which Lessor may withhold its consent. "Net Worth of Lessee" shall mean the net worth of Lessee (excluding any guarantors) established under generally accepted accounting principles.
        (d)     An assignment or subletting without consent shall, at Lessor's option, be a Default curable after notice per Paragraph 13.1(c), or a noncurable Breach without the necessity of any notice and grace period. If Lessor elects to treat such unapproved assignment or subletting as a noncurable Breach, Lessor may either: (i) terminate this Lease, or (ii) upon 30 days written notice, increase the monthly Base Rent and Percentage Rent Rate to 110% of the Base Rent and Percentage Rent Rate then in effect. Further, in the event of such Breach and rental adjustment, (i) the purchase price of any option to purchase the Premises held by Lessee shall be subject to similar adjustment to 110% of the price previously in effect, and (ii) all fixed and non-fixed rental adjustments scheduled during the remainder of the Lease term shall be increased to 110% of the scheduled adjusted rent.
        (e)     Lessee's remedy for any breach of Paragraph 12.1 by Lessor shall be limited to compensatory damages and/or injunctive relief.
        (f)     Lessor may reasonably withhold consent to a proposed assignment or subletting if Lessee is in Default at the time consent is requested.
        (g)     Notwithstanding the foregoing, allowing a diminimus portion of the Premises, ie. 20 square feet or less, to be used by a third party vendor in connection with the installation of a vending machine or payphone shall not constitute a subletting
    12.2     **Terms and Conditions Applicable to Assignment and Subletting.**
        (a)     Regardless of Lessor's consent, no assignment or subletting shall: (i) be effective without the express written assumption by such assignee or sublessee of the obligations of Lessee under this Lease, (ii) release Lessee of any obligations hereunder, or (iii) alter the primary liability of Lessee for the payment of Rent or for the performance of any other obligations to be performed by Lessee.
        (b)     Lessor may accept Rent or performance of Lessee's obligations from any person other than Lessee pending approval or disapproval of an assignment. Neither a delay in the approval or disapproval of such assignment nor the acceptance of Rent or performance shall constitute a waiver or estoppel of Lessor's right to exercise its remedies for Lessee's Default or Breach.
        (c)     Lessor's consent to any assignment or subletting shall not constitute a consent to any subsequent assignment or subletting.
        (d)     In the event of any Default or Breach by Lessee, Lessor may proceed directly against Lessee, any Guarantors or anyone else responsible for the performance of Lessee's obligations under this Lease, including any assignee or sublessee, without first exhausting Lessor's remedies against any other person or entity responsible therefore to Lessor, or any security held by Lessor.
        (e)     Each request for consent to an assignment or subletting shall be in writing, accompanied by information relevant to Lessor's determination as to the financial and operational responsibility and appropriateness of the proposed assignee or sublessee, including but not limited to the intended use and/or required modification of the Premises, if any, together with a fee of $25000 as consideration for Lessor's considering and processing said request. Lessee agrees to provide Lessor with such other or additional information and/or documentation as may be reasonably requested.(See also Paragraph 36)
        (f)     Any assignee of, or sublessee under, this Lease shall, by reason of accepting such assignment, entering into such sublease, or entering into possession of the Premises or any portion thereof, be deemed to have assumed and agreed to conform and comply with each and every term, covenant, condition and obligation herein to be observed or performed by Lessee during the term of said assignment or sublease, other than such obligations as are contrary to or inconsistent with provisions of an assignment or sublease to which Lessor has specifically consented to in writing.
        (g)     Lessor's consent to any assignment or subletting shall not transfer to the assignee or sublessee any Option granted to the original Lessee by this Lease unless such transfer is specifically consented to by Lessor in writing. (See Paragraph 39.2)
    12.3     **Additional Terms and Conditions Applicable to Subletting.** The following terms and conditions shall apply to any subletting by Lessee of all or any part of the Premises and shall be deemed included in all subleases under this Lease whether or not expressly incorporated therein:
        (a)     Lessee hereby assigns and transfers to Lessor all of Lessee's interest in all Rent payable on any sublease, and Lessor may collect such Rent and apply same toward Lessee's obligations under this Lease; provided, however, that until a Breach shall occur in the performance of Lessee's obligations, Lessee may collect said Rent. In the event that the amount collected by Lessor exceeds Lessee's then outstanding obligations any such excess shall be refunded to Lessee. Lessor shall not, by reason of the foregoing or any assignment of such sublease, nor by reason of the collection of Rent, be deemed liable to the sublessee for any failure of Lessee to perform and comply with any of Lessee's obligations to such sublessee. Lessee hereby irrevocably authorizes and directs any such sublessee, upon receipt of a written notice from Lessor stating that a Breach exists in the performance of Lessee's obligations under this Lease, to pay to Lessor all Rent due and to become due under the sublease. Sublessee shall rely upon any such notice from Lessor and shall pay all Rents to Lessor without any obligation or right to inquire as to

conditions or Rules and Regulations under this Lease, after a reasonable cure period, as the occurrence of one or more of the following Defaults, and the failure of Lessee to cure such Default within any applicable grace period:

(a)    The vacating or abandonment of the Premises.  Lessee shall be deemed to have vacated the Premises if Lessee ceases to continuously operate its business in the Premises for a period of 5 consecutive days.

(b)    The failure of Lessee to make any payment of Rent or any Security Deposit required to be made by Lessee hereunder, whether to Lessor or to a third party, when due, to provide reasonable evidence of insurance or surety bond, or to fulfill any obligation under this Lease which endangers or threatens life or property, where such failure continues for a period of 3 business days following written notice to Lessee.

(c) The commission of waste, act or acts constituting public or private nuisance, and/or an illegal activity on the Premises by Lessee, where such actions continue for a period of 3 business days following written notice to Lessee.

(d)    The failure by Lessee to provide (i) reasonable written evidence of compliance with Applicable Requirements, (ii) the service contracts, (iii) the rescission of an unauthorized assignment or subletting, (iv) an Estoppel Certificate, (v) a requested subordination, (vi) evidence concerning any guaranty and/or Guarantor, (vii) any document requested under Paragraph 41, (viii) material data safety sheets (MSDS), or (ix) any other documentation or information which Lessor may reasonably require of Lessee under the terms of this Lease, where any such failure continues for a period of 10 days following written notice to Lessee.

(e)    A Default by Lessee as to the terms, covenants, conditions or provisions of this Lease, or of the rules adopted under Paragraph 2.9 hereof, other than those described in subparagraphs 13.1(a), (b), (c) or (d), above, where such Default continues for a period of 30 days after written notice; provided, however, that if the nature of Lessee's Default is such that more than 30 days are reasonably required for its cure, then it shall not be deemed to be a Breach if Lessee commences such cure within said 30 day period and thereafter diligently prosecutes such cure to completion.

(f)    The occurrence of any of the following events: (i) the making of any general arrangement or assignment for the benefit of creditors; (ii) becoming a "debtor" as defined in 11 U.S.C. § 101 or any successor statute thereto (unless, in the case of a petition filed against Lessee, the same is dismissed within 60 days); (iii) the appointment of a trustee or receiver to take possession of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where possession is not restored to Lessee within 30 days; or (iv) the attachment, execution or other judicial seizure of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where such seizure is not discharged within 30 days; provided, however, in the event that any provision of this subparagraph is contrary to any applicable law, such provision shall be of no force or effect, and not affect the validity of the remaining provisions.

(g)    The discovery that any financial statement of Lessee or of any Guarantor given to Lessor was materially false.

(h)    If the performance of Lessee's obligations under this Lease is guaranteed:  (i) the death of a Guarantor, (ii) the termination of a Guarantor's liability with respect to this Lease other than in accordance with the terms of such guaranty, (iii) a Guarantor's becoming insolvent or the subject of a bankruptcy filing, (iv) a Guarantor's refusal to honor the guaranty, or (v) a Guarantor's breach of its guaranty obligation on an anticipatory basis, and Lessee's failure, within 60 days following written notice of any such event, to provide written alternative assurance or security, which, when coupled with the then existing resources of Lessee, equals or exceeds the combined financial resources of Lessee and the Guarantors that existed at the time of execution of this Lease.

13.2    **Remedies.**  If Lessee fails to perform any of its affirmative duties or obligations, within 10 days after written notice (or in case of an emergency, without notice), Lessor may, at its option, perform such duty or obligation on Lessee's behalf, including but not limited to the obtaining of reasonably required bonds, insurance policies, or governmental licenses, permits or approvals. Lessee shall pay to Lessor an amount equal to 115% of the costs and expenses incurred by Lessor in such performance upon receipt of an invoice therefor. In the event of a Breach, Lessor may, with or without further notice or demand, and without limiting Lessor in the exercise of any right or remedy which Lessor may have by reason of such Breach:

(a)    Terminate Lessee's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Lessee shall immediately surrender possession to Lessor. In such event Lessor shall be entitled to recover from Lessee: (i) the unpaid Rent which had been earned at the time of termination; (ii) the worth at the time of award of the amount by which the unpaid Rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the Lessee proves could have been reasonably avoided; (iii) the worth at the time of award of the amount by which the unpaid Rent for the balance of the term after the time of award exceeds the amount of such rental loss that the Lessee proves could be reasonably avoided; and (iv) any other amount necessary to compensate Lessor for all the detriment proximately caused by the Lessee's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including but not limited to the cost of recovering possession of the Premises, expenses of reletting, including necessary renovation and alteration of the Premises, reasonable attorneys' fees, and that portion of any leasing commission paid by Lessor in connection with this Lease applicable to the unexpired term of this Lease. The worth at the time of award of the amount referred to in provision (iii) of the immediately preceding sentence shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of the District within which the Premises are located at the time of award plus one percent. Efforts by Lessor to mitigate damages caused by Lessee's Breach of this Lease shall not waive Lessor's right to recover damages under Paragraph 12. If termination of this Lease is obtained through the provisional remedy of unlawful detainer, Lessor shall have the right to recover in such proceeding any unpaid Rent and damages as are recoverable therein, or Lessor may reserve the right to recover all or any part thereof in a separate suit. If a notice and grace period required under Paragraph 13.1 was not previously given, a notice to pay rent or quit, or to perform or quit given to Lessee under the unlawful detainer statute shall also constitute the notice required by Paragraph 13.1. In such case, the applicable grace period required by Paragraph 13.1 and the unlawful detainer statute shall run concurrently, and the failure of Lessee to cure the Default within the greater of the two such grace periods shall constitute both an unlawful detainer and a Breach of this Lease entitling Lessor to the remedies provided for in this Lease and/or by said statute.

(b)    Continue the Lease and Lessee's right to possession and recover the Rent as it becomes due, in which event Lessee may sublet or assign, subject only to reasonable limitations. Acts of maintenance, efforts to relet, and/or the appointment of a receiver to protect the Lessor's interests, shall not constitute a termination of the Lessee's right to possession.

(c)    Pursue any other remedy now or hereafter available under the laws or judicial decisions of the state wherein the Premises are located. The expiration or termination of this Lease and/or the termination of Lessee's right to possession shall not relieve Lessee from liability under any indemnity provisions of this Lease as to matters occurring or accruing during the term hereof or by reason of Lessee's occupancy of the Premises.

13.3    **Inducement Recapture.**  Any agreement for free or abated rent or other charges, or for the giving or paying by Lessor to or for Lessee of any cash or other bonus, inducement or consideration for Lessee's entering into this Lease, all of which concessions are hereinafter referred to as "**Inducement Provisions**", shall be deemed conditioned upon Lessee's full and faithful performance of all of the terms, covenants and conditions of this Lease. Upon Breach of this Lease by Lessee, any such Inducement Provision shall automatically be deemed deleted from this Lease and of no further force or effect, and any rent, other charge, bonus, inducement or consideration theretofore abated, given or paid by Lessor under such an Inducement Provision shall be immediately due and payable by Lessee to Lessor, notwithstanding any subsequent cure of said Breach by Lessee. The acceptance by Lessor of rent or the cure of the Breach which initiated the operation of this paragraph shall not be deemed a waiver by Lessor of the provisions of this paragraph unless specifically so stated in writing by Lessor at the time of such acceptance.

13.4    **Late Charges.**  Lessee hereby acknowledges that late payment by Lessee of Rent will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain.  Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Lessor by any Lender. Accordingly, if any Rent shall not be received by Lessor within 5 days after such amount shall be due, then, without any requirement for notice to Lessee, Lessee shall immediately pay to Lessor a one-time late charge equal to 10% of each such overdue amount or $100, whichever is greater. The parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of such late payment.  Acceptance of such late charge by Lessor shall in no event constitute a waiver of Lessee's Default or Breach with respect to such overdue amount, nor prevent the exercise of any of the other rights and remedies granted hereunder. In the event that a late charge is payable hereunder, whether or not collected, for 3 consecutive installments of Base Rent, then notwithstanding any provision of this Lease to the contrary, Base Rent shall, at Lessor's option, become due and payable quarterly in advance.

13.5    **Interest.**  Any monetary payment due Lessor hereunder, other than late charges, not received by Lessor, when due as to

days after receipt of said notice, or if having commenced said cure they do not diligently pursue it to completion, then Lessee may elect to cure said breach at Lessee's expense and offset from Rent the actual and reasonable cost to perform such cure, provided however, that such offset shall not exceed an amount equal to the greater of one month's Base Rent or the Security Deposit, reserving Lessee's right to reimbursement from Lessor for any such expense in excess of such offset.  Lessee shall document the cost of said cure and supply said documentation to Lessor.

14.   **Condemnation.**  If the Premises or any portion thereof are taken under the power of eminent domain or sold under the threat of the exercise of said power (collectively "**Condemnation**"), this Lease shall terminate as to the part taken as of the date the condemning authority takes title or possession, whichever first occurs.  If more than 10% of the floor area of the Premises, or more than 25% of the parking spaces situated within the parking area, is taken by Condemnation, Lessee may, at Lessee's option, to be exercised in writing within 10 days after Lessor shall have given Lessee written notice of such taking (or in the absence of such notice, within 10 days after the condemning authority shall have taken possession) terminate this Lease as of the date the condemning authority takes such possession.  If Lessee does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the Base Rent shall be reduced in proportion to the reduction in utility of the Premises caused by such Condemnation.  Condemnation awards and/or payments shall be the property of Lessor, whether such award shall be made as compensation for diminution in value of the leasehold, the value of the part taken, or for severance damages; provided, however, that Lessee shall be entitled to any compensation for Lessee's relocation expenses, loss of business goodwill and/or Trade Fixtures, without regard to whether or not this Lease is terminated pursuant to the provisions of this Paragraph.  All Alterations and Utility Installations made to the Premises by Lessee, for purposes of Condemnation only, shall be considered the property of the Lessee and Lessee shall be entitled to any and all compensation which is payable therefor.  In the event that this Lease is not terminated by reason of the Condemnation, Lessor shall repair any damage to the Premises caused by such Condemnation.

15.   **Brokerage Fees.**
15.1   **Additional Commission.**  In addition to the payments owed pursuant to Paragraph 1.13 above, and unless Lessor and the Brokers otherwise agree in writing, Lessor agrees that:  (a) if Lessee exercises any Option, (b) if Lessee acquires from Lessor any rights to the Premises or other premises owned by Lessor and located within the Project, (c) if Lessee remains in possession of the Premises, with the consent of Lessor, after the expiration of this Lease, or (d) if Base Rent is increased, whether by agreement or operation of an escalation clause herein, then, Lessor shall pay Brokers a fee in accordance with the schedule of the Brokers in effect at the time of the execution of this Lease.

15.2   **Assumption of Obligations.**  Any buyer or transferee of Lessor's interest in this Lease shall be deemed to have assumed Lessor's obligation hereunder.  Brokers shall be third party beneficiaries of the provisions of Paragraphs 1.13, 15, 22 and 31.  If Lessor fails to pay to Brokers any amounts due as and for brokerage fees pertaining to this Lease when due, then such amounts shall accrue Interest.  In addition, if Lessor fails to pay any amounts to Lessee's Broker when due, Lessee's Broker may send written notice to Lessor and Lessee of such failure and if Lessor fails to pay such amounts within 10 days after said notice, Lessee shall pay said monies to its Broker and offset such amounts against Rent.  In addition, Lessee's Broker shall be deemed to be a third party beneficiary of any commission agreement entered into by and/or between Lessor and Lessor's Broker for the limited purpose of collecting any brokerage fee owed.

15.3   **Representations and Indemnities of Broker Relationships.**  Lessee and Lessor each represent and warrant to the other that it has had no dealings with any person, firm, broker or finder (other than the Brokers, if any) in connection with this Lease, and that no one other than said named Brokers is entitled to any commission or finder's fee in connection herewith.  Lessee and Lessor do each hereby agree to indemnify, protect, defend and hold the other harmless from and against liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings or actions of the indemnifying Party, including any costs, expenses, attorneys' fees reasonably incurred with respect thereto.

16.   **Estoppel Certificates.**
(a)   Each Party (as "**Responding Party**") shall within 10 days after written notice from the other Party (the "**Requesting Party**") execute, acknowledge and deliver to the Requesting Party a statement in writing in form similar to the then most current "**Estoppel Certificate**" form published by the AIR Commercial Real Estate Association, plus such additional information, confirmation and/or statements as may be reasonably requested by the Requesting Party.

(b)   If the Responding Party shall fail to execute or deliver the Estoppel Certificate within such 10 day period, the Requesting Party may execute an Estoppel Certificate stating that: (i) the Lease is in full force and effect without modification except as may be represented by the Requesting Party, (ii) there are no uncured defaults in the Requesting Party's performance, and (iii) if Lessor is the Requesting Party, not more than one month's rent has been paid in advance.  Prospective purchasers and encumbrances may rely upon the Requesting Party's Estoppel Certificate, and the Responding Party shall be estopped from denying the truth of the facts contained in said Certificate.

(c)   If Lessor desires to finance, refinance, or sell the Premises, or any part thereof, Lessee and all Guarantors shall deliver to any potential lender or purchaser designated by Lessor such financial statements as may be reasonably required by such lender or purchaser, including but not limited to Lessee's financial statements for the past 3 years.  All such financial statements shall be received by Lessor and such lender or purchaser in confidence and shall be used only for the purposes herein set forth.

17.   **Definition of Lessor.**  The term "**Lessor**" as used herein shall mean the owner or owners at the time in question of the fee title to the Premises, or, if this is a sublease, of the Lessee's interest in the prior lease.  In the event of a transfer of Lessor's title or interest in the Premises or this Lease, Lessor shall deliver to the transferee or assignee (in cash or by credit) any unused Security Deposit held by Lessor.  Except as provided in Paragraph 15, upon such transfer or assignment and delivery of the Security Deposit, as aforesaid, the prior Lessor shall be relieved of all liability with respect to the obligations and/or covenants under this Lease thereafter to be performed by the Lessor.  Subject to the foregoing, the obligations and/or covenants in this Lease to be performed by the Lessor shall be binding only upon the Lessor as hereinabove defined.

18.   **Severability.**  The invalidity of any provision of this Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

19.   **Days.**  Unless otherwise specifically indicated to the contrary, the word "days" as used in this Lease shall mean and refer to calendar days.

20.   **Limitation on Liability.**  The obligations of Lessor under this Lease shall not constitute personal obligations of Lessor, or its partners, members, directors, officers or shareholders, and Lessee shall look to the Premises, and to no other assets of Lessor, for the satisfaction of any liability of Lessor with respect to this Lease, and shall not seek recourse against Lessor's partners, members, directors, officers or shareholders, or any of their personal assets for such satisfaction.

21.   **Time of Essence.**  Time is of the essence with respect to the performance of all obligations to be performed or observed by the Parties under this Lease.

22.   **No Prior or Other Agreements; Broker Disclaimer.**  This Lease contains all agreements between the Parties with respect to any matter mentioned herein, and no other prior or contemporaneous agreement or understanding shall be effective.  Lessor and Lessee each represents and warrants to the Brokers that it has made, and is relying solely upon, its own investigation as to the nature, quality, character and financial responsibility of the other Party to this Lease and as to the use, nature, quality and character of the Premises.  Brokers have no responsibility with respect thereto or with respect to any default or breach hereof by either Party.  The liability (including court costs and attorneys' fees), of any Broker with respect to

hours after the same is addressed as required herein and mailed with postage prepaid. Notices delivered by United States Express Mail or overnight courier that guarantee next day delivery shall be deemed given 24 hours after delivery of the same to the Postal Service or courier. Notices transmitted by facsimile transmission or similar means shall be deemed delivered upon telephone confirmation of receipt (confirmation report from fax machine is sufficient), provided a copy is also delivered via delivery or mail. If notice is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.

24.     **Waivers.** No waiver by Lessor of the Default or Breach of any term, covenant or condition hereof by Lessee, shall be deemed a waiver of any other term, covenant or condition hereof, or of any subsequent Default or Breach by Lessee of the same or of any other term, covenant or condition hereof. Lessor's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Lessor's consent to, or approval of, any subsequent or similar act by Lessee, or be construed as the basis of an estoppel to enforce the provision or provisions of this Lease requiring such consent. The acceptance of Rent by Lessor shall not be a waiver of any Default or Breach by Lessee. Any payment by Lessee may be accepted by Lessor on account of moneys or damages due Lessor, notwithstanding any qualifying statements or conditions made by Lessee in connection therewith, which such statements and/or conditions shall be of no force or effect whatsoever unless specifically agreed to in writing by Lessor at or before the time of deposit of such payment.

25.     **Disclosures Regarding The Nature of a Real Estate Agency Relationship.**
        (a)      When entering into a discussion with a real estate agent regarding a real estate transaction, a Lessor or Lessee should from the outset understand what type of agency relationship or representation it has with the agent or agents in the transaction. Lessor and Lessee acknowledge being advised by the Brokers in this transaction, as follows:
                (i)      **Lessor's Agent.** A Lessor's agent under a listing agreement with the Lessor acts as the agent for the Lessor only. A Lessor's agent or subagent has the following affirmative obligations: To the Lessor: A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessor. To the Lessee and the Lessor: (a) Diligent exercise of reasonable skills and care in performance of the agent's duties. (b) A duty of honest and fair dealing and good faith. (c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.
                (ii)     **Lessee's Agent.** An agent can agree to act as agent for the Lessee only. In these situations, the agent is not the Lessor's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Lessor. An agent acting only for a Lessee has the following affirmative obligations. To the Lessee: A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessee. To the Lessee and the Lessor: (a) Diligent exercise of reasonable skills and care in performance of the agent's duties. (b) A duty of honest and fair dealing and good faith. (c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.
                (iii)    **Agent Representing Both Lessor and Lessee.** A real estate agent, either acting directly or through one or more associate licenses, can legally be the agent of both the Lessor and the Lessee in a transaction, but only with the knowledge and consent of both the Lessor and the Lessee. In a dual agency situation, the agent has the following affirmative obligations to both the Lessor and the Lessee: (a) A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either Lessor or the Lessee. (b) Other duties to the Lessor and the Lessee as stated above in subparagraphs (i) or (ii). In representing both Lessor and Lessee, the agent may not without the express permission of the respective Party, disclose to the other Party that the Lessor will accept rent in an amount less than that indicated in the listing or that the Lessee is willing to pay a higher rent than that offered. The above duties of the agent in a real estate transaction do not relieve a Lessor or Lessee from the responsibility to protect their own interests. Lessor and Lessee should carefully read all agreements to assure that they adequately express their understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.
        (b)      Brokers have no responsibility with respect to any default or breach hereof by either Party. The Parties agree that no lawsuit or other legal proceeding involving any breach of duty, error or omission relating to this Lease may be brought against Broker more than one year after the Start Date and that the liability (including court costs and attorneys' fees), of any Broker with respect to any such lawsuit and/or legal proceeding shall not exceed the fee received by such Broker pursuant to this Lease; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.
        (c)      Buyer and Seller agree to identify to Brokers as "Confidential" any communication or information given Brokers that is considered by such Party to be confidential.

26.     **No Right To Holdover.** Lessee has no right to retain possession of the Premises or any part thereof beyond the expiration or termination of this Lease. In the event that Lessee holds over, then the Base Rent and Percentage Rent Rate shall be increased to 150% of the Base Rent and Percentage Rent Rate applicable immediately preceding the expiration or termination. Nothing contained herein shall be construed as consent by Lessor to any holding over by Lessee.

27.     **Cumulative Remedies.** No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

28.     **Covenants and Conditions; Construction of Agreement.** All provisions of this Lease to be observed or performed by Lessee are both covenants and conditions. In construing this Lease, all headings and titles are for the convenience of the Parties only and shall not be considered a part of this Lease. Whenever required by the context, the singular shall include the plural and vice versa. This Lease shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if both Parties had prepared it.

29.     **Binding Effect; Choice of Law.** This Lease shall be binding upon the parties, their personal representatives, successors and assigns and be governed by the laws of the State in which the Premises are located. Any litigation between the Parties hereto concerning this Lease shall be initiated in the county in which the Premises are located.

30.     **Subordination; Attornment; Non-Disturbance.**
        30.1     **Subordination.** This Lease and any Option granted hereby shall be subject and subordinate to any ground lease, mortgage, deed of trust, or other hypothecation or security device (collectively, "**Security Device**"), now or hereafter placed upon the Premises, to any and all advances made on the security thereof, and to all renewals, modifications, and extensions thereof. Lessee agrees that the holders of any such Security Devices (in this Lease together referred to as "**Lender**") shall have no liability or obligation to perform any of the obligations of Lessor under this Lease. Any Lender may elect to have this Lease and/or any Option granted hereby superior to the lien of its Security Device by giving written notice thereof to Lessee, whereupon this Lease and such Options shall be deemed prior to such Security Device, notwithstanding the relative dates of the documentation or recordation thereof.
        30.2     **Attornment.** In the event that Lessor transfers title to the Premises, or the Premises are acquired by another upon the foreclosure or termination of a Security Device to which this Lease is subordinated (i) Lessee shall, subject to the non-disturbance provisions of Paragraph 30.3, attorn to such new owner, and upon request, enter into a new lease, containing all of the terms and provisions of this Lease, with such new owner for the remainder of the term hereof, or, at the election of the new owner, this Lease will automatically become a new lease between Lessee and such new owner, and (ii) Lessor shall thereafter be relieved of any further obligations hereunder and such new owner shall assume all of Lessor's obligations, except that such new owner shall not: (a) be liable for any act or omission of any prior lessor or with respect to events occurring prior to acquisition of

31.    **Attorneys' Fees.** If any Party or Broker brings an action or proceeding involving the Premises whether founded in tort, contract or equity, or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees. Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term, **"Prevailing Party"** shall include, without limitation, a Party or Broker who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense. The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred. In addition, Lessor shall be entitled to attorneys' fees, costs and expenses incurred in the preparation and service of notices of Default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such Default or resulting Breach ($200 is a reasonable minimum per occurrence for such services and consultation).

32.    **Lessor's Access; Showing Premises; Repairs.** Lessor and Lessor's agents shall have the right to enter the Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable prior notice for the purpose of showing the same to prospective purchasers, lenders, or tenants, and making such alterations, repairs, improvements or additions to the Premises as Lessor may deem necessary or desirable and the erecting, using and maintaining of utilities, services, pipes and conduits through the Premises and/or other premises as long as there is no material adverse effect on Lessee's use of the Premises. All such activities shall be without abatement of rent or liability to Lessee.

33.    **Auctions.** Lessee shall not conduct, nor permit to be conducted, any auction upon the Premises without Lessor's prior written consent, which consent shall be granted or denied at Lessor's sole discretion.

34.    **Signs.** Lessor may place on the Premises ordinary **"For Sale"** signs at any time and ordinary **"For Lease"** signs during the last 6 months of the term hereof. All signs must comply with all Applicable Requirements. Lessee shall not place, construct, or maintain on the glass panes or supports of the show windows of the Premises, the doors, exterior walls or the roof of the Building, or anywhere else within the Shopping Center outside of the Premises, or on any interior portions of the Premises that are visible from the exterior of the Premises, any signs, advertisements, names, insignia, trademarks, descriptive material or any other items without Lessor's prior written consent, which consent shall be granted or denied at Lessor's sole discretion. Lessor shall designate the size, shape, color, design, and location of all exterior sign(s) to be installed by Lessee, and Lessee shall, at Lessee's sole cost and expense, fabricate, construct and install all such sign(s) in full compliance with Lessor's designation and in accordance with the Sign Criteria for the Shopping Center attached hereto, if any. Lessee agrees to submit plans and specifications for Lessee's sign(s) for Lessor's written approval within 30 days after the full execution hereof and to install such sign(s) prior to opening for business at the Premises. Lessor, at Lessee's cost, may remove any item placed, constructed or maintained in, upon or about the Premises or Shopping Center which does not comply with this paragraph. In the event there is a pole, pylon or monument sign for the Shopping Center, Lessor shall have the right, but not the obligation, to install lettering designating Lessee's business on such sign, at Lessee's expense, with Lessor's approval of location, size, style and color. All signs that are permanently attached to the Premises or Building shall become the property of Lessor at the expiration or earlier termination hereof; provided, however, that Lessee shall promptly remove all such signs if Lessor so elects, and Lessee shall promptly repair all damage caused by such removal. Lessee shall not place, construct or maintain in, upon or about the Premises any search lights, flashing lights, loudspeakers, phonographs or other visual or audio media.

35.    **Termination; Merger.** Unless specifically stated otherwise in writing by Lessor, the voluntary or other surrender of this Lease by Lessee, the mutual termination or cancellation hereof, or a termination hereof by Lessor for Breach by Lessee, shall automatically terminate any sublease or lesser estate in the Premises; provided, however, that Lessor may elect to continue any one or all existing subtenancies. Lessor's failure within 10 days following any such event to elect to the contrary by written notice to the holder of any such lesser interest, shall constitute Lessor's election to have such event constitute the termination of such interest.

36.    **Consents.** Except as otherwise provided herein, wherever in this Lease the consent of a Party is required to an act by or for the other Party, such consent shall not be unreasonably withheld or delayed. In those express instances where consent is within the sole discretion of a party, the party shall have no obligation to adhere to a standard of reasonableness. Lessor's actual reasonable costs and expenses (including but not limited to architects', attorneys', engineers' and other consultants' fees) incurred in the consideration of, or response to, a request by Lessee for any Lessor consent, including but not limited to consents to an assignment, a subletting or the presence or use of a Hazardous Substance, shall be paid by Lessee upon receipt of an invoice and supporting documentation therefor. Lessor's consent to any act, assignment or subletting shall not constitute an acknowledgment that no Default or Breach by Lessee of this Lease exists, nor shall such consent be deemed a waiver of any then existing Default or Breach, except as may be otherwise specifically stated in writing by Lessor at the time of such consent. The failure to specify herein any particular condition to Lessor's consent shall not preclude the imposition by Lessor at the time of consent of such further or other conditions as are then reasonable with reference to the particular matter for which consent is being given. In the event that either Party disagrees with any determination made by the other hereunder and reasonably requests the reasons for such determination, the determining party shall furnish its reasons in writing and in reasonable detail within 10 business days following such request.

37.    **Guarantor.**
    37.1    **Execution.** The Guarantors, if any, shall each execute a guaranty in the form most recently published by the AIR Commercial Real Estate Association.
    37.2    **Default.** It shall constitute a Default of the Lessee if any Guarantor fails or refuses, upon request to provide: (a) evidence of the execution of the guaranty, including the authority of the party signing on Guarantor's behalf to obligate Guarantor, and in the case of a corporate Guarantor, a certified copy of a resolution of its board of directors authorizing the making of such guaranty, (b) current financial statements, (c) an Estoppel Certificate, or (d) written confirmation that the guaranty is still in effect.

38.    **Quiet Possession.** Subject to payment by Lessee of the Rent and performance of all of the covenants, conditions and provisions on Lessee's part to be observed and performed under this Lease, Lessee shall have quiet possession and quiet enjoyment of the Premises during the term hereof.

39.    **Options.** If Lessee is granted an option, as defined below, then the following provisions shall apply.
    39.1    **Definition.** "Option" shall mean: (a) the right to extend the term of or renew this Lease or to extend or renew any lease that Lessee has on other property of Lessor; (b) the right of first refusal or first offer to lease either the Premises or other property of Lessor; (c) the right to purchase or the right of first refusal to purchase the Premises or other property of Lessor.
    39.2    **Options Personal To Original Lessee.** Any Option granted to Lessee in this Lease is personal to the original Lessee, and cannot be assigned or exercised by anyone other than said original Lessee and only while the original Lessee is in full possession of the Premises and, if requested by Lessor, with Lessee certifying that Lessee has no intention of thereafter assigning or subletting.
    39.3    **Multiple Options.** In the event that Lessee has any multiple Options to extend or renew this Lease, a later Option cannot be exercised unless the prior Options have been validly exercised.
    39.4    **Effect of Default on Options.**
        (a)    Lessee shall have no right to exercise an Option: (i) during the period commencing with the giving of any notice of Default and continuing until said Default is cured, (ii) during the period of time any Rent is unpaid (without regard to whether notice thereof is given

the Premises with the security measures instituted by Lessor, if any.

41. **Reservations.** Lessor reserves the right: (i) to grant, without the consent or joinder of Lessee, such easements, rights and dedications that Lessor deems necessary, (ii) to cause the recordation of parcel maps and restrictions, and (iii) to create and/or install new utility raceways, so long as such easements, rights, dedications, maps, restrictions, and utility raceways do not unreasonably interfere with the use of the Premises by Lessee. Lessee agrees to sign any documents reasonably requested by Lessor to effectuate such rights.

42. **Building Planning.** Lessor shall have the right at any time or times, upon giving Lessee not less than 60 days prior written notice, to provide and furnish Lessee with space of comparable visibility located elsewhere within any of the buildings within the Shopping Center and to move Lessee into such new space, provided that the usable area of such new space is not less than the usable area of the Premises and provided that all of Lessee's reasonable out-of-pocket moving expenses (including but not limited to the cost of moving Lessee's personal property, the cost of reprinting Lessee's stationery or other business materials with the new address, and the cost to relocate and reinstall tenant improvements and Lessee's telecommunications and computer equipment) shall be paid by Lessor, and provided further that Lessor shall construct at Lessor's expense such improvements to such new space as shall be necessary to place it in a condition that is substantially comparable to the Premises. Except as provided in the immediately preceding sentence, Lessor shall have no obligation to improve such space or pay any other expenses incurred by Lessee as a result of such relocation. On such relocation, the terms and conditions of this Lease shall remain in full force and effect, including but not limited to the Base Rent payable hereunder and Lessee's Share (even if the usable area of such relocated Premises is in excess of the usable area of the Premises), except that the Premises shall be in such new location. Upon Lessor's request, the Parties shall execute an amendment to this Lease in form required by Lessor confirming the relocation of the Premises to such new location. If the new space does not meet with Lessee's approval, which approval Lessee shall give or withhold in accordance with Paragraph 36, Lessee shall have the right to cancel this Lease by giving Lessor written notice thereof within 15 days of receipt of Lessor's notification of its intent to relocate Lessee. Lessee's failure to give such notice within such 15 day period shall be deemed Lessee's approval of the new space. If timely notice is given by Lessee, then this Lease shall terminate unless Lessor rescinds Lessor's prior notice of its intent to relocate Lessee within 10 days after Lessor's receipt of Lessee's notice of cancellation.

43. **Performance Under Protest.** If at any time a dispute shall arise as to any amount or sum of money to be paid by one Party to the other under the provisions hereof, the Party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said Party to institute suit for recovery of such sum. If it shall be adjudged that there was no legal obligation on the part of said Party to pay such sum or any part thereof, said Party shall be entitled to recover such sum or so much thereof as it was not legally required to pay. A Party who does not initiate suit for the recovery of sums paid "under protest" within 6 months shall be deemed to have waived its right to protest such payment.

44. **Authority; Multiple Parties; Execution.**
(a)    If either Party hereto is a corporation, trust, limited liability company, partnership, or similar entity, each individual executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on its behalf. Each Party shall, within 30 days after request, deliver to the other Party satisfactory evidence of such authority.
(b)    If this Lease is executed by more than one person or entity as "Lessee," each such person or entity shall be jointly and severally liable hereunder. It is agreed that any one of the named Lessees shall be empowered to execute any amendment to this Lease, or other document ancillary thereto and bind all of the named Lessees, and Lessor may rely on the same as if all of the named Lessees had executed such document.
(c)    This Lease may be executed by the Parties in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

45. **Conflict.** Any conflict between the printed provisions of this Lease and the typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions.

46. **Offer.** Preparation of this Lease by either Party or their agent and submission of same to the other Party shall not be deemed an offer to lease to the other Party. This Lease is not intended to be binding until executed and delivered by all Parties hereto.

47. **Amendments.** This Lease may be modified only in writing, signed by the Parties in interest at the time of the modification. As long as they do not materially change Lessee's obligations hereunder, Lessee agrees to make such reasonable non-monetary modifications to this Lease as may be reasonably required by a Lender in connection with the obtaining of normal financing or refinancing of the Premises.

48. **Waiver of Jury Trial.** THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING THE PROPERTY OR ARISING OUT OF THIS AGREEMENT.

49. **Mediation and Arbitration of Disputes.** An Addendum requiring the Mediation and/or the Arbitration of all disputes between the Parties and/or Brokers arising out of this Lease ☐ is ☐ is not attached to this Lease.

50. **Americans with Disabilities Act.** Since compliance with the Americans with Disabilities Act (ADA) is dependent upon Lessee's specific use of the Premises, Lessor makes no warranty or representation as to whether or not the Premises comply with ADA or any similar legislation. In the event that Lessee's use of the Premises requires modifications or additions to the Premises in order to be in ADA compliance, Lessee agrees to make any such necessary modifications and/or additions at Lessee's expense.

51. Joung Nam Oh address 4224 Castle Peak Dr Corona Ca 92883, SS# 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, tel 9521 440 8093 , Fax 951 549 0805

52. Space is leased as is with approximately 4602 sq ft

53. Promotional banner fee $ 650.00/yearly

54. SIGNING OF THIS LEASE WILL AUTOMATICALLY TERMINATE all PREVIOUS LEASE AND OPTION ON 12/10/2007 on 18311A East Colima Rd.

55. Lessee is aware of all county permit and licensing requirements in operating of a restaurant.

56. lease commencement date 12/11/2007

57. rent commencement date 1/1/2008

LESSOR AND LESSEE HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN, AND BY THE EXECUTION OF THIS LEASE SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO. THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LESSOR AND LESSEE WITH RESPECT TO THE PREMISES.

ATTENTION:    NO REPRESENTATION OR RECOMMENDATION IS MADE BY THE AIR COMMERCIAL REAL ESTATE ASSOCIATION OR BY

The parties hereto have executed this Lease at the place and on the dates specified above their respective signatures.

| | |
|---|---|
| Executed at: Los Angeles | Executed at: Los Angeles |
| On: 12/10/2007 | On: 12/10/2007 |
| By LESSOR: | By LESSEE: |
| JTNA Enterprises LLC | Joung Nam Oh |
| | |
| By: | By: |
| Name Printed: Joseph Lih | Name Printed: Joung Nam Oh |
| Title: manager | Title: owner |
| | |
| By: | By: |
| Name Printed: | Name Printed: |
| Title: | Title: |
| | |
| Address: 1801 Ave of the Stars #733 | Address: 18311A East Colima Rd |
| Century City Ca 90067 | Rowland Heights Ca 91748 |
| Telephone:(310) 284-8733 | Telephone:(951) 440-8093 |
| Facsimile: (310) 284-8738 | Facsimile:(951) 549-0805 |
| Federal ID No. | Federal Id No. |
| | |
| BROKER | BROKER |
| | |
| | |
| Attn: | Attn: |
| Title: | Title: |
| Address: | Address: |
| | |
| Telephone: (___) | Telephone: (___) |
| Facsimile: (___) | Facsimile: (___) |
| Email: | Email: |
| Federeal ID No.: | Federal ID No. : |

These forms are often modified to meet changing requirements of law and needs of the industry. Always write or call to make sure you are utilizing the most current form: AIR Commercial Real Estate Association, 700 South Flower Street, Suite 600, Los Angeles, CA 90017. (213) 687-8777.

©Copyright 2003 By AIR Commercial Real Estate Association.
All rights reserved.
No part of these works may be reproduced in any form without permission in writing.



# RENT ADJUSTMENT(S)
## STANDARD LEASE ADDENDUM

**Dated** _____ 12/10/2007 _____

**By and Between (Lessor)** JTNA Enterprises LLC _____

_____

**(Lessee)** Joung Nam Oh _____

_____

**Address of Premises:** 18311A East Colima Rd _____

Rowland Heights Ca 91748 _____

Paragraph __58__

A.    **RENT ADJUSTMENTS:**

The monthly rent for each month of the adjustment period(s) specified below shall be increased using the method(s) indicated below:

(Check Method(s) to be Used and Fill in Appropriately)

☐   I.   **Cost of Living Adjustment(s) (COLA)**

a.   On (Fill in COLA Dates): _____

_____

the Base Rent shall be adjusted by the change, if any, from the Base Month specified below, in the Consumer Price Index of the Bureau of Labor Statistics of the U.S. Department of Labor for (select one):☐ CPI W (Urban Wage Earners and Clerical Workers) or ☐ CPI U (All Urban Consumers), for (Fill in Urban Area):

_____

_____, All Items

(1982-1984 = 100), herein referred to as "CPI".

b.   The monthly rent payable in accordance with paragraph A.I.a. of this Addendum shall be calculated as follows: the Base Rent set forth in paragraph 1.5 of the attached Lease, shall be multiplied by a fraction the numerator of which shall be the CPI of the calendar month 2 months prior to the month(s) specified in paragraph A.I.a. above during which the adjustment is to take effect, and the denominator of which shall be the CPI of the calendar month which is 2 months prior to (select one):  the ☐ first month of the term of this Lease as set forth in paragraph 1.3 ("Base Month") or ☐ (Fill in Other "Base Month"): _____. The sum so calculated shall constitute the new monthly rent hereunder, but in no event, shall any such new monthly rent be less than the rent payable for the month immediately preceding the rent adjustment.

c.   In the event the compilation and/or publication of the CPI shall be transferred to any other governmental department or bureau or agency or shall be discontinued, then the index most nearly the same as the CPI shall be used to make such calculation. In the event that the Parties cannot agree on such alternative index, then the matter shall be submitted for decision to the American Arbitration Association in accordance with the then rules of said Association and the decision of the arbitrators shall be binding upon the parties. The cost of said Arbitration shall be paid equally by the Parties.

☐   II.   **Market Rental Value Adjustment(s) (MRV)**
a.   On (Fill in MRV Adjustment Date(s): _____

_____

the Base Rent shall be adjusted to the "Market Rental Value" of the property as follows:

1) Four months prior to each Market Rental Value Adjustment Date described above, the Parties shall attempt to agree upon what the new  MRV will be on the adjustment date. If agreement cannot be reached within thirty days, then:

(iii) If either of the Parties fails to appoint an arbitrator within the specified 15 days, the arbitrator timely appointed by one of them shall reach a decision on his or her own, and said decision shall be binding on the Parties.

(iv) The entire cost of such arbitration shall be paid by the party whose submitted MRV is not selected, i.e., the one that is NOT the closest to the actual MRV.

2) Notwithstanding the foregoing, the new MRV shall not be less than the rent payable for the month immediately preceding the rent adjustment.

b.  Upon the establishment of each New Market Rental Value:
1) the new MRV will become the new "Base Rent" for the purpose of calculating any further Adjustments, and
2) the first month of each Market Rental Value term shall become the new 'Base Month' for the purpose of calculating any further Adjustments.

☑   III.   **Fixed Rental Adjustment(s) (FRA)**

The Base Rent shall be increased to the following amounts on the dates set forth below:

5% increase per annum including options

On (Fill in FRA Adjustment Date(s)):                                    The New Base Rent shall be:

B.      **NOTICE:**
Unless specified otherwise herein, notice of any such adjustments, other than Fixed Rental Adjustments, shall be made as specified in paragraph 23 of the Lease.

C.      **BROKER'S FEE:**
The Brokers shall be paid a Brokerage Fee for each adjustment specified above in accordance with paragraph 15 of the Lease.

NOTE: These forms are often modified to meet changing requirements of law and needs of the industry.  Always write or call to make sure you are utilizing the most current form: AIR COMMERCIAL REAL ESTATE ASSOCIATION, 700 S. Flower Street, Suite 600, Los Angeles, Calif. 90017

writing, to arbitration in accordance with the following provisions:

(i) Within 15 days thereafter, Lessor and Lessee shall each select an ☐ appraiser or ☐ broker ("Consultant" - check one) of their choice to act as an arbitrator. The two arbitrators so appointed shall immediately select a third mutually acceptable Consultant to act as a third arbitrator.

(ii) The 3 arbitrators shall within 30 days of the appointment of the third arbitrator reach a decision as to what the actual MRV for the Premises is, and whether Lessor's or Lessee's submitted MRV is the closest thereto. The decision of a majority of the arbitrators shall be binding on the Parties. The submitted MRV which is determined to be the closest to the actual MRV shall thereafter be used by the Parties.

(iii) If either of the Parties fails to appoint an arbitrator within the specified 15 days, the arbitrator timely appointed by one of them shall reach a decision on his or her own, and said decision shall be binding on the Parties.

(iv) The entire cost of such arbitration shall be paid by the party whose submitted MRV is not selected, ie. the one that is NOT closest to the actual MRV.

2) Notwithstanding the foregoing, the new MRV shall not be less than the rent payable for the month immediately preceding the rent adjustment.

b. Upon the establishment of each New Market Rental Value:

1) the new MRV will become the new "Base Rent" for the purpose of calculating any further Adjustments, and
2) the first month of each Market Rental Value term shall become the new "Base Month" for the purpose of calculating any further Adjustments.

☑  **III.  Fixed Rental Adjustment(s) (FRA)**
The Base Rent shall be increased to the following amounts on the dates set forth below:

*5% rent increase per annum including options*

On (Fill in FRA Adjustment Date(s)):                     The New Base Rent shall be:

**B.  NOTICE:**
Unless specified otherwise herein, notice of any rental adjustments, other than Fixed Rental Adjustments, shall be made as specified in paragraph 23 of the Lease.

**C.  BROKER'S FEE:**
The Brokers shall be paid a Brokerage Fee for each adjustment specified above in accordance with paragraph 15 of the Lease.

**NOTE: These forms are often modified to meet changing requirements of law and needs of the Industry. Always write or call to make sure you are utilizing the most current form: AIR COMMERCIAL REAL ESTATE ASSOCIATION, 700 S. Flower Street, Suite 600, Los Angeles, Calif. 90017**

## AIR COMMERCIAL REAL ESTATE ASSOCIATION
# GUARANTY OF LEASE

WHEREAS, JTNA Enterprises LLC _____ , hereinafter
"Lessor", and Joung Nam Oh _____ , hereinafter
"Lessee", are about to execute a document entitled "Lease" dated 12/10/2007 _____ concerning the premises commonly
known as 18311A East Colima Rd RH Ca 91748 _____
wherein Lessor will lease the premises to Lessee, and

WHEREAS, Joung Nam Oh _____
hereinafter "Guarantors" have a financial interest in Lessee, and

WHEREAS, Lessor would not execute the Lease if Guarantors did not execute and deliver to Lessor this Guarantee of Lease.

NOW THEREFORE, in consideration of the execution of the foregoing Lease by Lessor and as a material inducement to Lessor to execute said Lease, Guarantors hereby jointly, severally, unconditionally and irrevocably guarantee the prompt payment by Lessee of all rents and all other sums payable by Lessee under said Lease and the faithful and prompt performance by Lessee of each and every one of the terms, conditions and covenants of said Lease to be kept and performed by Lessee.

It is specifically agreed that the terms of the foregoing Lease may be modified by agreement between Lessor and Lessee, or by a course of conduct, and said Lease may be assigned by Lessor or any assignee of Lessor without consent or notice to Guarantors and that this Guaranty shall guarantee the performance of said Lease as so modified.

This Guaranty shall not be released, modified or affected by the failure or delay on the part of Lessor to enforce any of the rights or remedies of the Lessor under said Lease, whether pursuant to the terms thereof or at law or in equity.

No notice of default need be given to Guarantors, it being specifically agreed that the guarantee of the undersigned is a continuing guarantee under which Lessor may proceed immediately against Lessee and/or against Guarantors following any breach or default by Lessee or for the enforcement of any rights which Lessor may have as against Lessee under the terms of the Lease or at law or in equity.

Lessor shall have the right to proceed against Guarantors hereunder following any breach or default by Lessee without first proceeding against Lessee and without previous notice to or demand upon either Lessee or Guarantors.

Guarantors hereby waive (a) notice of acceptance of this Guaranty. (b) demand of payment, presentation and protest, (c) all right to assert or plead any statute of limitations relating to this Guaranty or the Lease, (d) any right to require the Lessor to proceed against the Lessee or any other Guarantor or any other person or entity liable to Lessor, (e) any right to require Lessor to apply to any default any security deposit or other security it may hold under the Lease, (f) any right to require Lessor to proceed under any other remedy Lessor may have before proceeding against Guarantors, (g) any right of subrogation.

Guarantors do hereby subrogate all existing or future indebtedness of Lessee to Guarantors to the obligations owed to Lessor under the Lease and this Guaranty.

If a Guarantor is married, such Guarantor expressly agrees that recourse may be had against his or her separate property for all of the obligations hereunder.

The obligations of Lessee under the Lease to execute and deliver estoppel statements and financial statements, as therein provided, shall be deemed to also require the Guarantors hereunder to do and provide the same.

The term "Lessor" refers to and means the Lessor named in the Lease and also Lessor's successors and assigns. So long as Lessor's interest in the Lease, the leased premises or the rents, issues and profits therefrom, are subject to any mortgage or deed of trust or assignment for security, no acquisition by Guarantors of the Lessor's interest shall affect the continuing obligation of Guarantors under this Guaranty which shall nevertheless continue in full force and effect for the benefit of the mortgagee, beneficiary, trustee or assignee under such mortgage, deed of trust or assignment and their successors and assigns.

The term "Lessee" refers to and means the Lessee named in the Lease and also Lessee's successors and assigns.

In the event any action be brought by said Lessor against Guarantors hereunder to enforce the obligation of Guarantors hereunder, the unsuccessful party in such action shall pay to the prevailing party therein a reasonable attorney's fee which shall be fixed by the court.

If this Form has been filled in, it has been prepared for submission to your attorney for his approval. No representation or

**AIR**

# ADDENDUM NO. 1

**Date:** August 29 21012

**By and Between (Lessor)** JTNA Enterprises LLC

**(Lessee)** Young Jea Park

**Address of Premises:** 18311A East Colima Rd, Rowland Heights Ca 91748

Attached to and made part of the lease dated January 1, 2008 is made and entered into by between JTNA Enterprises LLC, ( lessor ) and Joung Nam Oh assignor assigned to Young Jea Park( Lessee ). Lessor and Lessee entered into a lease agreement covering the premises commonly known as 18311A East Colima Rd, Rowland Heights Ca 91748.

Lessor and Lessee presently agree to abide by these conditions

Now, Thereafter, such lease shall be and hereby is amended as follows

1. Lessee name change- Young Jea Park is deleted from lease and replaced with Young Keun Park

All other terms of the lease shall remain the same

Executed By Lessee this ____29____ day of __August__ 2012

Lessee : Young Jea Park ;  Young Keun Park

BY: _____    BY: _____

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

10250 Constellation Blvd., Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled (*specify*): TRUSTEE'S MOTION FOR ENTRY OF AN ORDER:  (A) APPROVING SALE OF BUSINESS FREE AND CLEAR OF ALL LIENS OR INTERESTS; (B) APPROVING OVERBID PROCEDURES; (C) APPROVING THE ASSUMPTION AND ASSIGNMENT OF REAL PROPERTY LEASE; AND (D) GRANTING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF TIMOTHY J. YOO IN SUPPORT THEREOF be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1**. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) September 12, 2018, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On September 12, 2018, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒  Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on September 12, 2018, I served the following persons and/or entities by personal delivery, overnight mail service, or, (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

Via Attorney Service
The Honorable Sheri Bluebond
U.S. Bankruptcy Court
255 E. Temple St.
Los Angeles, CA 90012

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| September 12, 2018 | Jason Klassi | /s/ Jason Klassi |
|---|---|---|
| Date | Printed Name | Signature |

**2:18-bk-11469-BB Notice will be electronically mailed to:**

Joseph Caceres on behalf of Creditor Chris Kang LB Global, Inc.
jec@locs.com, generalbox@locs.com

Jaenam J Coe on behalf of Debtor RH BBQ, Inc
coelaw@gmail.com

Raffi Khatchadourian on behalf of Interested Party Courtesy NEF
raffi@hemar-rousso.com

Monica Y Kim on behalf of Interested Party Courtesy NEF
myk@lnbrb.com, myk@ecf.inforuptcy.com

Monica Y Kim on behalf of Trustee Timothy Yoo (TR)
myk@lnbrb.com, myk@ecf.inforuptcy.com

Andy Kong on behalf of Interested Party Courtesy NEF
Kong.Andy@ArentFox.com

Kenneth G Lau on behalf of U.S. Trustee United States Trustee (LA)
kenneth.g.lau@usdoj.gov

Dare Law on behalf of U.S. Trustee United States Trustee (LA)
dare.law@usdoj.gov

Elissa Miller on behalf of Interested Party Courtesy NEF
emiller@sulmeyerlaw.com,
asokolowski@sulmeyerlaw.com;emillersk@ecf.inforuptcy.com;dwalker@sulmeyerlaw.com

Lan Nguyen on behalf of Creditor Quentin Meats, Inc.
LPN@EsqConsulting.com

Scott H Noskin on behalf of Interested Party Courtesy NEF
snoskin@mbnlawyers.com, aacosta@mbnlawyers.com

Juliet Y Oh on behalf of Trustee Timothy Yoo (TR)
jyo@lnbrb.com, jyo@lnbrb.com

Aram Ordubegian on behalf of Interested Party Courtesy NEF
ordubegian.aram@arentfox.com

Carmela Pagay on behalf of Interested Party Courtesy NEF
ctp@lnbyb.com

Carmela Pagay on behalf of Trustee Timothy Yoo (TR)
ctp@lnbyb.com

Charles Shamash on behalf of Creditor Chris Kang LB Global, Inc.
cs@locs.com, generalbox@locs.com

Joon W Song on behalf of Creditor Bank of Hope, c/o The Song Law Group, APLC
jsong@thesonglawgroup.com

Annie Y Stoops on behalf of Interested Party Courtesy NEF

1    annie.stoops@arentfox.com

2    United States Trustee (LA)
ustpregion16.la.ecf@usdoj.gov

3

Timothy J Yoo on behalf of Interested Party Courtesy NEF

4    tjy@lnbyb.com

5    Timothy Yoo (TR)
tjytrustee@lnbyb.com, tyoo@ecf.epiqsystems.com;tjy@trustesolutions.net

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

RH BBQ
UST and 4 Claimants

*Debtor*
**RH BBQ, Inc**
18311 East Colima Road
Rowland Heights, CA 91748
LOS ANGELES-CA

*Trustee*
**Elissa Miller (TR)**
SulmeyerKupetz
333 S Hope St, 35th fl
Los Angeles, CA 9007

*U.S. Trustee*
**United States Trustee (LA)**
915 Wilshire Blvd, Suite 1850
Los Angeles, CA 90017

Kenneth G Lau
Office of the United States Trustee
915 Wilshire Blvd, Suite 1850
Los Angeles, CA 90017

**Dare Law**
Office of the United States Trustee
915 Wilshire Blvd.
Suite 1850
Los Angeles, CA 90017

Timberland Bank (Secured Creditor)
624 Simpson Avenue
Hoquiam, WA 98850

HANA SMALL BUSINESS LENDING Inc.
Howard Kim, AVP & Special Assets
Officer
1000 Wilshire Boulevard 20th Floor
Los Angeles, CA 90017

Quentin Meats, Inc. (Secured)
13044 Park Street
Santa Fe Springs, CA 90670

BBCN Bank
3731 Wilshire Blvd., Suite 400
Los Angeles, CA 90010

Bank of Hope (Successor to BBCN)
c/o Joon Song
The Song Law Group, APLC
145 S. Fairfax Ave., Suite 200
Los Angeles, CA 90036

Quentin Meats, Inc.
c/o Mirman, Bubman & Nahmias LLP
21860 Burbank Blvd., Suite 360
Woodland Hills, CA  91367

Timberland Bank
c/o Turnbull & Born, PLLC
950 Pacific Ave., Suite 1050
Tacoma, WA 98402

**Jaenam J Coe**
Law Offices of Jaenam Coe PC
3731 Wilshire Bl Ste 910
Los Angeles, CA 90010

Lan P. Nguyen
Esquire Consulting
1055 West 7th St., 33rd Floor
Los Angeles, CA 90017